SOCIALIST WORKERS PARTY, et al., Plaintiffs,

v.

The ATTORNEY GENERAL OF the UNITED STATES, et al., Defendants.

No. 73 Civ. 3160.

United States District Court, S.D. New York.

Aug. 25, 1986.

See also 375 F.Supp. 318.

---

Margaret Winter, New York City, for plaintiffs; Shelley Davis, Herbert Jordan, Randlett Walster, Donna-Maria Gilligan, Charles Brennan, of counsel.

Rudolph W. Giuliani, U.S. Atty., New York City, for defendants; Edward G. Williams, Peter C. Salerno, Cathy R. Silak, Asst. U.S. Attys., of counsel.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for amici curiae Nat. Emergency and Liberty Committee, Bill of Rights Foundation; Leonard B. Boudin, of counsel.

## TABLE OF CONTENTS

**Page**

I. Introduction ............................................................. 1362
II. Issues for Trial and Decision .................................. 1363
III. Summary of Rulings .............................................. 1364
IV. The Socialist Workers Party .................................. 1364
 A. Historical Background .................................... 1364
 B. Fourth International ....................................... 1366
 C. Organization of the SWP .............................. 1369
 D. Ideology of the SWP ..................................... 1369
 E. Does the SWP Espouse or Practice Violence? ... 1370
V. FBI's Investigation ................................................. 1375
 A. Original Presidential Authorizations ............. 1375
 B. Commencement of SWP Investigation
 —*Dunne* Case ............................................ 1376
 C. Types of FBI Activities .................................. 1377
 D. Informants
 —Special Master's Report .......................... 1377
 E. Disruption ..................................................... 1383
 1. Covert Disruption Activities ................... 1384
 2. Interviews and Interrogations ............... 1389
 F. Electronic Surveillance ................................. 1389
 G. Surreptitious Entries
 —"Bag Jobs" ........................................... 1393
 H. Security Index/ADEX .................................... 1395
 I. Loyalty-Security Program ............................. 1396
 J. Termination of FBI Investigation ................. 1400
VI. Issues Under the Federal Tort Claims Act ............. 1401
 A. List of Administrative Claims ...................... 1401
 B. Findings Regarding Timeliness of Administrative Claims ............. 1402
 1. Disruption Program ............................... 1404
 2. Surreptitious Entries ............................ 1407
 3. Informants ............................................ 1409
 4. Electronic Surveillance ......................... 1410
 5. Sell and Starsky ................................... 1410
 6. Jenness and Pulley ............................... 1411
 C. Legal Conclusions Regarding Timeliness of Administrative Claims 1411
 D. Waiting Period After Administrative Claims ... 1414
 E. Discretionary Function Defense .................... 1415
 F. Sufficiency of Administrative Claims ............ 1417

**1362**

G. Tort Liability and Damages........................................................ 1417
 1. Disruption .................................................................. 1417
 2. Surreptitious Entries .................................................... 1420
 3. Informants ................................................................ 1422
 4. Starsky .................................................................... 1423
VII. Claims for Declaratory and Injunctive Relief................................. 1425
 A. Basic Legal Rules ..................................................... 1425
 B. Investigations ......................................................... 1425
 1. FBI ................................................................. 1425
 2. CIA ................................................................. 1425
 3. Military Services ................................................. 1426
 4. Postal Service.................................................... 1426
 5. Internal Revenue Service....................................... 1427
 6. Secret Service.................................................... 1427
 C. Federal Employment.................................................. 1427
 D. Immigration Matters.................................................. 1428
 E. Statutes................................................................ 1430
 F. Files ................................................................... 1430
VIII. Conclusion................................................................... 1432

## OPINION

GRIESA, District Judge.

### I

### *Introduction*

This is an action brought by a political organization, the Socialist Workers Party ("SWP"), its youth arm, the Young Socialist Alliance ("YSA"), and certain members of the SWP. The action is against the United States of America and certain officials of the United States.

Plaintiffs are followers of the Trotskyist branch of Marxism. They contend that they have been improperly viewed by various Government agencies as threats to national security, and have been subjected to infiltration, disruption and harassment in violation of their legal rights. Plaintiffs seek declaratory and injunctive relief and damages.

The action was commenced on July 18, 1973. The time required for motions and pre-trial discovery was unusually protracted, in part because of the need to organize a selective sample production of the enormous files in the Federal Government relating to the SWP, the YSA and certain of their members. The discovery was complicated by difficult claims of governmental secrecy, requiring two interlocutory appel-

late proceedings. The following is a list of the prior reported decisions in this case. To the extent that the substance of these decisions is relevant, they will be discussed in the course of the present opinion.

*District Court*

387 F.Supp. 747 (1974)

458 F.Supp. 895 (1978)

458 F.Supp. 923 (1978)

463 F.Supp. 515 (1978)

*Court of Appeals*

510 F.2d 253 (1974)

565 F.2d 19 (1977)

596 F.2d 58 (1979)

*Supreme Court*

419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (denial of stay)

436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978) (cert. denied)

444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979) (cert. denied)

The original complaint, filed in July 1973, named as defendants various federal agency and department heads by official title (*e.g.*, Attorney General of the United States) and certain individuals. The United States was not named as a defendant in the original complaint. The original complaint was filed as a class action. A stipulation and order dated September 9, 1974 provided that the action would not be maintained as a class action.

An amended complaint was filed on May 12, 1976. Among other things, it included a claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq*. Plaintiffs filed a second amended complaint on October 8, 1976. As a result of the amendments to the pleadings and various other motions and stipulations, the list of the parties at the time of the trial was as follows:

*Plaintiffs*

Socialist Workers Party
Young Socialist Alliance
Jack Barnes
Barry Sheppard
Peter Camejo
Farrell Dobbs
Willie Mae Reid
Linda Jenness
Andrew Pulley
Norman Oliver
Evelyn Sell
Morris Starsky

*Defendants*

Attorney General of the United States
Secretary of the Treasury
Secretary of Defense
Postmaster General
Secretary of the Army
Director of the Federal Bureau Of Investigation
Director of Central Intelligence
Director of the Secret Service
Director of the Defense Intelligence Agency
Civil Service Commissioners
President of the United States
Commissioner of the Immigration and Naturalization Service
Secretary of State
United States of America

The defendants, other than the United States, are officials named by title. The individual defendants, originally named, were dismissed from the case either on motion or by consent.

The trial was held from April 2 to June 25, 1981 before the court without a jury. Voluminous briefs were thereafter filed. The briefing extended into the spring of 1983.

## II

### Issues for Trial and Decision

The following is a summary of the issues which remain for resolution as a result of the trial of this case and the post-trial briefing.

The bulk of the evidence at the trial and the discussion in the briefs related to plaintiffs' allegations of wrongdoing by the FBI and the Department of Justice. Plaintiffs' principal complaints are about four types of FBI activity—disruption, surreptitious entries or burglaries, use of informants, and electronic surveillance (telephone wiretaps and "bugs" in offices and dwellings). Plaintiffs also complain about two programs implemented by the Department of Justice and the FBI, the Security Index/ADEX program and the loyalty-security program for federal employees. In connection with the second program, the SWP was included in the so-called Attorney General's list (now terminated) as a subversive organization.

Damage claims are asserted by the SWP and YSA and also by four of the individual plaintiffs, Evelyn Sell, Morris Starsky, Linda Jenness and Andrew Pulley. For the purpose of discussing the claims, the SWP and YSA will be treated as a unit, and will be referred to as the SWP.

The SWP is seeking damages against the United States under the FTCA with respect to disruption, surreptitious entries, use of informants, and electronic surveillance. The SWP contends that these activities not only violated the Constitution, but also constituted common law torts giving right to recovery under the FTCA. The Government admits that these activities were carried out by the FBI against the SWP, but denies any liability under the FTCA. The Government contends that the SWP's claims are time-barred, that the claims relate to discretionary functions, and that no substantive right to recovery has been shown under the applicable tort law.

The four individual plaintiffs seek damages against the United States under the FTCA. Sell and Starsky claim that FBI activity caused the loss of their jobs. Jenness and Pulley claim that the Secret Service conducted improper surveillance at a YSA convention.

There are no damage claims outstanding in this case other than those described above. However, there are claims for declaratory and injunctive relief by all plaintiffs against all the officials named as defendants. Plaintiffs seek a declaration of illegality and a prohibition against:

(1) Investigation of the SWP.

(2) Disruption of the SWP.

(3) Adverse actions against SWP members who are federal employees or applicants for federal employment.

(4) Adverse actions against SWP members under the immigration and visa laws.

(5) Maintenance of files on the political activities of the SWP. This request is made not only under the general equitable power of the court but also under the Privacy Act, 5 U.S.C. § 552a.

Plaintiffs also seek a declaration that it would be unconstitutional to hold its activities to be in violation of various federal statutes.

The Government objects to all of the requests for declaratory and injunctive relief, principally on the ground that there is no showing of present or threatened future conduct that would warrant such relief. Additional objections are made to the claim under the Privacy Act.

### III

### Summary of Rulings

The SWP is entitled to an award of damages under the FTCA against the United States for the FBI's disruption activities, surreptitious entries and use of informants. As to these claims, the SWP complied with the procedural requirements of the FTCA. Also, since these activities were violations of the constitutional rights of the SWP and lacked legislative or regulatory authority,

they were not discretionary functions within the meaning of the FTCA exception. Finally, the SWP has a right to recover damages under applicable tort law.

The SWP is awarded damages in the amount of $42,500 relating to disruption activities, $96,500 for the surreptitious entries, and $125,000 for the use of informants, or a total of $264,000.

The SWP's damage claim for electronic surveillance is dismissed for failure to comply with the procedural requirements of the FTCA.

The damage claims of Sell, Starsky, Jenness and Pulley are dismissed.

With one exception, the requests for declaratory and injunctive relief are denied because there is no present or threatened activity which warrants such a remedy. The exception is that the SWP is entitled to an injunction limiting the use of certain records illegally obtained by the Government. This will be granted under the general equitable power of the court and not under the Privacy Act.

The claims under the Privacy Act are dismissed.

### IV

### The Socialist Workers Party

IV.A. *Historical Background*

The SWP is dedicated to the doctrines of Karl Marx, V.I. Lenin and Leon Trotsky. A major issue in the present case is whether the FBI and certain other agencies of the Federal Government could reasonably believe that the SWP presented a threat of revolutionary or subversive activity against the governmental structure of the United States so that certain investigative techniques and other measures vis-à-vis these organizations and their members were justified.

In order to shed light on this issue, the parties introduced evidence about certain aspects of the development of Marxism and Trotskyism.

In the early 1860's the First International, also known as the International Workingman's Association, was formed under the leadership of Karl Marx and Friedrich Engels. It drew its membership from various Western European countries. The purpose of the First International was to promote the cooperation of working class political movements in various countries.

After the Paris Commune of 1871, a group within the First International embarked on a terrorist campaign. At the 1874 Congress of the First International this group was expelled and the International disassociated itself from the group's actions and statements. To prevent the terrorist faction from gaining control of the International, the headquarters of the International was moved from Europe to New York. The First International was dissolved in the 1870's.

The Second International, also known as the Labor and Socialist International, was formed in the late 1880's. By this time, trade union and working class political parties had developed in England, France and other countries of Western Europe. The Second International was an attempt to unite these parties. However, the Second International was terminated shortly before World War I.

The next relevant event was the Russian Revolution of 1917. At the trial of this action, both plaintiffs and defendants called historians to testify about this pivotal development.

Lenin, of course, was the key figure in the ultimate seizure of power by the Bolshevik faction. Trotsky worked closely with Lenin and became the foreign minister in the new government. The events of the revolution have a substantial bearing on the meaning of Trotskyism, since they carry us beyond mere theory and show what Trotsky and his mentor, Lenin, actually did in carrying out a revolution and forming a government.

In February 1917 the Czar was overthrown. This led to the formation of a provisional government. At the same time in many parts of the country some degree of political power came to be exercised by assemblies called "Soviets." The two major Soviets were in Moscow and Petrograd. By the fall of 1917 the Bolsheviks, a left-wing Marxist party led by Lenin, made up approximately half the membership of these two Soviets. Trotsky was the leader of the Petrograd Soviet. In terms of the overall picture of Russian political parties, the Bolsheviks were decidedly a minority. Nevertheless, in November the Bolsheviks in the Petrograd Soviet carried out a military takeover in Petrograd. The Bolsheviks stormed the Winter Palace, then the seat of the provisional government, and arrested the leaders of that government.

The Bolsheviks thereupon set themselves up as the purported government for the entire country. Lenin assumed the title of Chairman of the Soviet People's Commissars. Trotsky became foreign minister. Stalin was also given a position of power.

The Bolsheviks' seizure of power was accomplished with the assistance of the left wing of another party, the Socialist Revolutionary Party. The Bolsheviks and their left-wing allies were a minority group in the country.

The provisional government had set in motion the machinery for electing a constituent assembly, which was to form a permanent government. The elections to form the constituent assembly were held in November 1917, although the voting took a very long time and was not completed by the end of that month. The Bolsheviks received only 25% of the vote. The Socialist Revolutionary Party received 52% of the vote. Other parties received the balance. The constituent assembly met for one day in January 1918. During that day the assembly passed resolutions which condemned the activities of the Bolsheviks in taking power by military force and Lenin's plans for a government. The response of the Bolsheviks was simply to disband the constituent assembly by force.

The historical record is clear that following the fall of the Czar machinery was set up to establish a parliamentary govern-

ment based upon elections and freely competing political parties. The ideology and policy of Lenin, Trotsky and their Bolshevik party, were wholly antithetical to any concept of a free political process and a democratically elected government. They destroyed the organs which had been set up to establish such a government and installed themselves in power by military force. Their government, while using much of the terminology of parliamentary democracy, was in reality a totalitarian dictatorship.

In 1919 the Third International was formed. The purpose of the Third International was to spread Marxism world-wide through revolution, and it specifically repudiated the idea (which had been held by one element of the Second International) that a socialist society could be created through gradual reform of the capitalist system.

Lenin died in 1924. Shortly thereafter Stalin gained complete control over both the government of the Soviet Union and the Third International.

It was in connection with these events that the famous conflict between Stalin and Trotsky became acute. Stalin's announced position was that the struggle to establish socialism world-wide would be subordinated to the interests of strengthening the Soviet Union. Trotsky, on the other hand, advocated the view that socialism could not be promoted in one country alone and that, if the socialist revolution did not occur on an international scale, the forces of capitalism would defeat socialism even in the Soviet Union.

In 1927 Trotsky was expelled from the Communist Party in the Soviet Union. In 1929 he was exiled from the Soviet Union.

This controversy resulted in a split in the international socialist movement. By the time of Trotsky's ouster, Communist parties had grown up in various countries, including the United States, many of which were affiliated with the Third International. In 1928 the followers of Trotsky were expelled from the Communist Party of the United States. The expelled group founded the Communist League of America and

began publishing a newspaper called *The Militant.*

In 1934 the Communist League merged with a group called the American Workers Party, which in 1936 merged with the Socialist Party. However, this merger was not successful. The Socialist Party believed in a "reformist" ideology—that a socialist society could be attained gradually through the reform of capitalism.

In 1936 the Socialist Party expelled the former Communist League members. In 1938 the Communist League formed the Socialist Workers Party, which has continued to the present day. The leader of the SWP at this time was James Cannon, who was elected the first National Secretary.

The youth arm of the SWP—the Young Socialist Alliance—started holding meetings in 1957 and the organization was officially founded in 1960.

IV.B. *Fourth International*

Cannon was also instrumental in starting the Fourth International, the affiliates of which were Trotskyist parties in various countries. The first congress of the Fourth International was held in Paris in September 1938. The avowed purpose of the Fourth International was to promote the spread of socialist revolution on a world-wide scale in accordance with the doctrines of Lenin and Trotsky.

The 1938 congress adopted a program drafted mainly by Trotsky himself, called the "Transitional Program." The congress also elected a 15–member body known as the International Executive Committee ("IEC"), which was to guide the affairs of the International between congresses. Three members of the SWP were elected to the IEC—James Cannon, Max Schachtman and Karl Skoglund. Trotsky was also elected to the IEC.

The activities of the Fourth International were greatly hampered by World War II. However, a congress was held in New York in 1940, attended by delegates from a number of countries. During the war the head-

quarters of the Fourth International was in New York.

In 1940 Congress passed the Voorhis Act, 18 U.S.C. § 2386. This statute provides that an organization "subject to foreign control which engages in political activity" must register with the Attorney General and must submit a considerable amount of information, including the names and addresses of members and contributors. According to the statute, an organization is "subject to foreign control" if it is affiliated directly or indirectly with a foreign government or "an international political organization." In order to avoid registration under the Voorhis Act, the SWP withdrew as a formal member of the Fourth International. However, the SWP continued to participate in Fourth International activities as a "consultative member" or "sympathizing section." The evidence shows that this change made almost no practical difference. The SWP remained an important factor and a very active participant in the Fourth International. It should be noted that the United States Government has been fully aware of this, and has taken no steps to enforce the Voorhis Act against the SWP.

In 1946 the headquarters of the Fourth International was moved back to Europe. A new IEC was elected which included three members of the SWP.

World Congresses of the Fourth International are held every three to five years. The World Congress elects the International Executive Committee. This committee meets about once a year. It elects a smaller body called the United Secretariat, which meets every one to two months. Another body, known as the Bureau, meets weekly.

The SWP has, over the years, participated actively in each of the bodies just referred to. The SWP has always had at least one of its leaders stationed, more or less regularly, in Europe. Commencing in 1963 these persons have been:

| | |
|---|---|
| Joseph Hansen | 1963–65 |
| Ray Sparrow | 1965–68 |
| Barry Sheppard | 1969–70 |
| Jack Barnes and Mary Alice Waters | Early 1970's |
| Barry Sheppard | 1977–80 |
| Doug Jenness | 1980 to time of trial. |

The history of the Fourth International from 1946 to 1969 is of no particular relevance to the present case, except for one incident. Evidence was presented about a factional dispute which occurred during the years 1953–1963. Plaintiffs argue that what occurred supports .the view that the SWP has policies which are to some extent independent of the Fourth International. During this time a majority faction in the Fourth International took the position that World War III would break out in the 1950's, and that at this juncture a reformed Stalinism would assume the leadership of a world-wide Marxist revolutionary movement. This faction advocated the unification of Trotskyist parties with Stalinist Communism. A minority in the Fourth International, including the SWP, and the British and French Trotskyist parties, opposed any reconciliation with the Communist parties. The dispute was resolved in 1963, when the Fourth International officially repudiated the idea of reconciling with Stalinist Communism.

In 1969, another major dispute of considerable relevance to this case arose within the Fourth International. A majority of the delegates of the Ninth World Congress, held that year, supported the position that guerilla warfare was an appropriate tactic to be used by Trotskyist groups against Latin American governments deemed to be dictatorships. This majority faction took the view that guerilla warfare would become the dominant form of struggle against capitalism. This faction became known as the International Majority Tendency ("IMT"). The Ninth World Congress adopted a resolution on Latin America, stating:

[T]he only realistic perspective for Latin America is that of an armed struggle which may last for long years. . . . Even in the case of countries where large mobilizations and class conflicts in the cities

may occur first, civil war will take manifold forms of armed struggle, in which the principal axis for a whole period will be rural guerilla warfare....

\* \* \* \* \* \*

Take advantage of every opportunity not only to increase the number of rural guerilla nuclei but also to promote forms of armed struggle specially adapted to certain zones (for example, the mining zones in Bolivia) and to undertake actions in the big cities aimed both at striking the nerve centers (key points in the economy and transport, etc.) and at punishing the hangmen of the regime as well as achieving propagandistic and psychological successes....

It should be noted that a statement written by seven leaders of the IMT in May, 1972 *opposed* guerilla warfare in many countries, including Canada, the United States, France and West Germany, given the circumstances as they then existed. The authors of this statement were Alan Kravine and Herbert Kravine of France, Tariq Ali of Great Britain, Livio Maitan of Italy, Pat Jordan of Great Britain, Pierre Frank of France and Ernst Mandel of Belgium. But they did not dissent from the idea that guerilla warfare should be promoted at that time in Latin America, and would ultimately be a revolutionary device everywhere.

A minority faction of the Ninth World Congress opposed the IMT resolution on Latin America. This faction took the position that the class struggle should take place in urban areas through mass organization of workers, not through guerilla warfare or acts of terrorism. The SWP was part of this minority. The minority conceded that guerilla warfare was a subsidiary tactic that had been successfully used in certain circumstances, but argued that pursuing guerilla warfare on a large scale for an extended period would not facilitate the working class movement, but rather would lead to the political downfall of the organizations that attempted it. The minority group became known as the Leninist/Trotskyist Faction.

The minority group did not oppose guerilla warfare in all circumstances. A report written by Joseph Hansen, an SWP leader, in a July 1970 Fourth International publication stated:

> To prevent being misunderstood, let me recall the position taken by the minority at the World Congress. The minority did not reject guerilla warfare per se. On the contrary it recognized that under certain circumstances engagement in guerilla warfare can prove advantageous.

The Tenth World Congress of the Fourth International in 1974 reaffirmed support of immediate use of guerilla warfare in Latin America. A minority, including the SWP, remained opposed.

The controversy in the Fourth International about guerilla warfare was reflected in the activities of the SWP in the United States. The majority of the SWP was against the views of the IMT and in favor of the Leninist/Trotskyist Faction. However, approximately 5–7% of SWP members were supportive of the IMT. They formed a faction within the SWP known as the International Tendency ("IT"). The leaders of the IT were John Barzman and Bill Massey. In the summer of 1974 it was discovered that the IT was holding its own meetings, making decisions on various actions without informing the party, and publishing its own internal bulletin. The members of the IT were expelled from the SWP.

A discussion of certain terrorist activities in Latin America, occurring during the time of the espousal of guerilla warfare by the Fourth International, will be found in section IV.E of this opinion.

The pro-guerilla war faction of the Fourth International (the IMT) began to withdraw from its position in 1976. In 1977 the IMT published a repudiation of the position. At the 1979 World Congress there was an agreement to rescind all documents regarding Latin American guerilla warfare passed at the 1969 and 1974 congresses.

At the time of trial of this action the Fourth International considered itself to be

a reasonably unified and functioning organization made up of approximately 50 national sections.

### IV.C. *Organization of the SWP*

The headquarters of the SWP is in New York City. It has branches in various cities throughout the country. As of 1981 the SWP had a membership nationwide of 1,250. The annual budget of the SWP is about $1.5 million.

The highest authority of the SWP is the National Convention, consisting of delegates from the branches. A National Committee is elected by the National Convention and meets two to four times per year. A Political Committee is selected by the National Committee and meets at least weekly. The person who acts as a continuing chief executive of the SWP is the National Secretary. From 1938 to 1953 this office was held by James Cannon; from 1953 to 1972 by Farrell Dobbs; and from 1972 to the time of trial by Jack Barnes.

The SWP, through its local branches, its national committees, and its national convention, carries on a continual course of discussion and debate about official ideological positions. All of this is the subject of prolific writings within the party, particularly in the party's weekly newspaper, *The Militant*, which is available to the public.

The YSA is the youth arm of the SWP. The upper age limit is 29. As of 1981 the YSA had about 500–600 members. About 55% of these were also members of the SWP. The YSA has its headquarters in New York City, and has branches in various other cities.

### IV.D. *Ideology of the SWP*

The SWP subscribes to the political and economic doctrines of Marx and Lenin, as further articulated by Trotsky. The SWP is part of what is known as the Trotskyist movement.

The stated goal of the SWP since its founding has been "the abolition of capitalism through the establishment of a Workers and Farmers Republic." *Article II of the SWP Constitution.*

The SWP believes that the main feature of history is class conflict—the conflict between the workers and the capitalists—and that this conflict will ultimately end with the working class becoming the ruling class.

The SWP believes in the abolition of private ownership of industry, merchandising, finance, and farm production. The SWP would not abolish private ownership of "small" businesses and farms, or of personal property such as homes and automobiles.

The SWP leaders testified at the trial of this action that Trotskyists in general—and the SWP in particular—believe that the government and the economy should be administered democratically. The Marxist concept of the "dictatorship of the proletariat" is explained by them as being essentially democratic if properly carried out. The theory is that at the present time countries such as the United States are called democracies, but in reality they are dictatorships in which a small capitalist minority exercises absolute rule over the working masses. In the dictatorship of the proletariat, this situation would be reversed. The working class majority would hold power over the former capitalist minority. Admittedly, as Lenin has written, the capitalists—the "exploiters"—would need to be forcibly suppressed. Lenin, *Thesis and Report on Bourgeois Democracy and the Dictatorship of the Proletariat,* in Vol. 28 Collected Works 464–65. But this suppression would be desirable, according to Marxist theory, since the "masses" would be doing it, and the capitalist class only refers to 1 or 2% of the population.

The SWP leaders testified at length to the effect that, except for suppressing the 1 or 2%, they believe in democratically elected instruments of government. These would be popularly elected local soviets or workers' councils, which would choose the central soviet. According to this testimony, the SWP advocates freedom to form political parties, and basic individual rights

and freedoms such as freedom of speech and religion and due process of law.

The SWP and other Trotskyists state that they are sharply at odds with the manner in which Marxism has developed in the Soviet Union. The SWP leaders testified that Trotskyists support the nationalized property forms in that country, but oppose the totalitarian political regime. Trotskyists argue that the undesirable features of Soviet government are largely the fault of Stalin, Trotsky's rival. However, realizing that the establishment of the totalitarian state and the suppression of democracy occurred under Lenin, with the assistance of Trotsky, the Trotskyists contend that the anti-democratic developments were forced upon the regime by the civil war which broke out in 1918. Professor Stephen Cohen of Princeton testified at the trial and advanced this view.

As indicated earlier in this opinion, the issue before the court is not the making of some ultimate historical judgment, but the determination of whether the FBI and other organs of our Government could reasonably believe that the SWP has a revolutionary ideology whose goal is the violent overthrow of our democratic processes and form of government. Addressing this issue, it is safe to say that it would be reasonable for our Government to take the view that Lenin and Trotsky installed a totalitarian government in the Soviet Union *not* because the civil war of 1918 blighted a budding Leninist/Trotskyist democracy, but because the fundamental beliefs and policies of Lenin and Trotsky denied democracy and advocated totalitarian rule imposed by military force and terror.

The FBI and other organs of our Government need not blind themselves to the historical record of the Trotskyist movement's founder in considering the nature of that movement and its ultimate goals. However, it must also be recognized that the situation of Trotskyist parties in the world today is vastly different from the situation of the Bolsheviks in the Russia of 1917–18. The Bolsheviks, although a minority, had the ability to seize power and form a government. Since that time other communist governments have come to power, and have followed the grim pattern of abrogating freedom and democratic processes (and, it must be said, not for 1 or 2% of the population, but for almost everyone except the governing elite). However, nowhere in the world is there a government established by a Trotskyist party. Nowhere in the world, and certainly not in the United States, is there a Trotskyist party which even approaches having the ability to seize power. Thus the question of what kind of society a Trotskyist party such as the SWP wishes to create is currently one of belief not of practice.

However, even the smallest political parties and groups are capable of posing a threat to an ordered society if they are bent on revolutionary violence or terrorism. At the trial of this action, considerable evidence was presented on the issue of whether the SWP falls into this category.

IV.E. *Does the SWP Espouse or Practice Violence?*

The evidence at the trial related to both aspects of the above question. Does the SWP espouse violence as part of its ideology? Does the SWP practice violence?

At the trial of this action the SWP took the following position, as elaborated in the testimony of the SWP leaders. The SWP is in favor of revolution, but this simply means a transformation of society such as the Industrial Revolution. The revolution comes about through a historical process, and takes place when the capitalist system has exhausted itself. The revolution cannot be brought about by a putsch or coup, or the action of a minority, but only by the majority—broad mass action. The SWP believes in using the electoral process in this country to have the workers gain control of the government, and then amending the Constitution to carry out the nationalization of property required by their economic program. A most important part of the doctrinal presentation at the trial was the concept that the SWP would not take the initiative in using violence, but that

undoubtedly the capitalist class would use violence to prevent change—*i.e.*, would not allow the democratic process to run its course. The workers would then resort to armed force to *defend* themselves.

Aside from the question of whether the SWP advocates violent revolution is the related but somewhat different question of whether the SWP advocates individual acts of terrorism outside of the context of mass revolution.

As to the first point—the SWP's alleged belief in peaceful revolution of the Industrial Revolution type—one would be naive indeed to accept this as the doctrine of Marx/Lenin/Trotsky. In the first place, there is no doubt about the fact that Lenin advocated violent revolution.

> The replacement of the bourgeois by the proletarian state is impossible without a violent revolution. . . .

Lenin, *The State and Revolution*, quoted in *Handbook of Marxism* p. 739.

> The proletarian revolution is impossible without a forcible destruction of the bourgeois state machine.

Lenin, *Selected Works*, Vol. VII, p. 124.

At its founding convention in 1938, the SWP adopted the following resolution, which was reaffirmed at the Third National Convention in 1940.

> The Socialist Workers Party is a revolutionary Marxian party, based on a definite program, whose aim is the organization of the working class in the struggle for power and the transformation of the existing social order.

In the summer of 1979 the SWP leadership approved a document entitled "Socialism and Democracy." It stated in part:

> The fundamental difference between reformists and centrists of all varieties, and revolutionary Marxists, regarding the need for a socialist revolution, the conquest of state power by the workers, the nature of the proletarian state, and the meaning of the dictatorship of the proletariat consists of:
>
> \* \* \* \* \* \*

3. The recognition by revolutionary Marxists that the state apparatus and state institutions of even the most democratic bourgeois state serve to uphold the power and rule of the capitalist class, i.e., represent a social dictatorship of the capitalist class, and therefore cannot be instruments with which to overthrow that rule and transfer power from the capitalist class to the working class.

4. The recognition by revolutionary Marxists that the destruction of the bourgeois state apparatus . . . is a necessary prerequisite for the conquest of state power by the working class.

An SWP leader, James Cannon, wrote in *The Militant* in 1974:

> . . . we exploit the cracks and crevices in the bourgeois-democratic system without paying the slightest respect to it.

The SWP has referred to itself as a "combat Trotskyist party." In a speech in 1970 Farrell Dobbs, an SWP leader, stated:

> All this will be possible provided there is a combat party capable of giving revolutionary leadership, and to fulfill that role the party must be politically cohesive and organizationally disciplined.

In a 1970 article entitled "The New Radicalization and The Revolutionary Party," SWP leader Jack Barnes wrote:

> The very combat strength of the class enemy and its willingness to engage in combat defines the revolutionary party as a combat party. . . . By combat we do not mean only the insurrection that occurs at the height of the revolution.

Both Dobbs and Barnes were questioned at the trial about what they meant by "combat party." Both denied that they used the term in any sense that related to military or other violent combat. But it is difficult to credit this and other attempts to explain away plain language.

An interesting insight into the SWP's alleged disavowal of violent revolution is presented by the position taken by James Cannon, who was a defendant in the trial of the SWP leaders under the Smith Act in 1941. Cannon testified at that trial to the same effect as did the SWP witnesses in

the present case—that the SWP does not believe in violent revolution; that it believes in using the electoral processes to gain power; and that it would use armed force only if the capitalist classes used such force first. Cannon testified that, if the process were not disrupted by fascist methods on the part of the government, he saw no reason why socialism could not secure a victory by the democratic processes all the way to the final amendment of the Constitution. Cannon's testimony at the Smith Act trial was criticised by a Spanish Trotskyist named Munis for repudiating true Marxist/Leninist revolutionary doctrine. Cannon published a response, and said of his testimony:

> That is all any Marxist really needs to say on the question of violence in a capitalist court or at a propaganda meeting for workers at the present time in the United States. It tells the truth, conforms to principle, and protects the legal position of the party. The workers will understand it too. To quote Shakespeare's Mercutio: " 'Tis not so deep as a well, nor so wide as a church-door; but 'tis enough, 'twill serve."

Cannon also wrote:

> It is possible that others may regard our formulation as lacking in aggressiveness and militancy but, being more indulgent than Munis, pass it off as a legal euphemism, justifiable under the circumstances. To be sure, our formulation helped our position from a legal standpoint and we did not hesitate to emphasize it in this respect. Also, in our opinion, the declaration that we, the Trotskyists, prefer a peaceful change of society, is a good propaganda approach to the democratic-minded American workers. These two considerations are very important, but we are quite ready to agree that they would not justify the use of a false or hypocritical statement, or a statement contradicting principle.

With regard to the position that the SWP would use violence only to *defend* against activities of the capitalist class, Cannon stated:

The most effective mass action of the strikers, as every experienced organizer of mass actions knows, is organized and carried out under *defensive slogans.*

Matters are no different when the workers' mass action ascends from the elementary field of the economic strike to the topmost peak of the class struggle—the open fight for political power. Here also the action proceeds under defensive slogans and, to a very large extent, also under cover of legality.... That is the way the Great Russian Revolution was organized and carried through to victory.

\*　　\*　　\*　　\*　　\*　　\*

Naturally, being Bolsheviks, their "defense" had nothing in common with the policy of folded arms. They were prepared for eventualities but they never gave up the advantage of "seeming on the defensive." (emphasis in original.)

Cannon's 1941 trial testimony, the criticism of it, and Cannon's response (including the above passages) are all included in a book called "Socialism on Trial" and a pamphlet called "Defense Policy in the Minneapolis Trial." This book and pamphlet are currently used for educational purposes within the party.

Over the years various SWP leaders have made statements espousing violence. In 1968 an Atlanta radio station recorded a speech given by Paul Boutelle, the SWP candidate for Vice President.

... if I go to Vietnam it will only be for the purpose of studying the tactics of the National Liberation Front and then, if necessary, use them against my enemy right here in this country.

\*　　\*　　\*　　\*　　\*　　\*

And more black youth are being drafted; they say go to Vietnam and fight against the Viet Cong. You know that Malcolm said "if they teach me how to fire a gun, I won't have to go over there to find somebody to shoot." We do not advocate violence but we do not believe in nonviolence, and black people if they got to get violent it should not be in Korea

and Vietnam, it should be against the man right here in this country, and if America don't come around, as Rap Brown said, it should be burned down to the damned ground, it should not exist to see 1980. So this is the view of the Socialist Workers Party; we're Revolutionaries, we advocate a Socialist Revolution in America by any means necessary.

SWP leader Andrew Pulley made several statements in 1969 in a speech and at an anti-Vietnam War conference to the effect that

... the first thing to be done was to get the GI's to demonstrate peacefully and the ideal thing would be for them to take up their guns and shoot their officers.

On another occasion Pulley stated that

... GI's are not ready to take up arms against their officers or to overthrow capitalism although this is the long-term perspective.

In his testimony at the trial Pulley denied making the statements about soldiers shooting officers. The court does not credit this denial.

It is apparent that the SWP has not deserted the theory and example of Lenin and Trotsky favoring ultimate violent revolution. A broad survey of the writings of SWP leaders reveals without question that they look to the violent revolution of the Bolsheviks in Russia as a model, and that they contemplate the "capitalist classes" as an enemy, against which they would revolt, if they had the power. Of course, they do not have the power to carry out such a revolution. This brings us to the question of whether the SWP advocates terrorism as a kind of substitute for actual revolution or as an interim step leading to such a revolution.

At the trial, the SWP leaders testified that terrorism is totally contrary to the doctrine of their party, since it distracts attention and efforts from the development of a mass movement, and also subjects the militants to police action and loss of life. The evidence supports the view that Trotsky was opposed to terrorism and that the SWP accepts and follows this teaching.

An article on the subject by Trotsky appears in a pamphlet entitled "Leon Trotsky Against Individual Terrorism," which is distributed by the SWP to its members. The article states in part:

Whether a terrorist attempt, even a "successful" one, throws the ruling class into confusion depends on the concrete political circumstances. In any case the confusion can only be short-lived; the capitalist state does not base itself on government ministers and cannot be eliminated with them. The classes it serves will always find new people; the mechanism remains intact and continues to function.

\* \* \* \* \* \*

The anarchist prophets of "the propaganda of the deed" can argue all they want about the elevating and stimulating influence of terrorist acts on the masses. Theoretical considerations and political experience prove otherwise. The more "effective" the terrorist acts, the greater their impact, the more the attention of the masses is focused on them—the more they reduce the interest of the masses in self-organization and self-education.

In 1972 the SWP criticised the attack on Israeli athletes in Munich by the "Black September"—a Palestinian group. The SWP, which sympathizes with the Palestinians, issued a statement that such terrorist tactics are "ineffective and in fact harmful to the Palestinian struggle." In 1974 SWP leader Mary Alice Waters wrote a report denouncing the assassination of Spanish Prime Minister Carrero Blanco by terrorists.

Although the SWP has consistently opposed terrorism, it has remained affiliated through the Fourth International with other Trotskyist groups that have both advocated and practiced terrorism. It will be recalled that the 1969 World Congress of the Fourth International approved the concept of guerilla warfare in Latin America. *See* section IV.B *supra*. The SWP dissented. Still, the SWP retained its fraternal bond with the International and its member

groups. Consequently it is appropriate to set forth some of the deeds of the other sections of the International.

It appears that the French section of the Fourth International, the Parti Communiste Internationaliste (PCI), and a closely allied youth group, Jeunesse Communiste Revolutionnaire, were prominent in the violent student riots in France in 1968. The French government banned both organizations in 1968. As a result, the headquarters of the Fourth International was moved from Paris to Brussels.

In Argentina there was a Trotskyist group known as the Revolutionary Workers Party (PRT). In 1968 the PRT split into two sections, the majority led by Santucho, and the minority led by Moreno. Santucho's group was called the PRT Combatiente. At the 1969 World Congress of the Fourth International, Santucho's group was recognized as a member section, and Moreno's as a sympathizing section. In 1970 Santucho's group formed the Argentine Revolutionary Army of the People (ERP), intended to be a guerilla group.

In 1972 an Argentine industrialist named Sallustro was kidnapped and later murdered by the ERP. Santucho made a statement that actions such as the Sallustro matter fell within the policy endorsed by the Fourth International in 1969.

An expert witness for the Government in this action testified that the following additional acts were committed by the ERP:

—the kidnapping of Stanley Sylvester, a business executive, in May 1971;

—the assassination of General Juan Carlos Sanchez, in April 1972;

—the attack on two Ford Motor Company executives, one of whom died from wounds received, in May 1973;

—the kidnapping of John Thompson, director of Firestone operations in Argentina, in June 1973;

—the assassination of John Albert Swift, director of a Ford subsidiary, in November 1973.

In an article dated March 31, 1971, Livio Maitan, a leader of the Fourth International from Italy, evaluated the activities of the ERP up until that time. The article was written after numerous violent acts had already been committed by the ERP. It states:

The strategic perspective and the line that it is following in carrying out these objectives is the one laid down at the Ninth Congress of the Fourth International.

On March 22, 1971 a declaration on Argentina was issued by the United Secretariat of the Fourth International. It states:

United Secretariat sends its warmest greetings to the PRT Revolutionary Workers Party, Argentine section of the Fourth International, which through the audacious actions of the Revolutionary People's Army, ERP, has established itself in the front ranks of the organizations which support armed struggle and which conduct the struggle within the framework of large mass mobilization.

After the Sallustro kidnapping, the SWP issued statements to the effect that the Fourth International was in solidarity with the courageous militants in Argentina, but that the militants were on a "mistaken course."

The British section of the Fourth International, the International Marxist Group (IMG), endorsed the terrorist activities of the Irish Republican Army in the early 1970's. Indeed the IMG gave its support to a small and exceptionally violent "Marxist commando group," the SAOR Eire, which was headed by Gery Lawless, a member of the IMG. It should be noted that an SWP member, Gerry Foley, wrote an article in 1973 analyzing this situation and condemning the IMG's support for the SAOR Eire.

At the outset of this section of the opinion, the questions were posed:

Does the SWP espouse violence as part of its ideology?

Does the SWP practice violence?

The SWP, in accordance with Leninist/Trotskyist doctrine and historical example, must be considered to embrace violent revolution as an ultimate goal. However,

the SWP realizes that it has no power under current circumstances to carry out such a revolution. The SWP will use the available devices, such as elections, to accomplish what it can towards spreading its theories and transforming society. On the other hand, the devotion to ultimate revolution does mean that the SWP has an ideology which is basically antithetical to the political system and democratic processes of this country. This is epitomized by the statement of James Cannon, quoted earlier, that "we exploit the cracks and crevices in the bourgeois-democratic system without paying the slightest respect to it." As to the question of terrorism, as distinct from ultimate revolution, the SWP and its leaders have consistently taken strong positions opposing terrorism, citing Trotsky's condemnation of this type of activity. For a time, as described, a minority in the SWP subscribed to the Fourth International espousal of guerilla warfare in Latin America, but this minority group was expelled from the SWP.

As to whether the SWP practices violence, the evidence in this action compels a finding that it does not. The FBI conducted an intensive investigation of the SWP for over 30 years. There was not one single prosecution of any member of the SWP or YSA for any terrorist or revolutionary act of any kind. No evidence was introduced at the trial that any SWP or YSA member ever carried on any such activities. It is of interest to contrast this record with that of other groups which have committed numerous acts of violence and destruction in recent times in the United States, particularly during the late 1960's and early 1970's. Despite some occasional inflammatory rhetoric, there is no evidence that the SWP, the YSA or their members were involved in any such acts.

The evidence does show in considerable detail the nature of the SWP's actual, lawful activities over the years. One type of activity, which occupied a great amount of time and effort in the various meetings and assemblies of the SWP, was discussion and debate on various aspects of Marxist theory. This included Marxist economic and social theory, the Marxist view of history, particularly as applied to contemporary events, and other theoretical and doctrinal points. The SWP also devoted great time and effort to discussing various causes outside the strict confines of its own party concerns, such as opposition to the Vietnam War, and support for agricultural workers in California and for the civil rights movement. The SWP sought to ally itself with various groups promoting these causes and to participate in related public events. Also, the SWP devoted considerable effort to internal matters such as personnel, organization and fund raising. All of the above are unquestionably lawful political activities, which a group such as the SWP has a clear constitutional right to carry out. *See Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 88, 103 S.Ct. 416, 418, 74 L.Ed.2d 250 (1982). Further findings to this effect are set forth in section V.D. of this opinion.

On the other hand, it should be noted that the full picture of the SWP must include the fact that, through the Fourth International, it is in fraternal association with groups from other countries that have supported and even carried out acts of terrorism and guerilla warfare. The SWP has consistently dissented from this. However, the SWP and particularly certain of its leaders have remained closely connected to and active in the International.

## V

*FBI's Investigation*

V.A. *Original Presidential Authorizations*

As far as the evidence in this case is concerned, the history relating to the FBI's investigation of the SWP starts with a series of directives issued by President Roosevelt to J. Edgar Hoover, Director of the FBI. Roosevelt met with Hoover on August 24, 1936, and this meeting was recorded in a memorandum written by Hoover. According to the memorandum, Roosevelt "was desirous of discussing the question of the subversive activities in the

United States, particularly fascism and communism." The President wished to have an investigation which would obtain "a broad picture of the general movement and its activities as may affect the economic and political life of the country as a whole."

Due to the then existing system for appropriation of funds, it was arranged to have the President instruct the Secretary of State to have the investigation carried out. The Secretary of State made a request for the investigation to the Attorney General, who gave directions to the Director of the FBI. These steps were completed by September 1, 1936.

On September 6, 1939 President Roosevelt issued a public directive announcing that the FBI was the agency of the Federal Government in charge of investigative work in matters relating to espionage, sabotage, and violations of the neutrality regulations. All law enforcement officials in the country were requested to turn over to the FBI matters relating to these subjects and also matters relating to "subversive activities." A similar directive was issued by President Roosevelt on January 8, 1943.

Succeeding presidents confirmed this investigative authority of the FBI. On July 24, 1950 President Truman issued a directive reaffirming those of President Roosevelt and characterizing the FBI authority as relating to "espionage, sabotage, subversive activities and related matters." President Eisenhower issued a similar directive on December 15, 1953.

President Kennedy changed the structure somewhat. In a directive dated June 9, 1962, the Attorney General was given overall responsibility for the investigation of espionage, sabotage, subversion and other related matters affecting internal security. The FBI was to continue to conduct the investigations but the supervisory power of the Attorney General was expanded.

### V.B. *Commencement of SWP Investigation—Dunne Case*

Plaintiffs contend that the investigation of the SWP, stemming from the Roosevelt directive to the FBI, commenced in 1940. The FBI files bear this out. In 1941 Director Hoover wrote the New York office of the FBI complaining about the lack of information regarding the SWP and requesting that every effort be made "to obtain from book shops, informants and other sources" whatever written materials existed about the SWP.

In the early 1940's the St. Paul office of the FBI was investigating the SWP activities in the labor movement in that area. The St. Paul office generated a comprehensive report on the SWP dated March 10, 1941, which reflects in many ways the views of the SWP held by the FBI during subsequent years. According to this study, the SWP shared the well-known Marxist goals of overthrow of the capitalist state and the transfer of all or most economic activity to a "workers government." According to the study, the SWP stood for "militant class struggle" and proposed to carry on part of this class struggle within the labor union movement. The specific program of the SWP was said to involve fomenting strikes and other forms of work stoppages as well as the spreading of Marxist philosophy. It was said that, beyond the trade union program, the SWP was committed to taking leadership in all kinds of "progressive struggles," and was further committed to opposing United States involvement in World War II. The study stated that the position of the SWP was that it would not, under any circumstances, support this country's war effort, but would "fight against it."

On April 5, 1941 a second report was generated in the St. Paul office of the FBI, quoting several signed statements of former members of the SWP in Minnesota to the effect that the leaders of the SWP openly advocated the overthrow of the United States Government by armed force.

The St. Paul office reports were given wide circulation within the FBI.

In 1941 eighteen SWP leaders were prosecuted by the Federal Government for vio-

lation of the Smith Act, 18 U.S.C. § 2385. The charge was that they advocated the violent overthrow of the Government. They were convicted in December 1941, and the convictions were upheld on appeal. *Dunne v. United States*, 138 F.2d 137 (8th Cir.1943), *cert. denied*, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476 (1944).

Following the convictions in the *Dunne* case, the scope of the FBI investigation of the SWP broadened. In December 1942 Director Hoover sent instructions to the various FBI field offices directing that immediate inquiry should be made of confidential informants and confidential sources to determine if the SWP was active in various parts of the country.

### V.C. *Types of FBI Activities*

FBI investigations are classified as either criminal investigations or national security investigations. An FBI witness has stated that criminal investigation of the SWP and its members for violation of certain federal statutes continued into the early 1950's. The statutes involved were the Smith Act and the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611 *et seq.* However, there is no evidence of any relevant criminal prosecution following the *Dunne* case. It is safe to characterize the FBI investigation of the SWP from the early 1950's onwards as a national security investigation. The FBI continued its investigation of the SWP until 1976. Attorney General Levi terminated the investigation of the SWP on September 9, 1976.

The FBI engaged in various activities in connection with its thirty-five year investigation of the SWP. To some extent these involved the use of publicly available information. For example, the FBI analyzed publications of the SWP and observed events open to the public. Beyond this, the FBI engaged in the following activities of a more intrusive nature, which were the subject of extensive evidence at the trial and which will be discussed in detail in this opinion.

 Informants

 Disruption

 Electronic surveillance

 Surreptitious entries—"Bag Jobs"

The Department of Justice and the FBI implemented two programs against the SWP, purportedly on the basis of information gained from the FBI's investigation.

 Security Index/ADEX

 Loyalty-security program

### V.D. *Informants—Special Master's Report*

The evidence shows that the FBI used confidential informants in its investigation of the SWP as early as 1941.

The term "informants" refers to persons, other than FBI agents, who provide information to the FBI, often on a regular basis and for money. Some of the informants used in the SWP investigation were members of the SWP and YSA. By the use of these informants, the FBI "infiltrated" the SWP and YSA. Other informants were not members of the organizations, but were situated in such a way that they could provide information to the FBI—for example, the janitor of a building where an SWP office was located or an employee of a hospital where SWP members and their families went for treatment.

Although the FBI used informants in connection with the SWP since at least 1941, the evidence in this case about informants relates mainly to the years since 1960. During the period 1960–1976 there were a total of about 300 member informants and about 1,000 non-member informants used by the FBI in the SWP investigation.

In the present litigation, the handling of pretrial discovery regarding the FBI informants was the subject of substantial controversy. In the summer of 1976 the FBI produced its files (in expurgated form) on 7 of the informants, whose identities were already known to plaintiffs. Shortly thereafter plaintiffs moved for the production of additional files. The FBI had answered interrogatories designating each of the 1,300 informants by number and giving certain limited information about them

without identifying them. On the basis of these interrogatory answers plaintiffs requested production of 19 files. At some point one of the 19 files was voluntarily produced, but the FBI resisted production of the remaining 18. On May 31, 1977 the court ordered that the 18 files be produced to certain specified attorneys representing plaintiffs (led at that time by Leonard B. Boudin, Esq.) with the direction to these attorneys that they should not reveal the identities of the informants or any information in the files to anyone else without specific authorization from the court.

The Government sought review of the May 31, 1977 ruling by appeal and mandamus petition. The court of appeals dismissed the appeal and denied mandamus, holding that the district court order was a proper exercise of discretion. *In re United States*, 565 F.2d 19 (2d Cir.1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978). Thereafter the district court attempted to obtain a settlement of this controversy. The FBI agreed to produce 4 of the 18 files in question. However, this was not satisfactory to plaintiffs. Thus the order of May 13, 1977 remained outstanding as to 14 files and needed to be complied with. At this point, the Attorney General, as the official ultimately in charge of the FBI, assumed responsibility for the matter and on June 13, 1978 filed an affidavit announcing that he would not comply with the court order. Plaintiffs moved to hold the Attorney General in contempt. On June 30, 1978 the district court handed down a decision, holding that the Attorney General would be in civil contempt of court if he did not comply with the district court order by a specified time. *Socialist Workers Party v. Attorney General*, 458 F.Supp. 895 (S.D.N.Y.1978). The Attorney General did not comply, and was thus held in contempt. *Socialist Workers Party v. Attorney General*, 458 F.Supp. 923 (S.D.N.Y.1978).

The Attorney General appealed and sought a writ of mandamus. The court of appeals granted the writ of mandamus, vacated the contempt citation, and directed the district court to work out an alternative sanction with regard to the refusal of the Attorney General to produce the files. The court of appeals recommended that the district court or a special master review the files *in camera* and come up with a "set of representative findings" which would not compromise the identity of the informants, but would be the basis for developing the relevant facts regarding informants. *In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 217, 62 L.Ed.2d 141 (1979).

On April 30, 1979 the district court appointed as special master Honorable Charles D. Breitel, former Chief Judge of the New York Court of Appeals.

It is appropriate at this point to state that Judge Breitel and his staff performed a most valuable service to the court, to the litigants and to the public. The materials which they analyzed, while relating to a rather small number of informants, were really of enormous bulk. The Special Master and his assistants were meticulous in their examination and showed great insight into the significance of the minute items of information in the materials. They displayed remarkable ingenuity in developing a summary format which converted this mass of material into something concise and useful for the litigation. So successful was their summarization, and so acceptable was it to the court and to the parties, that it was taken as sufficient, not only as an evidentiary substitute for the files which the Special Master was actually analyzing, but also as a summary typifying the overall total of 1,300 informant files relating to the FBI's investigation of the SWP.

The Final Report of the Special Master was filed on February 4, 1980. Part I of the report contains a number of admissions made by the Government as a result of the Special Master's work with the parties. Part II of the report contains "representative findings" based on information contained in the files examined by the Special Master (the 18 files which were originally the subject of plaintiffs' motion less the 4 voluntarily produced).

The representative findings in Part II of the report were divided into two categories—general and specific. The general findings summarize certain general characteristics of informant activity and reporting, drawn from thousands of individual reports of meetings and other matters. The specific findings state certain specific items of information reported by particular informants (always referred to as "an informant" or "one informant" without disclosing the identity). The Special Master recommended that the findings in Part II be taken as proved unless rebutted by other information. As it turned out, none of the representative findings in Part II of the report were rebutted or contradicted, and they therefore stand as proven facts in the case.

Part III of the report consists of additional items of information drawn from the informant files. These are items which the Special Master believed might or might not have significance in the case, depending on what additional evidence existed outside of the 14 files.

Part IV of the report is entitled "Conclusive Presumptions." These relate to certain untoward incidents happening to the SWP and its members, reflected in informant reports. Although the nature of these presumptions raised the question of whether they could be the basis of any form of relief to plaintiffs, particularly an award of damages, plaintiffs have not developed any argument to this effect. Prior to completing this opinion the court conferred with the parties to determine whether there is any basis for granting such relief. The court concludes that there is not. No detailed discussion of the presumptions is required.

The findings of fact in this opinion regarding the FBI informants used in the SWP investigation are based largely on Parts I and II of the Special Master's report.

As already described, between 1960 and 1976 the FBI used a total of about 1,300 informants in its investigation of the SWP and YSA. There were about 300 member informants and 1,000 non-member informants. Each informant was supervised by an FBI agent (the case agent) in a particular local field office. Each member informant reported to the case agent regarding (1) what occurred at every meeting and every other activity he attended, and (2) the name, address, physical description, place of employment, and a great deal of other personal information about the SWP and YSA members, and their families. The personal information covered matters such as marital or cohabitational status, marital strife, health, travel plans, and personal habits.

Informants were paid according to what the FBI considered to be the quality of their work. Of the 14 informants whose files the Special Master examined, and the 4 whose files were voluntarily produced, all but 2 were compensated. During the years 1960–1976 the 16 who were compensated received a total of $264,239 for services and $94,408 reimbursement for expenses, for a grand total of $358,647. In many cases payments for services ranged up to $200 or $300 per month.

For the FBI investigation of the SWP, the gross amount paid to all informants during the years 1960–1976 was $1,680,592.

The number of member informants year-by-year from 1960 to 1976 was:

| SWP | | YSA | |
|---|---|---|---|
| 1960 | 52 | 1960 | 9 |
| 1961 | 54 | 1961 | 11 |
| 1962 | 53 | 1962 | 10 |
| 1963 | 51 | 1963 | 7 |
| 1964 | 52 | 1964 | 9 |
| 1965 | 49 | 1965 | 11 |
| 1966 | 47 | 1966 | 12 |
| 1967 | 39 | 1967 | 14 |
| 1968 | 34 | 1968 | 23 |
| 1969 | 32 | 1969 | 38 |
| 1970 | 30 | 1970 | 58 |
| 1971 | 32 | 1971 | 77 |
| 1972 | 33 | 1972 | 83 |
| 1973 | 28 | 1973 | 77 |
| 1974 | 24 | 1974 | 75 |
| 1975 | 23 | 1975 | 62 |
| 1976 | 19 | 1976 | 41 |

Since the SWP and the YSA have relatively few members, these informants com-

prised a not insignificant percentage of the membership. This is shown by the following table:

| Year | % of members who were FBI informants (number of informants/number of members) | |
|------|------|------|
| | SWP | YSA |
| 1960 | 11%(52/466) | 8%(9/115) |
| 1961 | 11%(54/480) | 8%(11/137) |
| 1962 | 10%(53/510) | 5%(10/184) |
| 1963 | 10%(51/531) | 4%(7/200) |
| 1964 | 10%(52/503) | NA(9/NA) |
| 1965 | 10%(49/497) | 3%(11/377) |
| 1966 | 10%(47/450) | 5%(12/247) |
| 1967 | 9%(39/420) | 6%(14/254) |
| 1968 | 8%(34/444) | 6%(23/405) |
| 1969 | 7%(32/488) | 6%(38/678) |
| 1970 | 5%(30/550) | 7%(58/850) |
| 1971 | 4%(32/748) | 6%(77/1388) |
| 1972 | 4%(33/859) | 6%(83/1367) |
| 1973 | 3%(28/1095) | 6%(77/1256) |
| 1974 | 2%(24/1116) | 6%(75/1250) |
| 1975 | 2%(23/1080) | 3%(62/1819) |
| 1976 | 2%(19/1000) | 3%(41/1185) |

Presumably the principal purpose of an FBI informant in a domestic security investigation would be to gather information about planned or actual espionage, violence, terrorism or other illegal activities designed to subvert the governmental structure of the United States.

In the case of the SWP, however, there is no evidence that any FBI informant ever reported an instance of planned or actual espionage, violence, terrorism or efforts to subvert the governmental structure of the United States. Over the course of approximately 30 years, there is no indication that any informant ever observed any violation of federal law or gave information leading to a single arrest for any federal law violation.

What the informant activity yielded by way of information was thousands of reports recording peaceful, lawful activity by the SWP and YSA. The Special Master's report contains the following illustrative finding:

An informant, who had consistently been rated reliable by the FBI, reported that: (1) during the informant's six-year association with the SWP and YSA during the 1970's, neither organization advocated violence or terrorist tactics; and (2) SWP and YSA members who advocated violence or disorder as an organizational policy were expelled.

The report states at another point:

In the early 1970's, an informant gave the following evaluation of the SWP and YSA in a western city:

I have observed the SWP and YSA in [a western city] for over 10 years now, and have been acquainted with several of its members and former members. They have been devoted Marxists, but have advocated change by working through the system, and have made a point of having no members that advocated violence.

The Special Master's report summarizes the situation as follows:

The 14 informant files contain thousands of reports concerning the activities of the SWP and YSA. All the reports describe facts apparently consistent with peaceful, lawful political activity insofar as the SWP and YSA are concerned,* with the following arguable qualifications: ....

The asterisk refers to the following footnote:

In fact, there are recurring instances of advice and instructions to the members to abstain from acts of violence and physical disorder, and from using marijuana because it would embarrass the organization. There are also instances of members openly disavowing the appropriateness of owning or possessing firearms and there are repeated references by the SWP and YSA to the nonviolent nature of plaintiff organizations and their consequent unwillingness to associate with organizations known or believed to advocate violence.

Returning to the previous quotation, the following are what the Special Master has set forth as the "arguable qualifications" to the general statement about "peaceful, lawful political activity," together with the court's comments thereon.

(1) On numerous occasions SWP and YSA members participated in demonstrations, pickets or marches in which some kind of violence or disorder occurred, and in some instances SWP and YSA members were arrested. However, the Special Master's report notes that the informant files provide no facts, other than the fact of arrests, showing or otherwise suggesting that such members had or had not committed any unlawful acts. At the trial, the Government did not come forward with any evidence that SWP or YSA members actually engaged in violence or committed unlawful acts on such occasions.

(2) On "at least one occasion," members were instructed that they should not bring weapons from home for a particular demonstration, but that the organization would provide whatever weapons would be necessary. The Special Master's report states that the informant information is to the effect that this instruction related to concern about violence from some other party or parties outside the SWP and YSA. The Special Master's report does not give the date of this instruction or any other details. At the trial, the Government did not come forward with any evidence that SWP or YSA members actually were given, or used, weapons at any such occasion.

(3) Certain rallies were organized to stop, to interrupt, or to embarrass speakers whose views were unacceptable to the SWP and YSA. The Special Master's report states that there is no indication that these efforts involved any violence.

(4) Informants reported on ideological discussions to the effect that, at some unspecified future time, the development of class conflict and the oppression of the working class in capitalist society will inevitably require the use of force to bring about a socialist society. There were also "at least a handful" of SWP members or other persons addressing SWP meetings whose views might imply the advocacy of violence or unlawful activity. This opinion has already dealt at length with the question of the position of the SWP and YSA on the subject of revolutionary change and terrorism. *See* section IV.E *supra.*

(5) There are many reported instances in which members travelled outside this country to meet with Trotskyists in other countries, particularly in connection with the Fourth International. Members also met with officials or representatives of foreign governments in the United States and abroad. The relationship of the SWP to the Fourth International is described in section IV.B.

(6) There were a number of discussions reported by informants regarding the movement within the Fourth International—the Internationalist Tendency—favoring the immediate use of violence and terrorism to facilitate the onset of revolution. As described in section IV.B, this group was a small minority in the SWP and was expelled. Moreover, the issue was the use of guerilla warfare in Latin America. There is no evidence that even this minority actually committed any acts of violence in the United States or elsewhere.

With regard to the nature of the informants' activities, it was the FBI's strategy that the member informants should not be "quietly sitting back as observers," but should enter into discussions and engage in normal organizational activity. The member informants in the SWP and YSA were also encouraged to cultivate relationships with these organizations' leaders in order to assist the informants in attaining leadership positions. In the view of the FBI the value of informants increased with their advancement to higher levels in the organizations being investigated.

A number of the member informants did in fact achieve positions of responsibility in local SWP and YSA branches: secretary, treasurer, director of fund raising, "organizer," and member of the executive committee or executive board. One informant served on a national committee of the SWP. Three informants ran for political office as SWP candidates. About 55 FBI informants held offices or committee posi-

tions in the SWP and YSA between 1960 and 1976. Approximately 51 informants served on executive committees or executive boards.

The evidence shows that, when the occasion permitted, the FBI encouraged the member informants to frustrate the growth of the organizations. The Special Master's report shows that one informant, who served as an SWP branch organizer for many years, periodically reported to the FBI that the branch was making no effort to recruit new members. An FBI memorandum reported that this informant, as well as a second informant, used their influence to suppress recruiting activities by the branch as well as branch activities in general. According to the Special Master's report, at least two other SWP informants, following FBI instructions, periodically urged that contributions and dues be lowered from what they were, or be set at lower figures than suggested by other members.

When it was not instructing the member informants to affirmatively impede the organizations, the FBI still, on occasion, gave instructions to make sure that the informants were doing nothing to enhance the development of the SWP or YSA.

The member informants were expected to provide the FBI with copies of SWP and YSA documents, including private documents, obtained by surreptitious means if necessary. Certain non-member informants provided documents, such as a janitor who searched trash of an SWP branch. Between 1960 and 1976 the informants—mainly member informants—supplied the FBI with about 12,600 SWP and YSA documents, about 7,000 of which were intended to be available only within the organizations. These private documents included membership lists, financial records, financial budgets and projections, minutes of meetings, mailing lists, and correspondence. The member informants generally obtained the documents from SWP and YSA offices, although at least one member informant obtained confidential documents from the residence of another member.

Many of the member informants served over lengthy periods of time. This provided the FBI with a steady and voluminous flow of detailed information. According to the Special Master's report, one unidentified informant worked in a local SWP office over a ten-year period opening all mail and regularly furnishing the FBI with minutes of meetings, card files, mailing lists, financial documents, and all incoming and outgoing correspondence, as well as certain flyers and leaflets not publicly available.

One informant who has been identified is Edward Heisler. Heisler was a member of the SWP branch in Chicago from 1960 to 1980, and was an FBI informant from 1966 to 1971. He had keys made to the SWP's local office. He would obtain access to documents during the day, remove them, rush them to an FBI agent for copying, and then return them to the office. Sometimes there were documents which could not be removed during the day, in which case Heisler would enter the office at night and remove the desired documents for photocopying.

Another identified informant is Ralph DeSimone, who was secretary of a YSA branch in Berkeley, California. The branch received the confidential minutes of the National Executive Committee of the YSA. These were kept in a locked drawer in the local office. DeSimone had a key to this drawer, and provided the FBI with information from these minutes.

Still another identified informant was Timothy Redfearn, a member of the YSA in Denver. An FBI report dated June 20, 1973 refers to the FBI having obtained "items stolen from the YSA local office." The reference is to certain file cards removed by Redfearn from a private file box. Redfearn regularly obtained confidential documents from the YSA, so that the FBI could copy them. Redfearn would then return the documents to their original location. In a report dated January 22, 1974 the FBI rated Redfearn as "excellent."

On February 3, 1975 Redfearn was arrested by the Denver police for burglaries unrelated to his informant activities. Red-

fearn requested FBI assistance, but the FBI declined to help him. Redfearn then cooperated with the local police and gave them information regarding other persons who were burglars and fences. Redfearn was discontinued as an FBI informant on April 17, 1975. Shortly thereafter he was given deferred prosecution on the local burglary charges. The only restriction imposed upon him by the local authorities was that he could not associate with known criminals. Redfearn then called the FBI, which reinstated him as an informant on May 28, 1975.

Beginning in June 1976 Redfearn started to work at a book store in Denver that was operated by *The Militant.* Redfearn told the FBI that this would give him access to records of both the SWP and the YSA.

On July 2, 1976 the SWP headquarters in Denver, located in the book store, was burglarized. A padlock on the door to the book store had been cut, and the contents of a file cabinet and a small box of petty cash were taken. On July 7 Redfearn called his FBI contact agent and showed him a group of SWP files. Because of the pendency of the present case in the federal court in New York, the FBI neither retained nor copied the files.

After the SWP burglary was reported in the local news media, the FBI claimed no knowledge of the matter. A local FBI agent was called before a grand jury in Denver and denied knowing how Redfearn had obtained the files. However, the FBI terminated Redfearn as an informant, and apparently has never reinstated him. He was indicted for burglarizing the SWP, pleaded guilty and was given a prison sentence.

The Special Master's report states that one non-member informant was an employee at a hospital where SWP members and their relatives were patients. This informant supplied the FBI with dozens of hospital records. The FBI files clearly indicate recognition on the part of the FBI that the informant was violating his duty to the hospital and that the procurement of these records by the FBI was a flagrant invasion

of the privacy of the patients. The FBI file cautioned that particular care should be taken to conceal the identity of the informant. One memorandum stated that care should be exercised in circulating the information even within the FBI, "since hospital records are confidential."

One use of informants was to gain information useful to the FBI in its program to disrupt the SWP. This program will be discussed in detail in the following section of this opinion. However, it should be stated at this point that, largely through informants, the FBI learned of internal difficulties in the SWP, and problems in its relationships with allied groups. Various FBI operations were designed to exploit these situations. Informants also provided the FBI with information about scheduled activities so that the FBI could decide where, and by what means, to attempt to disrupt them.

### V.E. *Disruption*

When a country is conducting "intelligence" activities—*i.e.,* gathering information—regarding a foreign power, the latter will frequently attempt to disrupt these activities with "counterintelligence."

It is obvious that the United States engages in counterintelligence activities designed to disrupt the intelligence gathering conducted by other countries. Not so obvious is the fact that these counterintelligence and disruption activities have at times been directed against domestic organizations.

In connection with domestic organizations considered subversive, the Government's concern has been twofold. One concern has been the threat that a domestic organization might assist a hostile foreign nation in gathering intelligence on the United States Government. Another concern, as perceived by the Government, has been that such organizations might subvert or sabotage military and other governmental activities, or engage in acts of violence or terrorism.

One of plaintiffs' principal claims is that the FBI, over a period of several years, engaged in activity aimed at disrupting the SWP and YSA. Plaintiffs contend that this activity was wholly beyond any legitimate counterintelligence or any legitimate defense against subversion, and was a violation of plaintiffs' constitutional rights.

### V.E.1. *Covert Disruption Activities*

A substantial body of evidence on this subject was introduced at the trial. As will be described, there was an FBI program specifically aimed at disrupting the SWP and YSA. Other FBI programs, aimed at disrupting other organizations or movements, also impinged to some extent upon the SWP and YSA. These programs were referred to as counterintelligence programs, or "COINTELPRO's" for short.

The first program of this kind affecting the SWP was one principally directed at the Communist Party. It was called COINTELPRO–CPUSA. This program had its genesis at a March 8, 1956 meeting of the National Security Council, attended by President Eisenhower, Vice President Nixon, the Secretary of State, the Secretary of Defense, Attorney General Brownell, Director Hoover of the FBI, the head of the CIA, and other officials.

Brownell testified about this meeting. He stated that the leaders of the Government were greatly concerned about the threat of sabotage and espionage, as indicated by the Rosenberg case and other recent matters. Hoover reported that, in the interest of protecting the national security, the FBI was seeking to "infiltrate, penetrate, disorganize and disrupt" the Communist Party. Hoover stated that the FBI was using informants, wiretaps, microphone surveillance, and surreptitious entries—techniques used at least as far back as the Roosevelt administration in connection with Nazi spies.

A series of subsequent FBI memoranda, starting in July 1956, recorded the establishment of COINTELPRO–CPUSA, which was said to be "a systematic program for the disruption of the Communist Party,

USA." It was said to be a program "on a broader scale than heretofore attempted." COINTELPRO–CPUSA was approved by FBI Director Hoover in the fall of 1956. This program affected the SWP only tangentially. The details do not merit discussion.

In the fall of 1961 FBI headquarters sent a memorandum to the field offices suggesting that a disruption program similar to COINTELPRO–CPUSA be initiated against the SWP. The memorandum requested the views of these offices. The New York office responded with a letter favoring such a program, which stated that it "should prove highly beneficial in disrupting the activities of the SWP on a national, as well as local level." FBI headquarters sent a letter to certain field offices dated November 29, 1961 to the effect that a disruption program against the SWP should be implemented. It was entitled the "SWP Disruption Program," and was "designed to disrupt the SWP on a broad national basis." No operation was to be initiated without specific prior headquarters approval.

A third program affecting the SWP was entitled COINTELPRO–New Left. This was started in 1968. An FBI memorandum dated May 9, 1968 explained that the country was undergoing an era of disruption and violence caused by what was called the "New Left." The memorandum stated that some of these activists urged revolution in the United States and called for the defeat of the United States in the Vietnam War. According to the FBI, the New Left activists were making false allegations against Government officials and utilizing unlawful acts to further their causes. The memorandum proposed that a counterintelligence program be set up to "neutralize the New Left and the Key Activists." The proposal was approved by FBI Director Hoover. It appears that most of the activities under this program were directed at the Students for a Democratic Society ("SDS"), although a few of the programs related, at least in part, to the SWP.

The evidence shows that in the SWP Disruption Program 72 operations were proposed, and 46 operations were approved and carried out. In the COINTELPRO–New Left program only 8 of the 285 operations carried out were directed in any way against the SWP. In the COINTELPRO–CPUSA only 3 of the 1388 operations carried out involved the SWP.

The following is a description of a number of the operations. For future reference in connection with the issue of damages, all the operations discussed will be numbered. All occurred in the SWP Disruption Program except No. 16, which was in COINTELPRO–New Left. Two additional COINTELPRO–New Left operations, involving plaintiffs Sell and Starsky, will be dealt with in sections VI.B.5 and VI.G.4 of this opinion.

(1) The first operation under the SWP Disruption Program was an attempt to embarrass the SWP's candidate for Manhattan Borough President, John Franklin, a black. This occurred in 1961. The SWP was receiving publicity because Franklin and three other members were running for New York City office. The FBI learned that Franklin had a criminal record involving offenses committed some years earlier, before he became associated with the SWP. The New York FBI office furnished information about Franklin's criminal record to the New York Daily News, which printed a story about it. The FBI then anonymously circulated copies of this article. The FBI regarded this operation as "highly successful" for reasons over and beyond Franklin's loss of the election, which was expected. An FBI memorandum stated:

> The immediate result of this operation was the discontinuance of SWP membership on the part of Franklin and his brother Robert Franklin.... Information has also been received indicating that the SWP's efforts in connection with attempts to recruit Negroes have apparently suffered a setback directly as a result of Franklin's expose.

The FBI also felt that the incident had created hostility within, and had a "definite demoralizing influence" on, the SWP. Director Hoover later included this incident on a list of "examples of the type of operations desired by the Bureau" because it was "designed to disrupt the SWP on a broad national basis."

(2) In 1963 and 1964 the FBI carried out an operation with respect to Clifton DeBerry, the SWP candidate for New York City Council in 1963 and for President of the United States in 1964. The FBI learned that DeBerry had failed to make child support payments to his former wife in Chicago. In late 1963, the FBI learned through an informant that DeBerry was scheduled to make a speech in Chicago before the Militant Labor Forum. The FBI then passed the information to the Cook County Department of Welfare, which obtained an arrest warrant for DeBerry. He was arrested on charges of non-support at the meeting hall immediately prior to the speech. DeBerry was taken to the police station where he immediately posted bond, and returned to the meeting hall to make his speech. A few days later DeBerry was convicted of non-support and given a six month jail sentence. However, the matter was settled when DeBerry agreed to make the overdue payments. In 1964, when DeBerry was running for President, he was scheduled to go on another national speaking tour. The New York FBI office supplied derogatory material regarding DeBerry's marital status to "friendly" newspaper contacts. Since DeBerry was a black candidate for President, the FBI thought that he was potentially influential in allying the SWP with the civil rights movement. In May 1964 the New York FBI office made an anonymous mailing to various persons, including Daniel Watts and Harold Cruse, editors of a publication called "Liberator." The anonymous mailing suggested that the SWP was trying to manipulate the civil rights movement for its own benefit. Cruse later wrote articles in "Liberator" attacking DeBerry and the SWP. An FBI memorandum indicated satisfaction with this, reasoning that these articles would hinder any SWP efforts to form an alliance with the "rising tide of Negro radicals."

(3) In 1963 the SWP was supporting a black candidate for Mayor of San Francisco, Sam Jordan. The FBI sent Jordan a letter in October 1963 signed "Disappointed." The letter said that "Disappointed" was delighted that Jordan was running for mayor, but lamented that certain people connected with Jordan's campaign, who were members of the SWP, threatened to make Jordan "a tool of the SWP." There is no evidence of any specific result flowing from this letter.

One objective of the FBI was to foment racial strife within the SWP.

(4) Paul Boutelle, a black, was the SWP's candidate for Vice President of the United States in 1968 and for Mayor of New York City in 1969. At a national convention of the SWP held in New York City in August 1969, Boutelle complained of some degree of racism within the SWP and a "patronizing" attitude towards blacks. On September 9, 1969 Boutelle was arrested in New Jersey with two other blacks for possession of stolen property. There is no indication that the FBI was connected with this arrest. The arrest was disclosed at a closed SWP meeting the next day. The FBI devised disruptive operations to capitalize on these events. In September 1969 the New York FBI office furnished information about Boutelle's arrest to the New York Daily News and the Associated Press. At about this time informants reported to the FBI that Boutelle was expressing the view that he was being used by the SWP because of his color. In order to increase the friction, the New York FBI office sent an anonymous letter to Boutelle in October 1969 signed "Your nasty friends." The letter expressed contempt for Boutelle, and offered the suggestion that he and the "rest of your fellow party monkeys hook up with the [Black] Panthers where you'd feel at home." The letter concluded with the thought that then the rest of the members could get on with the "job Trotsky had in mind for us." Informants later reported that Boutelle, visibly angry, had read the letter at a meeting in Detroit, but had announced that he would stay in the SWP. Shortly thereafter

the FBI sent another anonymous letter to Boutelle, signed "thin-skinned non-monkey." The letter stated that "thin-skinned" knew who had written the previous letter, and indicated some degree of agreement with it. The new letter suggested that Boutelle get out of the SWP, and that the resulting "brain-drain" would not be significant. The letter made slurring remarks about two other black members, including DeBerry. According to informants' reports, the second letter had a considerable effect on Boutelle, who appeared hostile and missed various meetings. The FBI concluded that its efforts had indeed heightened racial tension within the SWP.

Certain of the FBI's disruption operations were designed to frustrate the SWP's attempts to form alliances with other groups.

(5) At some point a group of black persons was arrested in connection with an incident in Monroe, North Carolina. The Committee to Aid the Monroe Defendants ("CAMD") was formed. The SWP was heavily involved in CAMD. In 1962 the FBI sent an anonymous letter to Berta Green, an SWP member and a leader of CAMD, accusing a black group involved in CAMD of misusing funds. The FBI also placed an anonymous telephone call about this accusation to one of the defendants. These communications were designed to cause strife between the SWP and the black group. There is no evidence of specific results.

(6) In 1962 the FBI learned from an informant that CAMD was receiving financial support from the NAACP. The New York FBI office sent an anonymous letter to the NAACP stating that CAMD was dominated and controlled by "the Trotskyist branch of the communist movement." The FBI believed that this anonymous letter stopped the NAACP aid to CAMD.

(7) In 1962 Mayor Leo Carlin of Newark designated a certain day as CAMD Day in Newark. The Newark FBI office sent a memorandum to a newspaper contact, describing the SWP's role in CAMD, and fur-

ther describing the SWP as "a militantly revolutionary group." The letter stated that the function of CAMD was to instigate militant action and demonstrations. Mayor Carlin sharply curtailed the intended ceremonies.

(8) In 1964 the FBI sought to use an incident relating to CAMD in an effort to discredit the SWP in the civil rights field. There was a theft of CAMD funds from the home of a Monroe, North Carolina civil rights leader, whom an SWP member, George Weissman, was visiting at the time. The FBI sent an anonymous communication to various persons, including the black author James Baldwin and a New York Times reporter. The communication contained a sardonic poem, which in effect charged that Weissman had stolen the money.

(9) In 1965 the FBI's New York office learned that the SWP was trying to form an alliance with the followers of the recently assassinated Malcolm X. The FBI instructed some of its SWP informants to antagonize these followers. An FBI memorandum dated June 28, 1965 reports that due to this disruptive activity the relations between the SWP and the Malcolm X group were deteriorating.

The FBI also sought to hinder the involvement of the SWP in the anti-Vietnam War movement.

(10) In 1966 the FBI's New York office sent an anonymous letter to SWP members and to several anti-war groups ridiculing the SWP and YSA and asserting that they were playing an ineffective and divisive role in the anti-war movement. An FBI memorandum states that the letter was sent to "create disruption within the ranks of the SWP," and to "hamper the party's total occupation at this time: that is, its anti-war actions and objectives." From the scope and nature of the activity, the court concludes that some disruptive results of the kind intended occurred.

(11) In August 1968 the New York FBI office sent another anonymous letter to 68 "new left groups" and "peace groups." The purpose of the FBI letter was to "wid-en the split" between the YSA and a prominent anti-war group called the Student Mobilization Committee to End the War in Vietnam ("SMC"). The letter accused the YSA of disrupting the SMC and of opposing the only really effective elements within the SMC. There is testimony to the effect that the letter caused great trouble within the YSA. The trouble related to suspicion and worry as to who would write such a letter and what its effects would be. In September 1968, to further embarrass the SWP and the YSA, the FBI sent out a follow-up anonymous letter. This letter ridiculed these organizations for cowardice in the demonstrations at the 1968 Democratic Party convention in Chicago. The letter implored the SWP and YSA to "stay home" on future occasions of this kind.

(12) The SWP and YSA participated in an anti-war group called the National Mobilization Committee ("MOBE"). In February 1969 the FBI's New York office sent out an anonymous letter ridiculing MOBE's activities at the so-called "counter-inaugural" that took place in Washington, D.C. at the same time as President Nixon's inauguration in January 1969. The letter was sent to members of various anti-war groups, including the SWP and YSA. There is testimony that this letter aggravated certain problems within MOBE. MOBE ceased operation in February 1969.

(13) The next FBI effort involved an anti-war parade in New York City that took place on April 5, 1969. This parade was jointly sponsored by the SWP, YSA and SMC. Since it was to involve both civilians and military personnel, the sponsors of the parade regarded it as particularly important to keep the parade peaceful, so as not to draw the military personnel into trouble with the law. Just before the parade the FBI's New York office distributed an anonymous leaflet entitled "Notes from the Sand Castle" (the latter term being slang for Columbia University), accusing the "SWP–YSA–SMC coalition" of cowardice in not being willing to fight the "pigs" (police) and to accumulate "battle wounds." The FBI's expressed purpose in creating the

leaflet was to "disrupt plans for the demonstration and create ill-will between SWP–YSA and other participating non-Trotskyist groups and individuals." The evidence shows that this communication created difficulties in managing the march.

(14) In December 1969 the New York FBI office sent an anonymous obscene leaflet to 230 individuals and organizations urging them to "flush" the SWP and YSA from the successor to MOBE, called New MOBE. From the scope and nature of the operation, the court concludes that it had a disruptive effect of the kind intended by the FBI.

(15) In February 1970 the New York FBI office sent a memorandum to various antiwar activists purporting to be written by a member of New MOBE. The FBI's purpose was to "create splits" between the SWP participants and other groups in the New MOBE coalition. The memorandum attacked "the Trotskyites" for taking control of New MOBE and for resisting the recruitment of blacks. The FBI was aware, through its informant system, of criticism of the SWP about racial imbalance disfavoring blacks. The court concludes that this operation had a disruptive effect of the kind intended by the FBI.

(16) The SMC planned a national conference at Catholic University, Washington, D.C. in February 1971. An internal FBI memorandum recommended efforts to bring to the university's attention the SWP/YSA's alleged domination of the SMC, and to disrupt the conference. The FBI distributed an anonymous leaflet in advance of the conference date, entitled "Trotskyists Welcomed At Catholic University!" The leaflet questioned whether the Catholic Church had been "duped again," in allowing its facilities to be used by the SMC, an organization said to be controlled by the Trotskyist SWP and YSA. Subsequent to the appearance of the leaflet, the university requested that the SMC obtain an insurance policy to cover any property damage. It is questionable whether this resulted from the leaflet. In any event, the SMC obtained the policy, and the con-

ference was held. This operation was carried out under the COINTELPRO–New Left program.

The evidence shows other instances of FBI operations designed to disrupt the activities of the SWP.

(17) In 1962 the Newark FBI office informed the New Jersey Alcoholic Beverage Control Office that the SWP was selling alcoholic beverages at a camp without a liquor license. The FBI provided the ABC with a detailed drawing of the camp and buildings therein. The ABC stated it would raid the camp on the day suggested by the FBI and arrest the persons responsible for any violations. The raid was conducted as planned, and two persons were arrested. The raid disrupted a series of SWP meetings at the camp.

(18) In 1963 the Los Angeles FBI office instructed its informants in the local SWP organization to keep a particular dispute at its highest possible pitch. An FBI report on this matter noted with satisfaction that an informant had followed FBI instructions, and had "fanned the flames of discord and discontent."

(19) In 1963 the New York FBI office sent an anonymous letter to the Better Business Bureau of New York City designed to interfere in fund-raising efforts by the SWP under the name of the New York School of Social Science. The planned fund-raising event was not held in 1963, and the FBI thought it likely that this was a result of the disruptive action.

(20) In 1964 the Newark FBI office sent an anonymous letter to Murray Zuckoff's employer. Zuckoff was the organizer of the SWP Newark branch and an alternate member of the SWP National Committee. The employer then told Zuckoff that he must discontinue his SWP activities if he wanted to retain his job. Zuckoff continued to support the SWP but was not active.

(21) In 1964 the Newark FBI office mailed a leaflet designed to appear to be from a committee working to elect a black, Larry Stewart, to the U.S. Senate from New Jersey. Stewart was the SWP candi-

date for this office but had recently resigned from the SWP Executive Committee and was critical of the SWP's efforts in the civil rights field. The leaflet attacked the SWP's position on civil rights and was mailed to *The Militant* and white SWP members. The FBI viewed the operation as successful because it caused internal dissension in the SWP.

The SWP Disruption Program was discontinued in October 1969. An FBI directive stated that disruptive activity against the SWP was "discontinued as a program," but would be considered in the future on a case-by-case basis.

On March 8, 1971 certain documents were stolen from the FBI office in Media, Pennsylvania. Apparently it has never been ascertained who committed the burglary. In any event, the FBI was of the opinion that the burglary compromised the counterintelligence/disruption programs. These programs were discontinued by an FBI directive dated April 28, 1971. This included the COINTELPRO–CPUSA and COINTELPRO–New Left. The directive also stated that the SWP Disruption Program was being discontinued. Presumably this had been terminated in October 1969; it is not clear why the program was again referred to in the April 1971 directive. The FBI directive reserved the possibility of carrying out counterintelligence activities in exceptional cases on an individual basis.

### V.E.2. *Interviews and Interrogations*

A frequent, and usually quite legitimate, activity of the FBI is to conduct interviews and interrogations. However, in the case of the SWP, such activities often had a purpose other than information gathering. The FBI had a practice of questioning members and prospective members of the SWP, as well as their relatives, landlords and employers. An FBI memorandum of September 1970, relating to the so-called New Left, stated that such interviews could "enhance the paranoia in these circles and will further serve to get the point across there is an FBI agent behind every mailbox."

An SWP member named Reissner testified about FBI activity of this kind in the mid-1960's. He testified that he was informed by his supervisor at work that the FBI had questioned the supervisor every six months over a period of three years. The FBI also questioned the minister who married Reissner and his wife. Finally, Reissner testified that when he re-applied for an apartment in New York City, after having left the city and returned, the landlord refused to rent to him again, and said that during his earlier tenancy the FBI had come to the landlord's office "constantly" and had questioned the landlord and his secretary about Reissner. The landlord did not "want to go through that again."

### V.F. *Electronic Surveillance*

The FBI's use of electronic surveillance in its investigation of the SWP involved both wiretaps on telephone lines and microphones ("bugs") installed in rooms. The first wiretap occurred in June 1943, when the FBI tapped the telephone in Farrell Dobbs' hotel room in Milwaukee. The first bug was planted in the same month at the SWP's Detroit office. The FBI's electronic surveillance operations against the SWP and YSA continued until 1963.

During the years 1943–1963, when these operations were taking place, the FBI had wiretaps in place for a total of about 20,000 wiretap-days, and bugs in place for about 12,000 bug-days. Almost all of this occurred between 1943 and the early 1950's. There was no wiretapping at all after 1954. There were isolated instances of bugging between 1954 and 1963. In 1960, 1961 and 1963 meetings of the SWP National Committee were bugged. These occurred at the SWP's headquarters at 116 University Place, New York City. In 1963 the SWP National Convention was bugged. This took place at the Empire Hotel, New York City. Both the ballroom and a conference room were bugged. In 1962 the office of an SWP leader, James P. Cannon, was bugged for about 40 days. This office was located in his residence in Los Angeles.

The installation of bugs generally required a surreptitious entry into private premises. Both the wiretaps and the bugs involved the overhearing and recording of private conversations on political, organizational and personal matters.

The FBI policy concerning the use of electronic surveillance changed over the years, as did Fourth Amendment law affecting the legality of certain practices. Associate Deputy Attorney General Robert Keuch testified at the trial about the history of the FBI's policy concerning the use of electronic surveillance in national security investigations. The following discussion is based largely on his testimony.

When the FBI was created in about 1920 the policies of both the FBI and the Department of Justice prohibited any use of wiretapping. Ten years later the Bureau of Prohibition, an agency of the Treasury Department which had been using wiretaps, was merged into the FBI. The Bureau of Prohibition continued to use wiretaps after the merger. The policies of the FBI and the Department were then changed by the Attorney General to allow wiretapping by the FBI upon approval of the Director of the FBI and an Assistant Attorney General. In the 1930's two events took place bearing upon this policy. First, Congress passed the Federal Communications Act of 1934, 47 U.S.C. § 605, which provides that "no person not being authorized by the sender shall intercept any wire or radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person...." The Department interpreted the statute as requiring both interception and disclosure before there was a violation of the statute. Moreover, the Department took the view that the statute would be violated only by a disclosure to some person outside of the executive branch. Therefore, under the Department's view, interception and disclosure within the executive branch did not violate the statute. The second event was the Supreme Court's decision in *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), which held that

under the Communications Act evidence or information obtained by use of a wiretap was not admissible in a criminal trial. The Supreme Court extended the scope of this ruling in the second *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), which held that evidence procured through the use of knowledge gained by intercepting communications in violation of the Communications Act was inadmissible.

In early 1940 Attorney General Jackson reinstated the former policy that the FBI would not engage in wiretapping. That policy was short-lived. On May 21, 1940 President Roosevelt sent the Attorney General a memorandum stating that in the President's view the Supreme Court did not intend to have its decision apply to grave matters involving the defense of the nation. The President noted that certain foreign nations were engaged in sabotage and "fifth column" operations, and that preventive steps by the United States were essential. The President directed the Attorney General, in such cases as he should approve, to secure information by listening devices directed to the conversations of persons suspected of subversive activities against the Government of the United States, including suspected spies. These operations were to be limited insofar as possible to aliens.

In 1946 President Truman affirmed the policy of having the FBI use wiretaps in "cases vitally affecting domestic security."

A similar policy developed regarding the FBI's use of microphone surveillance—*i.e.*, this technique could be used to protect against persons or entities thought to be subversive of the national security.

In 1954 the Supreme Court decided *Irvine v. California*, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), where a defendant in a state criminal case claimed that evidence obtained by installing a microphone bug in his home was improperly admitted into evidence. The entire Court agreed that the surreptitious installation of the microphone in a home and the overhearing

of conversations there constituted a violation of the Fourth or Fifth Amendment. However, five of the justices relied on *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), to hold that the state court was not constitutionally required to exclude the evidence.

Justice Jackson's plurality opinion expressed outrage at the intrusion involved in the microphone surveillance:

> Each of these repeated entries of petitioner's home without a search warrant or other process was a trespass, and probably a burglary, for which any unofficial person should be, and probably would be, severely punished. Science has perfected amplifying and recording devices to become frightening instruments of surveillance and invasion of privacy, whether by the policeman, the blackmailer, or the busybody. That officers of the law would break and enter a home, secrete such a device, even in a bedroom, and listen to the conversation of the occupants for over a month would be almost incredible if it were not admitted.

347 U.S. at 132, 74 S.Ct. at 382.

On May 28, 1954 Attorney General Brownell sent a memorandum to the Director of the FBI, discussing the significance of the *Irvine* decision with respect to national security investigations by the FBI. The memorandum stated in part:

> It is clear that in some instances the use of microphone surveillance is the only possible way of uncovering the activities of espionage agents, possible saboteurs, and subversive persons. In such instances I am of the opinion that the national interest requires that microphone surveillance be utilized by the Federal Bureau of Investigation. This use need not be limited to the development of evidence for prosecution. The FBI has an intelligence function in connection with internal security matters equally as important as the duty of developing evidence for presentation to the courts and the national security requires that the FBI be able to use microphone surveil-

lance for the proper discharge of both of such functions. The Department of Justice approves the use of microphone surveillance by the FBI under these circumstances and for these purposes.

The Attorney General expressed the view that the *Irvine* case, dealing with the investigation of gambling, did not require the FBI to abandon use of microphone surveillance for the protection of the national security. The Attorney General went on to state that "not infrequently the question of trespass arises in connection with the installation of a microphone," and "whether a trespass is actually involved and the second question of the effect of such a trespass" must be resolved in each case "in the light of the practical necessities." The Attorney General concluded:

> I recognize that for the FBI to fulfill its important intelligence function, considerations of internal security and the national safety are paramount and, therefore, may compel the unrestricted use of this technique in the national interest.

As of this time the policy of the Government allowing telephone wiretaps for purposes of national security remained in place.

As already described, wiretaps against the SWP ceased in 1954, although isolated instances of bugging continued until 1963. The parties presented evidence about legal developments occurring subsequent to 1963, presumably in reference to plaintiffs' claim for declaratory and injunctive relief.

In a memorandum of June 30, 1965 President Johnson reaffirmed the authorization of wiretaps "in connection with investigations related to national security."

The next major development was *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), where the Supreme Court held that there is no requirement of physical penetration into premises in order for microphone surveillance to be unlawful, overruling *Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). In *Katz*, a microphone was installed on the top of a telephone booth. The Court held that this installation, without a warrant,

was a Fourth Amendment violation. *Katz* was a criminal case, not dealing with a national security investigation. However, the decision contained significant comments on the latter subject. Footnote 23 to the majority opinion stated:

Whether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case.

389 U.S. at 358, 88 S.Ct. at 515. Justice White's concurring opinion stated that electronic surveillance to protect the national security should be held lawful.

Wiretapping to protect the security of the Nation has been authorized by successive Presidents.... We should not require the warrant procedure and the magistrate's judgment if the President of the United States or his chief legal officer, the Attorney General, has considered the requirements of national security and authorized electronic surveillance as reasonable.

389 U.S. at 363–64, 88 S.Ct. at 517–18.

At the time of the *Katz* decision, Congress was considering legislation intended to deal with electronic surveillance, among other things. In 1968 Congress passed the Omnibus Crime Control and Safe Streets Act. Title III of the statute contained provisions relaxing the ban on wiretapping contained in the Communications Act of 1934, and providing regulations regarding the use of *both* wiretapping and microphone surveillance in criminal investigations, on the condition that such surveillance be approved by prior court order. 18 U.S.C. §§ 2510–2520. Section 3 of the Act, 18 U.S.C. § 2511(3), discussed the power of the President to use electronic surveillance in national security investigations.

Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.

The meaning of this language was considered four years later in the landmark decision, *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). The Court defined the issue:

The issue before us is an important one for the people of our country and their Government. It involves the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval. Successive Presidents for more than one-quarter of a century have authorized such surveillance in varying degrees, without guidance from the Congress or a definitive decision of this Court.

407 U.S. at 299, 92 S.Ct. at 2128.

The particular activity involved in the case was wiretapping but the Court's discussion was clearly broad enough to cover microphone surveillance as well. As the Court explained, the precise issue related to the use of electronic surveillance against domestic organizations, defined as groups or organizations (whether formally or informally constituted) composed of citizens of the United States and having no significant connections with a foreign power, its agents or agencies. 407 U.S. at 309 n. 8, 92 S.Ct. at 2132 n. 8. The Court held that 18 U.S.C. § 2511(3) is not a provision *enabling* the Federal Government to engage in electronic surveillance in national security cases, but is simply an expression of

neutrality on the part of Congress with respect to this issue. *Id.* at 308, 92 S.Ct. at 2132. The Court went on to hold that electronic surveillance against domestic organizations in national security matters could not be carried out without a warrant. *Id.* at 321, 92 S.Ct. at 2138. It was obvious from the opinion that the Court considered that Congress could provide a system for the issuance of such warrants. The Court did not address the issue of the use of electronic surveillance with respect to the activities of foreign powers within or without this country. *Id.* at 308, 321–22, 92 S.Ct. at 2132, 2138–39.

In 1978 Congress passed the Foreign Intelligence Surveillance Act, 92 Stat. 1783, which provided for a court composed of federal judges to rule on applications for warrants in *foreign* national security investigations. No legislation was passed then, or has been passed since, regarding electronic surveillance in *domestic* national security investigations. The Department of Justice and the FBI now believe that they have no authority to conduct electronic surveillance in domestic national security cases, and they do not do so.

## V.G. *Surreptitious Entries—"Bag Jobs"*

As has been noted above, in the course of its SWP investigation, FBI agents surreptitiously entered various premises to install microphone surveillance equipment or "bugs." However, the evidence indicates that there were relatively few entries for the purpose of bugging. Most of the entries were for the purpose of photographing or removing documents. The FBI referred to entries where documents were obtained as "bag jobs" or "black bag jobs."

*In toto* the FBI made at least 204 surreptitious entries of SWP and YSA offices and at least four such entries of SWP members' homes. During these entries at least 9,864 documents were removed or photographed. The first such entry was of the SWP offices in Minneapolis in January 1945. Those offices were also entered twice in 1947. By far the largest number of surreptitious entries took place in New York City between 1958 and 1966 and occurred at SWP and YSA offices. There were 193 such incidents. Often more than one office would be located in the same building, as indicated in the table below. When the FBI broke into multiple offices in the same building, each break-in would be recorded as a separate bag job, since each office had its own separate locks and keys. The following table shows the New York entries during the years 1958–1966.

| Years | Building Address | Office Entered | Number of Surreptitious Entries |
|---|---|---|---|
| 1958–1965 | 116 University Place | SWP National Office | 81 |
| | | SWP New York Office | 76 |
| | | YSA Office | 5 |
| 1960 | 45 E. 7th Street | YSA National Office | 2 |
| 1962–1964 | 125 Fourth Avenue | YSA National Office | 9 |
| 1964–1966 | 41 Union Square West | YSA Office | 8 |
| 1966 | 873 Broadway | SWP National Office | 4 |
| | | SWP New York Office | 4 |
| | | YSA Office | 4 |

Other cities in which the FBI entered into SWP or YSA offices include Newark (in 1947 and 1957), Chicago (1949), Detroit (1954), Boston (1959), and Milwaukee (1965). In addition, the FBI entered the homes of SWP members in Detroit (1957), Newark (1951), Hamden, Connecticut (1960), and Los Angeles (1960).

George Baxtrum, who was in charge of the FBI's New York office from 1953 to 1966, testified about the surreptitious entries made in New York.

The first entry took place on November 22, 1958 at 116 University Place. The FBI was interested in covering an upcoming SWP National Committee meeting with microphone surveillance. The New York office obtained the approval of FBI headquarters for surreptitiously entering these premises. The purpose of the first entry was to determine both the feasibility of microphone coverage of the meeting and the feasibility of photographing documents. The entry was made between midnight and 5 A.M. Seven or eight FBI agents went to 116 University Place, where one agent obtained access and then admitted the others, including Baxtrum. The agents found that both microphone coverage and the photographing of documents were feasible. Keys were made to ease future access.

A microphone was installed shortly thereafter to cover the upcoming meeting of the SWP's National Committee.

The entries subsequent to the "trial run" were, with the possible exception of three or four instances, black bag jobs for the purpose of obtaining documents. Each was authorized by FBI headquarters. Several FBI agents would go to the building in question late at night, equipped with walkie-talkies, but not weapons or FBI identification. Usually three agents would go inside, one to take pictures and two to search for documents to be photographed. In their searches, the FBI agents would open file cabinets and desk drawers. They were looking, Baxtrum testified, for three types of documents: (a) those connecting the SWP to the Fourth International, (b) those showing that the SWP was working to overthrow the United States Government, and (c) those showing the travel of members on the FBI Security Index (discussed in section V.H *infra*). Other agents would remain outside as lookouts.

As a result of the surreptitious entries, the FBI photographed or removed documents containing information concerning the political activities and finances of the SWP and YSA, legal matters, and the personal lives of the members. Presumably some of the documents had to do with the SWP's relationship with the Fourth International and the travel of members. However, there is no indication that the FBI obtained any documents showing any violence or any action to overthrow the Government.

A memorandum dated July 19, 1966 that circulated among certain FBI officials in Washington summarized the FBI policy on black bag jobs.

We do not obtain authorization for "black bag" jobs from outside the Bureau. Such a technique involves trespass and is clearly illegal; therefore, it would be impossible to obtain any legal sanction for it. Despite this, "black bag" jobs have been used because they represent an invaluable technique in combatting subversive activities of a clandestine nature aimed directly at undermining and destroying our nation.

The present procedure followed in the use of this technique calls for the Special Agent in Charge of a field office to make his request for the use of the technique to the appropriate Assistant Director. The Special Agent in Charge must completely justify the need for the use of the technique and at the same time assure that it can be safely used without any danger of embarrassment to the Bureau. The facts are incorporated in a memorandum which, in accordance with the Director's instructions, is sent to Mr. Tolson or to the Director for approval. Subsequently this memorandum is filed in the Assistant Director's office under a "Do Not File" procedure.

In the field the Special Agent in Charge prepares an informal memorandum showing that he obtained Bureau authority and this memorandum is filed in his safe until the next inspection by Bureau Inspectors, at which time it is destroyed.

In a note at the conclusion of the memorandum, FBI Director Hoover directed that the activities referred to be terminated. There is no evidence of surreptitious entries by the FBI into SWP or YSA premises after the time of this July 19, 1966 memorandum.

V.H. *Security Index/ADEX*

Over a period of many years the FBI maintained certain lists of persons to be considered for detention in the event of a war involving the United States. Evidence on this point comes mainly from the so-called Church Committee Report. *Senate Select Committee to Study Governmental Operations With Respect to Intelligence Activities, Final Report, Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans,* S.Rep. No. 755, 94th Cong., 2d Sess. (1976).

The FBI established a Custodial Detention List in 1940. In 1943 the Attorney General ordered the termination of this list, stating that it lacked any statutory authorization.

Director Hoover did not abolish the list except to change its name to the Security Index. The list was considered by the FBI to be composed of persons potentially dangerous to the public safety and the internal security of the United States. In March 1946 the FBI advised a new Attorney General of the Security Index. No objection was made. In a memorandum of September 1946 the FBI listed membership in the SWP as a basis for inclusion in the Security Index.

The Department of Justice prepared and compiled numerous draft proclamations and orders for use in a national emergency. This was called the "Attorney General's Portfolio." In 1949 an Emergency Deten-

tion Plan was agreed to between the Attorney General and the Secretary of Defense. The plan provided for apprehending and detaining civilians listed in the Security Index in the event of war or other grave national emergency. The FBI was charged with the responsibility of investigating and apprehending the persons to be detained.

In 1950 Congress passed the Emergency Detention Act (Title II of the Internal Security Act of 1950), 50 U.S.C. §§ 811–826 (repealed September 25, 1971), which set forth specific standards for the apprehension of persons in the event of an internal security emergency declared by the President. The Attorney General advised FBI Director Hoover to disregard the legislation, and to rely on the Attorney General's Portfolio. A Department of Justice memorandum summarized the differences between the provisions of the Emergency Detention Act and the Portfolio. The memorandum stated, among other things, that the FBI's Security Index contained the names of 19,577 persons, many of whom would not be subject to detention under the Emergency Detention Act.

As of 1950 at least 308 SWP members were listed in the Security Index. The evidence is that the FBI intended to include all SWP members and presumably all YSA members.

Inclusion in the Security Index had its consequences. An FBI agent testified at the trial that the FBI verified the residence and employment of SWP and YSA members every 45 days by interviewing landlords and employers for the purpose of keeping the Security Index up to date.

As discussed in section V.E.2 of this opinion dealing with certain disruption techniques, an FBI memorandum of September 1970 stated that the FBI intended that interviews with persons such as employers would "enhance the paranoia" of the leftist subjects of the interviews. It can be safely inferred that the FBI intended, or at least knew, that interviews every 45 days with landlords and employers of SWP and YSA members in connection with

the Security Index would create difficulties for these members.

In 1971 Congress repealed the Emergency Detention Act. Thereafter the FBI, with the consent of the Department of Justice, re-constituted the Security Index as the Administrative Index ("ADEX"), with a broader composition. The evidence at the trial was that the Department and the FBI took the view that, despite the repeal of the statute, a list should be continued, which would be of use in the event of a war or broad civil disturbance.

SWP and YSA members were listed in the ADEX, as they had been in the Security Index, although, after the ADEX came into being, the FBI ceased the practice of the 45–day verification interviews. It is not clear what verification procedures, if any, were then put in place.

The ADEX was discontinued in 1976.

### V.I. *Loyalty-Security Program*

The FBI had substantial responsibilities in connection with programs related to the loyalty and security of federal employees.

The first of these programs commenced in the late 1930's at the direction of President Roosevelt. A commission on loyalty and security was established, and the Attorney General investigated certain organizations to determine if they were fascist, communist or otherwise subversive.

On March 21, 1947 President Truman promulgated Executive Order 9835, which established the Employee Loyalty Program for civilian employees in the executive branch of the Government. The introduction stated that it is of vital importance that federal employees "be of complete and unswerving loyalty to the United States" and that the employment of "any disloyal or subversive person constitutes a threat to our democratic processes." Section V.1 of the order stated:

> The standard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States.

Section V.2.f provided that factors which could be considered in determining disloyalty included membership in any organization

> ... designated by the Attorney General as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means.

This provision led to the creation of what became known as the "Attorney General's list." The order provided that this list was to be disseminated to all departments and agencies.

The order directed that an investigation be conducted of all applicants for employment in the executive branch and all existing employees. In the first instance this investigation was to be of a limited nature, including what has come to be known as a National Agency Check—*i.e.*, a check of any information in the files of the FBI or any other federal investigative or intelligence agency. If the limited investigation revealed "derogatory information," or if certain sensitive positions were involved, a "full field investigation" would be conducted.

In a memorandum dated October 30, 1947 President Truman directed that the FBI was to conduct all loyalty investigations under the program.

Commencing in September 1948 the SWP was included in the Attorney General's list as a communist organization, a subversive organization, and an organization which seeks to alter the form of government of the United States by unconstitutional means.

The SWP promptly protested its inclusion in the Attorney General's list and asked for a hearing. The Department of Justice responded that there was no provision in the executive order for a hearing.

On April 27, 1951 President Truman issued E.O. 10241, which amended section V.1 of E.O. 9835, relating to the standard for refusing employment. The new provision was:

The standard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States.

On April 27, 1953 President Eisenhower promulgated E.O. 10450, which superseded E.O. 9835. E.O. 10450 in somewhat amended form is still in effect. It covers all civilian Government employees, not just those in the executive branch.

The introduction to E.O. 10450 again refers to the need for "unswerving loyalty" in federal employees. However, the guiding standard set forth in the order (*e.g.*, section 2) is that

... the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security.

In determining whether the employment of an individual is "clearly consistent with the interests of the national security," consideration is to be given to a number of factors, including membership in certain organizations. Section 8(a)(5), as promulgated in the original version of E.O. 10450, defined the potentially disqualifying membership as follows:

... membership in, or affiliation or association with, any foreign or domestic organization ... which is totalitarian, Fascist, Communist, or subversive, or which has adopted, or shows a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or which seeks to alter the form of government of the United States by unconstitutional means.

This provision was similar to section V.2.f of E.O. 9835, except that the new provision omitted any reference to the Attorney General's list. However, section 13 of E.O. 10450 directed that the Attorney General render advice to departments and agencies to enable them to carry out an appropriate employee security program. This provision was interpreted as authorization for the continuation of the Attorney General's list.

Meanwhile, in 1951 the Supreme Court held that due process required notice and hearing before an organization could be placed on the Attorney General's list. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). Regulations were subsequently issued under E.O. 10450 providing for notice and hearing in accordance with the *Joint Anti-Fascist* case. On May 12, 1953 public notice was given of the continuation of the SWP's designation on the Attorney General's list. By letter dated June 4, 1953 the SWP gave notice of contest. However, the Department of Justice took the position that under the regulations the SWP's notice was defective because it was not signed by all the executive officers of the SWP. No hearing was ever held. The SWP remained on the Attorney General's list until the list was terminated in 1974.

It became the practice for federal employment applications to include questions about whether the applicant belonged to any organization which to his knowledge advocated the overthrow of the Government by force, violence or other unlawful means. If the employment application or some other information revealed that an applicant for federal employment was a member of an organization on the Attorney General's list, this would trigger a full field investigation by the FBI. The information collected would be given to the Civil Service Commission without recommendation.

If the FBI's full field investigation confirmed membership in an organization on the Attorney General's list, the Civil Service Commission would send the applicant written interrogatories regarding his loyalty to this country and its governmental system.

All the information obtained in a given case would be used by the Civil Service Commission, or by the employing department or agency, to determine suitability for employment.

Certain members of the SWP were affected by the enforcement of E.O. 10450.

Sally Lou Moore was terminated from her employment as a distribution clerk with the Post Office on September 16, 1968. The Civil Service Commission determined that she was unsuitable for federal employment because she was a member of the SWP and because she was living with a man to whom she was not married. She did not pursue the available administrative appeals.

In 1969 Kenneth Evenhuis applied for a position as an air traffic controller for the Federal Aviation Administration. For some reason, he filled out two successive applications, in each of which he was asked if he belonged to any organization which to his knowledge advocated the overthrow of the Government by force, violence or other unlawful means. In the first application Evenhuis answered "No." In the second he answered "Yes." The FAA asked which answer was correct, and he responded that the negative answer was correct. Meanwhile, the Civil Service Commission learned from the FBI that Evenhuis was a member of the SWP and the YSA. The Commission then sent Evenhuis written questions, asking whether he was aware that the SWP was seeking to overthrow the Government by force, and whether he condoned that objective or was assisting in bringing it about. Evenhuis failed to respond, and was given no further consideration for FAA employment.

However, in December 1969 Evenhuis was hired as a substitute postal carrier. In May 1970 the Civil Service Commission sent him interrogatories asking him to explain those of his previous answers denying membership in an organization that advocated the violent overthrow of the Government. In June 1970 Evenhuis responded that the SWP was not seeking to overthrow the Government by force, but to bring socialism to the United States through lawful means, and that he was not assisting in attempting to overthrow the Government by force and did not condone such an objective.

The Civil Service Commission did not credit these assertions. Evenhuis was discharged from his postal position on July 12, 1971 on the ground that his negative answers in connection with the FAA application were false.

Duncan Gordon was another SWP member who was employed by the Post Office. He was discharged in December 1970 on the ground that he had made a false answer in his application when he denied that he was a member of an organization advocating the overthrow of the Government. The Civil Service Commission noted that the SWP was on the Attorney General's list and that it "has been reported" that the SWP advocated the overthrow of the Government.

Gordon and the SWP brought suit. The Government voluntarily reinstated Gordon, conceding that it had made a "mistake." This made the lawsuit moot as to Gordon. As to the SWP's claims, the court held that the Attorney General's list was constitutional, but that the SWP was entitled to assurance that "mistakes" in using the list would not be repeated. *Gordon v. Blount*, 336 F.Supp. 1271 (D.D.C.1971). It should be noted that the opinion did not really define what was meant by "mistakes." Moreover, the opinion did not make any finding that the SWP was not advocating the violent overthrow of the Government. On the latter point, the court noted that the Seventh Circuit had held that on the record before it substantial evidence did not exist to support a finding that the SWP advocated violent overthrow of the Government. *See Scythes v. Webb*, 307 F.2d 905, 909 (7th Cir.1962).

The court in the *Gordon* case had received information about the Evenhuis situation, and termed this a mistake similar to what occurred with Gordon. Evenhuis was reinstated to his postal position in March 1972.

Evidence was presented in the present case about certain other instances of investigations or questioning of SWP members in connection with Government employment. However, in those instances there is no evidence of any prejudice to the persons, and the details need not be discussed. *But see Clark v. Library of Congress*, 750 F.2d 89 (D.C.Cir.1984) (full field investigation in 1976 of a non-sensitive employee, who was a member of the SWP). No evidence about the Clark matter was offered at the trial of the present case.

The SWP witnesses have testified that, even aside from any problems with applying for federal employment, the inclusion of the SWP on the Attorney General's list was detrimental to the organization. The fact that the SWP was on the list was a matter of public knowledge and was frequently reported in the press in connection with items about SWP candidates for public office. The SWP contends that this circumstance detracted from the support the SWP and its candidates would otherwise have had.

On June 4, 1974 the Attorney General's list was abolished by E.O. 11785. At the same time the definition in E.O. 10450 of potentially disqualifying organizational membership was amended to read:

Knowing membership with the specific intent of furthering the aims of, or adherence to and active participation in, any foreign or domestic organization, association, movement, group, or combination of persons (hereinafter referred to as organizations) which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States or of any State, or which seeks to overthrow the Government of the United States or any State or subdivision thereof by unlawful means.

Aside from these changes, the basic loyalty-security program of E.O. 10450 remains in place.

As will be described in the next section of this opinion, the Attorney General terminated the FBI's authority to investigate the SWP in September 1976.

In 1977 the FBI addressed two memoranda to the Attorney General asking for guidance on the FBI's investigative power under E.O. 10450. Basically, the FBI inquired whether it should initiate full field investigations (as distinct from responding to requests from another agency) when information came to light that an employment applicant was a member of the SWP or YSA. The Attorney General did not formally respond. However, the Department of Justice has instructed the FBI informally that it should perform a full field investigation on a member of the SWP or YSA only if requested by another agency, and then only after consultation with the Department. The issue has come up only once, and the Department disapproved the investigation.

The FBI does report the fact of SWP or YSA membership in connection with a National Agency Check, where such membership is indicated in the FBI files. However, these files are by now ten years old or more. The FBI is prepared to circulate to federal departments and agencies the following description of the SWP.

The SWP is a revolutionary, Trotskyist-communist organization which has as its purpose the overthrow of the U.S. Government and the institution of a dictatorship of the working class and the eventual achievement of a communist society.

The FBI ceased investigating the YSA/SWP in September, 1976, pursuant to the Attorney General's Guidelines for Domestic Security Investigations. Therefore, receipt of an allegation that an individual is a member of the YSA/SWP would no longer warrant an FBI investigation.

The functions formerly performed by the Civil Service Commission have now been given to the Office of Personnel Management ("OPM"). A witness from the OPM testified at the trial that his agency regards the FBI's information on the SWP as stale. OPM policy is that membership in

the SWP or YSA no longer raises a loyalty issue.

There is no evidence that, following the termination of the SWP investigation, an SWP or YSA member was denied federal employment because of that membership. As of the time of trial two present or former members of the SWP or YSA were employees of the Government.

### V.J. *Termination of FBI Investigation*

On April 5, 1976 the Department of Justice issued the Attorney General's Guidelines for Domestic Security Investigations. Section I(A) stated that a domestic security investigation was designed to

ascertain information on the activities of individuals, or the activities of groups, which involve or will involve the use of force or violence and which involve or will involve the violation of federal law, for the purpose of:

(1) overthrowing the government of the United States or the government of a State. . . .

The guidelines provided for three types of investigations: preliminary, limited and full. The FBI investigation of the SWP was a full investigation. The standards for determining whether to institute a full investigation were set out in Section II(I):

Full investigations must be authorized by FBI Headquarters. They may only be authorized on the basis of specific and articulable facts giving reason to believe that an individual or a group is or may be engaged in activities which involve or will involve the use of force or violence and which involve or will involve the violation of federal law. . . . The following factors must be considered in determining whether a full investigation should be undertaken:

(1) the magnitude of the threatened harm;

(2) the likelihood it will occur;

(3) the immediacy of the threat; and

(4) the danger to privacy and free expression posed by a full investigation.

In the spring of 1976, the Department of Justice commenced a review of the FBI's investigation of the SWP. On May 17, 1976 the FBI submitted a report recommending continuation of the investigation. In a section entitled "Violation of Federal Law," the report referred to the 1941 conviction of SWP leaders under the Smith Act. No subsequent prosecutions or convictions were mentioned. The report stated:

There have been no recent prosecutions of SWP members. However, when SWP analysis of objective conditions progresses to the point where SWP believes that a revolutionary situation exists, SWP members would be expected to violate Federal statutes at that time such as those dealing with insurrection, conspiracy, sabotage, antiriot and advocating the overthrow of the Government. Thus investigation is being conducted so that the Government is aware of this decision when made.

The FBI recommended that the investigation be carried on by the collection of public information, physical surveillance, interviews, and informants. No mail covers or electronic surveillance were to be used. The report stated:

The above recommendation is made because the SWP and YSA are revolutionary parties—small, but well-organized, disciplined, and financed—dedicated to eventual communist revolution in the United States and heavily involved with a worldwide communist-Trotskyist movement. They are working continually to achieve conditions in which the revolution can begin. At the present, they give the appearance of using legal means; yet, it is clear in Marxist and Trotskyist ideology that illegal means will not be rejected when "objective conditions" are such that violence and illegal activity will aid, rather than harm, the desired revolution.

On September 9, 1976 Attorney General Levi terminated the investigation of the SWP. His memorandum to Director Kelley of the FBI stated:

We have considered the case under the FBI guidelines for domestic security investigations and also under the FBI guidelines for foreign intelligence and foreign counterintelligence matters. It is our view based on the facts as presented that the investigation should be terminated.

The information presented by the FBI and CIA does not constitute specific and articulable facts giving reason to believe the Socialist Workers Party will engage in violence in the foreseeable future; thus the standard set by the domestic security guidelines has not been met. There is no evidence of conduct that would justify an investigation under the foreign counterintelligence guidelines. We have received no request from the Director of Central Intelligence or other appropriate official that the investigation be continued to provide information of foreign intelligence value; thus the investigation cannot be considered in that light. We have noted that information disseminated by the CIA to the FBI indicates a significant link between the Socialist Workers Party and a foreign based political group. This type of information should be carefully watched to see whether in the future a reconsideration of this case is required. Similarly, if new facts or circumstances emerge which change the character of the group's domestic conduct in such a way as to justify investigation, a reconsideration would be in order.

Although the memorandum refers only to the SWP, the effect was to terminate the investigation of the YSA also. There is no evidence that an investigation of the SWP or the YSA has been revived by the FBI in any form.

On March 7, 1983 the Department of Justice issued revised guidelines for domestic security investigations. The revision brought together the rules for investigating domestic security/terrorism cases and the rules for investigating general crimes and racketeering enterprises. The guidelines provide for preliminary inquiries and full investigations. Part III(B) is entitled "Domestic Security/Terrorism Investigations," and provides:

A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States. The standard of "reasonable indication" is identical to that governing the initiation of a general crimes investigation under Part II.

Part II(C) provides:

The standard of "reasonable indication" is substantially lower than probable cause. In determining whether there is reasonable indication of a federal criminal violation, a Special Agent may take into account any facts or circumstances that a prudent investigator would consider. *However, the standard does require specific facts or circumstances indicating a past, current, or impending violation.* (emphasis added)

Nothing has been brought to the court's attention indicating that either a preliminary inquiry or an investigation has been instituted by the FBI against the SWP or YSA under the March 1983 guidelines.

## VI

### *Issues Under the Federal Tort Claims Act*

#### VI.A. *List of Administrative Claims*

In order to recover damages from the United States under the Federal Tort Claims Act, a plaintiff must comply with the prescribed procedure regarding the filing of a claim with the appropriate department or agency. 28 U.S.C. §§ 2401(b), 2672, and 2675. Plaintiffs in the present case filed a total of 18 administrative claims. Plaintiffs pursued only nine of these claims at the trial of this action. One of these—pertaining to alleged U.S. Army involvement in Legion of Justice activity—was dismissed at the conclusion of plain-

tiffs' proof at the trial. The remaining eight of these claims are listed below.

| | Claimants | Subject | Date | Agency |
|---|---|---|---|---|
| 1. | SWP/YSA | SWP Disruption | 7/17/75 | FBI |
| 2. | SWP/YSA | COINTELPRO–New Left and CPUSA | 7/22/76 | FBI |
| 3. | SWP/YSA | Burglaries | 7/22/76 | FBI |
| 4. | SWP/YSA | Informants— removal of documents | 10/28/76 | FBI |
| 5. | SWP/YSA | Informants— other activities | 10/28/76 | FBI |
| 6. | Evelyn Sell | Job loss | 10/03/75 | FBI |
| 7. | Morris Starsky | Job loss | 10/03/75 | FBI |
| 8. | Linda Jennes; Andrew Pulley | Electronic surveillance | 5/27/76 | Secret Service |

There are no recoverable damages from the COINTELPRO programs referred to in Claim No. 2. This claim will not be discussed further.

All of these administrative claims were formally denied in a letter to plaintiffs' attorney dated August 6, 1979 from the Torts Branch, Civil Division, Department of Justice.

On December 11, 1981, after the trial of this action had been completed, the SWP filed an administrative claim against the FBI relating to electronic surveillance.

## VI.B. *Findings Regarding Timeliness of Administrative Claims*

One of the provisions of the Federal Tort Claims Act is the statute of limitations contained in 28 U.S.C. § 2401(b).

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues....

As will be discussed hereafter, there are substantial questions about when certain of the claims in the present case accrued. For instance, the first administrative claim listed above relates to the SWP Disruption Program. The Government contends that this program was terminated in 1969 and that the claim relating to this program accrued no later than 1969. Plaintiffs contend that, although the formal Disruption Program was terminated in 1969, disruptive activities by the FBI continued thereafter. Alternatively, plaintiffs contend that, even if FBI disruption ceased in 1969, plaintiffs can rely on two related legal doctrines. The first of these is that a claim does not accrue, within the meaning of § 2401(b), until the time when the plaintiff discovers or should have discovered the facts giving rise to the claim. The second is that the claim does not accrue as long as the tortious activity is fraudulently concealed. It is necessary to make certain factual findings relevant to the dis-covery and fraudulent concealment rules.

The events leading directly to the filing of the administrative claims started with the commencement of this action on July 18, 1973. The original complaint, filed at that time, did not make any claim for damages against the United States. No administrative claims under the FTCA had been submitted prior to the filing of the original complaint. However, events that occurred during the discovery proceedings in this action led to the filing of certain of the administrative claims. Aside from this, the original complaint is significant for another reason. The Government contends that the allegations in the original complaint are an important part of the evidence showing that plaintiffs had discovered the various

illegal activities of the FBI and the other Government agencies more than two years prior to the filing of the administrative claims. The first such claim of the SWP/YSA was filed on July 17, 1975. The other claims of the SWP/YSA were not filed until 1976 and 1981. The claims of the individual plaintiffs were filed on various dates beginning in October 1975. The Government contends that the original complaint indicates that plaintiffs knew of all or most of the illegal activities referred to in the administrative claims at and before the time the original complaint was filed.

It is necessary to describe certain allegations of the original complaint in some detail. The defendants in this complaint were heads of Government agencies and departments named by official title, *e.g.*, "Attorney General of the United States." In addition certain individuals were named as defendants—most prominently, former President Nixon and officials of the Nixon administration, former Attorney General John Mitchell, and White House staff members H.R. Haldeman, John Ehrlichman, John W. Dean, III, and Tom Charles Huston. The complaint sought injunctive relief against all the defendants and damages against the individual defendants.

The complaint alleged (par. 33) that, commencing in the year 1948 and continuing to the time of the complaint, Government officials agreed to engage in a

... systematic campaign of excessive interrogation, employment discrimination and other harassment against SWP, its members, candidates and supporters (including members of YSA), and to spy upon them systematically by means of warrantless electronic surveillance, unauthorized opening and monitoring of mail, burglary, and by other illegal means.

The complaint then referred (par. 34) to the so-called "Huston Plan," which was said in the complaint to have involved an agreement made in 1970 to intensify the type of activities referred to in par. 33.

Detailed allegations about these activities were contained in pars. 37–76:

(a) The Attorney General placed the SWP on a list of subversive organizations (par. 37).

(b) The FBI carried out interrogation and surveillance of SWP members, supporters and candidates for public office (par. 39).

(c) The FBI carried out interrogation of landlords, employers, parents and friends of SWP members, with warnings about the alleged subversive nature of the SWP (pars 41–43).

(d) The FBI induced members and supporters of the SWP "to become government agents" for the purpose of spying and "interfering with lawful campaigning and organizing" (par. 44).

(e) Government agents installed a wiretap on the home telephone of plaintiff James P. Cannon, in Los Angeles, California, which was discovered by a repairman in February 1972 (pars. 58–59).

(f) Prior to and during the 1972 and 1973 election campaigns, Government agents used illegal wiretaps and other electronic listening devices to intercept campaign-related and other conversations involving people connected with the SWP (pars. 60–61).

(g) Government agents committed burglaries and removed documents at the following premises: SWP campaign headquarters, Detroit, October 1971; Charles Bolduc residence, Detroit, February 1972; Norman Oliver residence, Brooklyn, New York, May 1973 (pars. 66–70).

(h) Government agents terrorized SWP campaign workers in Los Angeles, May 1970 (pars. 71–72).

(i) Government agents placed a bomb in SWP campaign headquarters in Houston, March 1971 (pars. 73–74).

An analysis of these allegations shows several things. First, they contain no reference to the SWP Disruption Program which the FBI carried on from 1961 to 1969. The original complaint alleged "harassment," but this obviously referred to the interrogation of members and poten-

tial members and approaches to family, landlords, and employers.

The original complaint referred to burglaries. A previous section of this opinion dealt with surreptitious entries, most of which were, in FBI parlance, "bag jobs." These were, of course, burglaries. The only specific instances of burglaries alleged in the original complaint were ones occurring in Detroit and Brooklyn in 1971–1973. There were no allegations in this complaint about the extensive program of FBI burglaries which occurred at SWP/YSA premises at various times through 1966, described earlier in this opinion.

What is said here is sufficient to show that the original complaint contained a rather limited list of allegations, based on limited information which plaintiffs had at that time.

It is now necessary to discuss in some detail the events which led to the filing of the administrative claims.

VI.B.1. *Disruption Program*

Earlier in this opinion, there was a reference to the burglary of the FBI office in Media, Pennsylvania, which occurred in March 1971. The SWP soon learned of this. The text of the documents was published in March 1972 by a magazine called "WIN." One of the documents contained the words "COINTELPRO–New Left." No description was given of this program. Nothing was said to indicate that the program was directed in part at the SWP. No mention was made in these documents of the SWP Disruption Program.

In the January 27, 1972 issue of The New York Review of Books, there was an article by former FBI agent Robert Wall in which he described to some extent the COINTELPRO–New Left and its tactics. However, there was no reference to the SWP or the SWP Disruption Program.

In early 1973 NBC newsman Carl Stern commenced an action in the federal district court for the District of Columbia, under the Freedom of Information Act, 5 U.S.C. § 552, seeking to have the FBI turn over documents relating to COINTELPRO–New Left. Apparently the FBI had refused Stern's request to the agency, and the FBI resisted the court action. On September 25, 1973 the court handed down an opinion holding that the documents should be turned over. *Stern v. Richardson*, 367 F.Supp. 1316 (D.D.C.1973). The Government did not appeal, and the documents were turned over to Stern on December 7, 1973. He promptly made these documents public.

One of the documents was the directive of April 28, 1971 which terminated a number of COINTELPRO programs and referred to them by name, including the COINTELPRO–CPUSA and COINTELPRO–New Left. This termination order also referred to the SWP Disruption Program.

This is the first time that the FBI's SWP Disruption Program had ever been publicly disclosed. There is no evidence that plaintiffs in the present action had ever learned of the SWP Disruption Program prior to this time.

Within days, plaintiffs filed interrogatories in this action asking about the purpose of the SWP Disruption Program. Relevant documents were also requested.

On February 5, 1974 the FBI filed answers to the interrogatories, stating that the purpose of the SWP Disruption Program "was to alert the public to the nature and activities of the Socialist Workers Party and thus to neutralize the Socialist Workers Party." The answers further described the tactics employed in the SWP Disruption Program as consisting of the furnishing of information to law enforcement agencies regarding violations of the law by SWP and YSA members; furnishing the news media pertinent information regarding the objectives and activities of these organizations, and furnishing "information concerning the nature and activities of SWP and YSA to organizations and individuals associated with SWP, YSA or their members." The FBI further stated that the COINTELPRO–New Left was not applicable to either the SWP or the YSA.

These answers were grossly deceptive. In March 1975 the FBI produced documents which showed that the facts about the SWP Disruption Program bore very little resemblance to the bland description given by the FBI in its February 1974 interrogatory answers. As shown in the lengthy discussion earlier in this opinion, the SWP Disruption Program was designed to injure and obstruct the SWP and YSA by covert means—to hamper their activities, to turn the members against each other, to intensify racial friction within the membership, and to rupture the SWP's alliances with other groups. This was not good-faith dissemination of information.

On July 17, 1975 the SWP and YSA filed their administrative claim about the SWP Disruption Program. This was less than two years after the existence of the program had come to light in December 1973, and shortly after the document production of March 1975.

The Government cites various items of evidence allegedly showing that the SWP had information about the disruption activities sufficient to require the SWP to file the administrative claims long before July 1975. Certain of the Government's contentions will be discussed below. All have been considered by the court.

An SWP leader, Farrell Dobbs, testified that the "witchhunt" against the SWP started in 1938–1939. Another SWP leader, Peter Camejo, testified that it was a known fact from the time the SWP was formed in 1938 that the FBI was harassing the party. A 1941 article in *The Militant* alleged that the FBI sent "agents provocateurs" into a labor union and the SWP to spy upon and "frame" militant workers. In the fall of 1941 the SWP learned that FBI agents and informants met with certain Teamsters Union members to stir up a "slander campaign" against SWP supporters in the union. In 1953 Dobbs circulated a letter within the SWP about FBI attempts to question members about a split in the party. The letter termed the questioning "FBI harassment." An article in a 1958 issue of *The Militant* referred to the

FBI's "anonymous letter writers." A 1959 memo written by an SWP leader, George Breitman, refers to FBI harassment. Camejo testified in his deposition in this case that he was aware earlier than 1960 that the FBI was attempting to destroy the SWP.

In the mid–1950's the SWP consulted with lawyers for the American Civil Liberties Union, and perhaps other lawyers, about bringing a lawsuit because of the harassment by the FBI. According to Dobbs' testimony, the SWP was told that there would be no chance of winning the case in the political climate of the time.

The Government contends that this evidence shows that the SWP was aware in the 1930's, 1940's and 1950's of the FBI disruption activities against the SWP. But this evidence is beside the point. The administrative claim of the SWP filed on July 17, 1975 is based specifically on the "Socialist Workers Party Disruption Program." The claim clearly refers to the formal SWP Disruption Program commencing in 1961, disclosed in the documents produced in March 1975. The claim is not based on any vaguely discerned or suspected activities occurring in the 1930's, 1940's or 1950's. Moreover, there is no evidence to suggest that the activities which the FBI carried out against the SWP prior to the commencement of the SWP Disruption Program in 1961 were the same as the latter program in structure, purpose or scope. In other words, a distinct program came into being in 1961.

The Government cites certain evidence about what the SWP and its members learned in the 1960's and early 1970's.

An SWP leader, Barry Sheppard, testified that in 1961 he lost his job because of the "intervention" of the FBI. Larry Seigle, who joined the SWP and YSA in 1965, testified that the SWP destroyed its financial records, and had always done so, to protect members from being harassed, wiretapped and interrogated by the FBI. According to the deposition of Norman Oliver, in 1968 it was commonly assumed that the

Government was "attempting to intimidate us in all kinds of ways."

The above evidence shows the same kind of general suspicion and belief about FBI hostility that the SWP had possessed in earlier years. Also it shows one instance where an SWP member, Barry Sheppard, knew that he lost his job because of "FBI intervention." However, knowledge of this one instance of personal loss of employment is not the equivalent of knowledge of the full-fledged Disruption Program.

None of the evidence about what the SWP learned in the 1960's and early 1970's shows that the SWP gained any information about the facts concerning the SWP Disruption Program and the covert activities carried out thereunder.

The only reference in this evidence to an activity which turned out to be under the SWP Disruption Program is the following. Item (3) in section V.E.1 of this opinion dealing with the Disruption Program refers to an anonymous letter sent by the FBI to an SWP-supported candidate, Sam Jordan. The Government's evidence shows that Jordan told an SWP member that he (Jordan) basically disregarded the letter because he assumed that "an agent or somebody like that had written it." This in no way meant that the SWP was informed of the Disruption Program. This incident related to only one of 46 formally approved and implemented operations under the program, and merely shows that Jordan surmised or assumed that some agent of some governmental body was responsible for the letter. The SWP did not learn from this incident that there was a systematic, covert FBI program whose express purpose was to disrupt the SWP on a national basis.

There has already been reference in this opinion to the documents stolen from the FBI office in Media, Pennsylvania in March 1971. By at least March 1972 the text of these documents had been published and was available to the SWP. As already noted, one of the documents contained the words "COINTELPRO–New Left." However, there was no description at all of what this was, and there was no indication

that it had to do with the SWP. The documents made no mention of the SWP Disruption Program. A member of the YSA was mentioned in the documents, but not in connection with any disruption program or activities.

There has also been reference earlier in this opinion to the article by former FBI agent Robert Wall in the January 27, 1972 issue of The New York Review of Books, in which there was some description of COINTELPRO–New Left and its tactics. The article stated that the program was designed to thwart and undermine "any organization that fell into the category of the 'New Left.'" The article also stated that the FBI had addressed a fictitious letter to the leaders of New MOBE, designed to hinder plans for an anti-Vietnam War rally by suggesting that the black community of Washington, D.C. would not support the rally unless New MOBE gave a "security bond" to a black organization. This letter was received by SWP leader Fred Halstead in his capacity as a member of the steering committee of New MOBE. However, the Wall article makes no reference to the SWP or to the SWP Disruption Program. The SWP, which was founded in 1938 and, which follows the doctrines of Marx, Lenin and Trotsky, had no reason to assume that the FBI included it in the "New Left."

The court finds that during the 1960's and early 1970's, the SWP did not know of the SWP Disruption Program, its purpose or its activities. Since this was a covert program, which the FBI intended not to be traceable to the FBI, it cannot be said that the SWP was lacking in due diligence in not discovering the facts during this time.

As of the time the original complaint was filed in July 1973, the SWP knew of certain forms of harassment by the FBI—interrogation of members and potential members and approaches to family, landlords and employers. However, the original complaint does not allege, nor was the SWP informed of, the facts about the SWP Disruption Program.

Noting the Freedom of Information Act suit brought by NBC newsman Carl Stern,

which uncovered the existence of the SWP Disruption Program in December 1973, the Government contends that due diligence required that the SWP file a FOIA request of its own "instead of waiting for reporter Carl Stern to do so." The court rejects the argument that due diligence, for purposes of complying with the time requirements of the Tort Claims Act, requires that a party engage in litigation under the FOIA. In any event there is no cogent argument as to why the SWP should have made a claim under the FOIA any sooner than Stern did (undoubtedly stimulated by the reference to COINTELPRO–New Left in the Media, Pa. documents), and there is no showing as to why the SWP should have gotten any documents from the FBI sooner than Stern did—December 1973. The SWP filed its administrative claim on July 17, 1975, less than two years after the production of the documents to Stern. Of course, as already described, the FBI consumed a substantial amount of time after December 1973 trying to conceal from plaintiffs the actual facts about the SWP Disruption Program. When such facts were finally and belatedly disclosed in March 1975, plaintiffs forthwith filed their administrative claim.

The court finds that prior to December 1973 plaintiffs did not know, nor should they have known, of the SWP Disruption Program. Moreover, they did not know the facts about this program until March 1975. These findings apply to the covert disruption activities carried out under the SWP Disruption Program described in section V.E.1 of this opinion.

The above findings do not apply to the interrogations described in section V.E.2, involving approaches by the FBI to SWP and YSA members and to their families, landlords and employers. These activities were known to the SWP and YSA for many years. They were referred to in the original complaint filed in July 1973. Therefore any claim for damages based on these activities accrued more than two years before the filing of the administrative claim on July 17, 1975.

## VI.B.2. *Surreptitious Entries*

Administrative claim 3, referred to in section VI.A *supra,* complains of the burglaries or surreptitious entries of SWP and YSA offices in New York City commencing in 1958. These are described in section V.G. The FBI intended that these entries would be carried out with complete secrecy and there is no reason to believe that the FBI failed to achieve this.

The original complaint in this action, filed in July 1973, referred to burglaries, but the allegations related to three operations believed to have been perpetrated by the Government between 1971 and 1973 at premises other than those of the SWP and YSA offices in New York. In fact, these three burglaries were not committed by the FBI. The original complaint contained no allegations about what was virtually a campaign of FBI burglaries during the years 1958 through 1966.

Following the filing of the original complaint, the FBI and certain persons in the Justice Department took elaborate steps to avoid disclosing to plaintiffs the actual facts about the burglaries. After this scheme was exposed, it became the subject of a 31–page Justice Department report entitled, *Summary of Inquiry into the Nondisclosure of FBI Bag Jobs in the Socialist Workers Party Civil Litigation* ("Bag Jobs Inquiry"). This report is dated June 25, 1980. The following is a summary of what is set forth in the report.

The Government filed its answer to the original complaint on January 7, 1974. The answer denied any Government involvement in the 1971 to 1973 burglaries alleged in pars. 66–69 of the complaint. However, the real problem regarding the FBI strategy was the reference to "burglary" in par. 33. The FBI knew, as plaintiffs did not, about the numerous burglaries or bag jobs committed during the years 1958 through 1966, and some before that time. The FBI knew that a truthful answer to par. 33 would require disclosure of these facts. The FBI sought to avoid such disclosure.

The United States Attorney's office for the Southern District of New York had

primary responsibility for the defense of the action. This office was apparently answerable, in connection with the present action, to the Criminal Division of the Justice Department in Washington. While the Government's answer to the original complaint was being prepared, the FBI submitted a litigation report to the Criminal Division dated November 15, 1973. The report proposed that the allegation of burglary in par. 33 be denied. No explanation or elaboration was given. At least one of the two FBI agents who worked on the report was aware that the SWP had been the target of FBI bag jobs. The primary impetus for recommending the denial of the burglary allegation in par. 33 "appears to have been the deep concern within [the Domestic Intelligence Division of the FBI] that the Bureau's resort to bag jobs not be disclosed outside the FBI." *Bag Jobs Inquiry* at 6. The Government's answer, filed January 7, 1974, did in fact deny the burglary allegation.

In February 1974 the Government served on plaintiffs an extensive set of interrogatories as part of pre-trial discovery. Included were several hundred questions, prepared by the FBI in Washington, asking about the history and ideology of the SWP. An FBI official has admitted that the FBI's strategy was to

> ... encourage the plaintiffs to agree to limit discovery to a relatively recent time period, hopefully a period beginning sometime after 1966. In that way, disclosure of bag jobs could be avoided, since J. Edgar Hoover had ordered the abandonment of the technique on July 19, 1966.

*Bag Jobs Inquiry* at 18.

Indeed, the FBI engaged in a prolonged series of tactics to conceal the bag jobs from the United States Attorney's office. At one point in late 1973 or early 1974, an FBI agent in Washington dealing with the matter told the FBI case agent in New York not to advise the U.S. Attorney's office of the bag jobs.

At one meeting between the FBI and the Assistant U.S. Attorney the FBI represent-atives used the term "confidential investigative techniques," knowing that this reference included bag jobs. The Assistant asked for an explanation of what the term covered. The reply did not include bag jobs.

The FBI's use of the bag job technique was publicly confirmed for the first time on July 14, 1975 by FBI Director Kelley at a news conference. He indicated that such activies had been carried out prior to a cutoff in 1966. This announcement did not disclose that the SWP had been a target.

The Assistant U.S. Attorney inquired of the FBI whether there had been bag jobs against the SWP. The FBI responded that the SWP was not one of the targets.

On July 25, 1975 the FBI sent the Attorney General a package of memoranda discussing bag jobs. One of these cited the SWP as an example of a target. The FBI did not send these documents to the Criminal Division office having responsibility for the SWP action, nor did it send them to the Assistant U.S. Attorney.

During the fall of 1975 the FBI provided information, on a confidential basis, to Congressional committees and to the Civil Rights Division of the Justice Department indicating that the SWP had been a target of bag jobs. Although one of these items reached the Criminal Division, it is uncertain when this occurred. More important, the FBI did not give the information to the Assistant U.S. Attorney, nor is there any indication that the information reached the Assistant U.S. Attorney even indirectly at this time.

On September 25, 1975 an FBI representative testified about bag jobs before a public session of the Church Committee. The testimony was widely reported, but the witness did not name any target of the bag jobs.

This caused the Assistant U.S. Attorney on the SWP case again to inquire of the FBI if there had been any bag jobs involving the SWP. The FBI replied that it would be necessary to check. The Bureau

did not conclude its check until March 1976. *Bag Jobs Inquiry* at 30.

The Assistant continued to press his inquiry on this point at a meeting with the FBI on October 8, 1975 and in a letter dated November 5, 1975.

Finally, in telephone conversations on March 16 and 20, 1976 the Assistant was advised by the FBI that there had been bag jobs against the SWP. Disclosure was made by the Assistant to plaintiffs on March 24, 1976. *Bag Jobs Inquiry* at 31.

The conclusion is that the FBI deliberately concealed the SWP burglaries or bag jobs from both plaintiffs and the United States Attorney's office for a period of 2¾ years following the filing of this action— *i.e.*, from July 1973 to March 1976.

The administrative claim regarding burglaries was filed on July 22, 1976.

The Government cites a few items of evidence allegedly showing that the SWP knew of the burglaries more than two years before the administrative claim was filed.

Prior to 1958 (the first year referred to in the administrative claim), there were seven entries into SWP/YSA offices, but these were in places other than New York City. During the years 1958–1966 there were four entries into SWP/YSA offices outside New York City. During the years 1951–1960 there were four entries into the homes of SWP *members* in various cities.

The Government notes that an FBI bug of an SWP meeting in 1951 picked up a conversation to the effect that one of the members found "three Southerners ... with crewcuts" going through papers in his apartment "during the war"—presumably World War II (1939–1945). The Government apparently contends that the SWP should have filed an administrative claim against the FBI sometime before 1945 based on a burglary by "three Southerners ... with crewcuts." The point is of no substance, and certainly has nothing to do with a claim for burglaries carried out many years later.

In 1971 the SWP office in Detroit was broken into. A policeman who came to investigate reportedly stated, "It looks like an FBI job." Indeed, the burglary of the Detroit office in 1971 was the subject of one of the allegations in the original complaint. However, the evidence indicates that the FBI did not carry out this burglary. Thus knowledge of the 1971 Detroit incident was not knowledge of an FBI burglary, and was not in any way knowledge of the 1958–1966 burglaries which are the subject of the claim in this action.

On May 24, 1973 there was an article by Seymour M. Hersh in The New York Times, quoting an unnamed former FBI official as saying that the FBI had been "doing burglaries for years." The article also quoted an unidentified source as saying that certain FBI "undercover operations" were suspended in 1966. The SWP summarized this article in the June 15, 1973 issue of *The Militant.* However, the Hersh article did not mention the SWP or contain any information to the effect that the SWP was the target of burglaries.

Under all the circumstances, the court finds that the SWP did not know of the FBI's surreptitious entries, burglaries or bag jobs complained of in the present action until the March 24, 1976 disclosure by the Assistant United States Attorney. Prior to that time the SWP neither knew nor should have known of these operations. The administrative claim was filed on July 22, 1976.

### VI.B.3. *Informants*

The FBI's use of informants in its investigation of the SWP dates back to 1941.

The SWP concedes that it knew of the use of informants by the FBI for investigation and infiltration purposes more than two years before it filed the administrative claims about informant activity on October 28, 1976. For instance, the SWP occasionally discovered an FBI informant. One such instance occurred in 1969. The SWP denies, however, that it knew, or had reason to know, of the use of informants as part of the SWP Disruption Program until

the document production of March 1975. There are two administrative claims about informants, claims 4 and 5 in the list in section VI.A of this opinion. Claim 5 refers in part to disruption.

The court agrees that prior to March 1975, the SWP did not know, or have reason to know, of the role of informants in the SWP Disruption Program. However, this matter should be treated as covered by claim 1 relating to the Disruption Program.

Insofar as claims 4 and 5 refer to the use of informants for purposes other than as auxiliaries to the SWP Disruption Program, they are time barred, except as to matters which occurred within two years prior to October 28, 1976,—*i.e.*, matters occurring after October 28, 1974.

### VI.B.4. *Electronic Surveillance*

On December 11, 1981 an administrative claim was filed by the SWP against the FBI relating to electronic surveillance. This was after the trial was completed.

The claim cited instances of telephone wiretaps and bugging from 1943 to 1958.

This claim was referred to in a brief filed by plaintiffs in this case on May 28, 1982. In this brief plaintiffs stated that they were moving to reopen the record to have this claim received into evidence.

The motion is granted. However, the claim is of no avail. It patently fails to comply with the two-year requirement of § 28 U.S.C. 2401(b). Electronic surveillance was prominently featured in the original complaint filed seven years before the administrative claim.

### VI.B.5. *Sell and Starsky*

For the reasons hereafter set forth, the claim of plaintiff Evelyn Sell for damages under the FTCA is barred for failure to file a timely administrative claim as required by 28 U.S.C. § 2401(b). As to the claim of Morris Starsky, the statute of limitations defense is questionable. However, it is clear that the Starsky claim must be dismissed on the merits, as will be discussed later in this opinion. The limitations point will not be addressed as to Starsky.

Evelyn Sell was a prominent member of the SWP in Detroit from 1948 to 1969. She was on the FBI's Security Index. *See* section V.H *supra*. In 1969 Sell moved to Austin, Texas, where she continued her membership in the SWP and helped organize a branch. The FBI learned about Sell's move to Austin from an informant.

Sell obtained a position with the Austin School District. She was assigned to the federally funded Head Start Program for pre-school children, and was hired for the 1969–1970 school year.

Sell had a son, Eric, who was a high school student and a YSA member. The FBI in Austin visited the principal of Eric's school. The principal told Eric about the visit, and he in turn told his mother. In an article in *The Militant* in 1975 Sell is quoted as saying that at the time of the events in question she told Eric that the FBI must have been in contact with her school. In her testimony at the trial Sell stated that she was misquoted in *The Militant*. The court does not credit this testimony.

The FBI activities in Austin were apparently carried on as part of the COINTEL-PRO–New Left. In October 1969 the FBI stimulated the Austin police to meet with Ernest Cabe, assistant superintendent of schools. The police told Cabe that Sell was being investigated by the FBI. Cabe testified that he asked the police what the investigation was about. An FBI memorandum regarding the meeting states that Cabe wanted to fire Sell but needed additional information about her activities in Detroit. The FBI furnished the police with some public source documents showing Sell's activities with the SWP, and the police gave these documents to Cabe. Cabe put the documents in a "complaint file" separate from Sell's personnel file, and took no action against Sell.

Some time later, in March 1970, Cabe had a telephone conversation regarding Sell with an FBI agent. Cabe testified that this was a routine employment check. The FBI memorandum of the call states that Cabe

said that Sell would not be considered for re-employment in the school district because of the information Cabe received from the police. Cabe also allegedly said that this information would be passed on to the organization handling the Head Start Program for the 1970–1971 school year.

The Head Start Program in the Austin School District ended in the spring of 1970. All the teachers, including Sell, were terminated. They were given the opportunity to apply for regular teaching positions with the school district. The person in charge of hiring teachers in Sell's category testified that Sell was not hired because she failed to apply and because in any event there were few positions available.

However, Sell did apply to the Human Opportunities Corporation ("HOC") of the city of Austin, which had a Head Start Program of its own. Sell was hired in 1970 as a supervisor in this program, where she remained until 1972, when she left voluntarily. During her employment with the program she was promoted several times.

There is no evidence that the school district passed on to the HOC any of the information about Sell's connection with the SWP which they had received from the Austin police.

After Sell commenced working for the HOC, the FBI approached that agency regarding Sell. The HOC advised Sell of these visits. According to Sell, the HOC viewed the FBI approaches with some hostility. In the 1975 *Militant* article Sell is quoted as saying that the HOC was outraged and considered the visits to be harassment.

Sell filed an administrative claim with the FBI on October 3, 1975. The claim alleged that the FBI caused the Austin police to inform the school district of her connection with the SWP and that the FBI thereafter conveyed such information to the HOC, all for the purpose of interfering with her employment. The claim alleged that the nature of the injury was violation of First Amendment rights. At the trial of this action and in the briefs Sell has stated

that her claim is for invasion of privacy and intentional infliction of emotional distress.

■ With regard to the requirement of 28 U.S.C. § 2401(b), Sell asserts that her cause of action did not accrue until she received documentary evidence of the FBI activities in the March 1975 production of documents by the FBI.

The court does not accept this contention. Although certain additional information came to light with the document production, Sell had knowledge in 1969–1972 of the basic activities of the FBI. Her cause of action accrued no later than 1972. She did not file an administrative claim within two years.

### VI.B.6. *Jenness and Pulley*

■ Claim 7 is that the Secret Service unlawfully entered and recorded the YSA National Convention held in Houston in late 1971 and early 1972. The speeches of plaintiffs Linda Jenness and Andrew Pulley were among the items recorded. Their administrative claim was filed May 27, 1976. There is no explanation as to why the claims of Jenness and Pulley did not accrue at or near the time of the event in question. There is no indication that the matter was not known to these plaintiffs at least by the time of the filing of the original complaint in July 1973.

### VI.C. *Legal Conclusions Regarding Timeliness of Administrative Claims*

As stated earlier, the threshold requirement for pursuing a claim under the Federal Tort Claims Act is that it be presented in writing to the appropriate federal agency "within two years after such a claim accrues." 28 U.S.C. § 2401(b).

■ The applicable rules regarding time of accrual are cogently summarized in the Second Circuit decision, *Barrett v. United States*, 689 F.2d 324 (2d Cir.1982). It is appropriate to quote from the decision at some length.

It has generally been held that under the FTCA a tort claim accrues at the time of

the plaintiff's injury, although in certain instances, particularly in medical malpractice cases, accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause. *United States v. Kubrick*, 444 U.S. 111, 120 n. 7, 100 S.Ct. 352, 358 n. 7, 62 L.Ed.2d 259 (1979); *Stoleson v. United States*, 629 F.2d 1265, 1268 (7th Cir. 1980); *Waits v. United States*, 611 F.2d 550, 552 (5th Cir.1980); *Steele v. United States*, 599 F.2d 823, 827–28 (7th Cir. 1979); *Lee v. United States*, 485 F.Supp. 883, 885–86 (E.D.N.Y.1980); *Liuzzo v. United States*, 485 F.Supp. 1274, 1280 (E.D.Mich.1980).

The diligence-discovery rule of accrual is not often applied outside the medical malpractice area, *see, e.g., Steele*, 599 F.2d at 828, but may be appropriate in non-malpractice cases, *Liuzzo*, 485 F.Supp. at 1281, where plaintiffs face comparable problems in discerning the fact and cause of their injuries, *Stoleson*, 629 F.2d at 1269. Thus, any plaintiff who is blamelessly ignorant of the existence or cause of his injury should be accorded the benefits of the more liberal accrual standard. *Id.*

For example, the diligence-discovery rule has been applied where a plaintiff demonstrates that his injury was inherently unknowable at the time he was injured, *Quinton v. United States*, 304 F.2d 234 (5th Cir.1962), and where the Government conceals its negligent acts so that the plaintiff is unaware of their existence, *Peck v. United States*, 470 F.Supp. 1003, 1018 (S.D.N.Y.1979). In regard to the latter situation, "[r]ead into every federal statute of limitations ... is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C.Cir.1977).

689 F.2d at 327. Thus the two-year period for filing the administrative claim under § 2401(b) does not begin to run until the plaintiff has discovered, or with reasonable diligence should have discovered, "the critical facts of both his injury and its cause." Where the defendant deliberately conceals "material facts relating to his wrongdoing," the time does not begin to run until the plaintiff has or should have discovered "the basis of the lawsuit."

*Barrett* involved a claim that the Army Chemical Corps caused the death of Harold Blauer in the early 1950's by covertly using him for chemical warfare experimentation. In 1975 the Secretary of the Army revealed the facts about how Blauer's death occurred, and his administratrix sued under the FTCA. The district court dismissed the complaint under § 2401(b). The court of appeals reversed, holding that there should be a trial on this issue. In addition to the discussion quoted above, the court stated:

> It is illogical to require a party to sue the Government for negligence at a time when the Government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it.

689 F.2d at 330. The court further noted:

> Even if Blauer's estate had probed so far as to discover the source of the drug, it would have been given the innocuous misinformation that the supplier was the Army Medical Corps [rather than the culpably responsible Chemical Corps].

*Id.*

Another instructive case is *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir.1984). This was not an action against the United States but against certain FBI agents, local policemen, and the District of Columbia. There was an issue in the case about whether fraudulent concealment had tolled the three-year statute of limitations of the District of Columbia. Although the case involved a local statute and not the FTCA limitation provision, it is clear that the doctrines discussed in *Hobson* are of general application.

*Hobson* involved the FBI's COINTELPRO–New Left and COINTELPRO–Black Nationalist programs. A number of the defendants were found liable for civil rights violations after a jury trial. Regarding the statute of limitations issue, the court of appeals found that because of the covert nature of the COINTELPRO operations the wrongs perpetrated were "self-concealing" or "inherently unknowable." *Id.* at 36. *See also Barrett,* 689 F.2d at 327. However, the court in *Hobson* stated that the doctrine of fraudulent concealment does not come into play if a plaintiff is on notice of a potential claim. The court stated:

> By "notice," we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud.

737 F.2d at 35. The plaintiff must be on "notice of the particular cause of action, not of just any cause of action." *Id.*

■ The two-year period provided in 28 U.S.C. § 2401(b) relates, of course, to the time when the administrative claim must be filed. Thus, under the discovery accrual rule, the cause of action accrues when the plaintiff has, or should have, enough information to file an administrative claim. However, the cases equate this with the amount of information necessary to file a lawsuit. In other words, the two-year period starts to run when the plaintiff has, or should have, enough information to file suit. *See Barrett,* 689 F.2d at 330; *Hobson,* 737 F.2d at 39. This is quite reasonable, since a party who has filed an administrative claim must be prepared to sue promptly if the agency denies it. 28 U.S.C. § 2401(b).

■ The *Hobson* opinion aptly states that it would be anomalous to require a person to file a suit on a "hunch," only to have the suit dismissed for failure to state a claim. 737 F.2d at 39. By the same token, an administrative claim is not required to be filed, and a cause of action does not accrue, when a person has a mere hunch, hint, suspicion, or rumor of a claim. *Id.* at 35. Accrual only occurs when a

party has discovered, or should have discovered, the "critical facts of both his injury and its cause." *Barrett,* 689 F.2d at 327. Suspicions may create a duty to inquire, but where the facts involve covert activity by the FBI, normal inquiry is likely to be in vain. *Hobson,* 737 F.2d at 35 n. 107.

■ Knowledge of one type of FBI activity does not necessarily constitute notice of another type of activity, particularly where the latter is carried out with a high degree of secrecy. *Id.* at 39.

For a recent discussion of the *Barrett* and *Hobson* cases, see *Hohri v. United States,* 782 F.2d 227 (D.C.Cir.1986).

■ These authorities point the path to the resolution of the issues under § 2401(b) in the present case. Both the SWP Disruption Program referred to in sections V.E.1 and VI.B.1 and the surreptitious entries referred to in sections V.G and VI.B.2 were highly secret, covert activities of the FBI. In each case the FBI intentionally suppressed the facts in a manner designed to prevent plaintiffs, even with reasonable effort, from ascertaining them. In the case of the Disruption Program this suppression of the facts continued successfully until the document production of March 1975. *See* section VI.B.1 *supra.* As to the surreptitious entries, the FBI successfully suppressed the facts until March 1976, as found in section VI.B.2.

Plaintiffs ultimately learned the facts about the above operations due to a chain of events occurring after the filing of their lawsuit. (The suit was originally brought to complain about *other* problems.) For a substantial time after the action was started, the FBI concealed the facts about these operations through "innocuous misinformation" and outright falsehoods. Any idea that some earlier inquiry prior to the lawsuit would have disclosed the facts to plaintiffs is unfounded. It is safe to conclude that the FBI would have dealt with plaintiffs with the same deceptive tactics as were used even after the court processes were in effect.

In the *Hobson* case, the FBI argued that certain circumstances, particularly the article by former FBI agent Robert Wall in the New York Review of Books, put the plaintiffs on notice of their cause of action. As noted earlier, a similar argument was made by the Government in the present case. *See* section VI.B.1 *supra.* The court in *Hobson* stated:

> Nor does the mere fact that a plaintiff might have read a newspaper article detailing an FBI scheme to disrupt certain organizations cast upon him a duty to presume that he was a target and to file suit.

737 F.2d at 39. The court went on to find that the Wall article was a factor, along with other circumstances, in putting certain plaintiffs on notice of their claims, because the article dealt, in part, with certain of the *precise activities* complained about. No such circumstances exist in the present case.

The applicable authorities fully support the conclusion, based on the findings in section VI.B.1 of this opinion, that the cause of action regarding the SWP Disruption Program did not accrue until March 1975. The cause of action regarding the burglaries or surreptitious entries did not accrue until March 1976. *See* section VI.B.2 *supra.* The administrative claims for the Disruption Program (July 1975) and the burglaries (July 1976) were filed within the two-year period provided by 28 U.S.C. § 2401(b).

■ With regard to the claim about informants, nothing needs to be added to what was stated in section VI.B.3, except for the following point. Plaintiffs argue that the doctrine of continuing tort applies. *See Cook v. Pan American World Airways, Inc.,* 771 F.2d 635 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986); *Leonhard v. United States,* 633 F.2d 599 (2d Cir.1980). Plaintiffs contend that the FBI's use of informants involved a single continuing policy and plan, which lasted over the entire period when informants were used, and continued until the FBI's investigation of the SWP was terminated in September 1976.

The use of informants involved a series of activities lasting over a period of more than four decades. Plaintiffs basically concede that, at various points during this lengthy period of time, they had sufficient information to take legal action with respect to the FBI's use of informants for purposes of investigation and infiltration. In the view of the court, there is no justification for allowing plaintiffs to wait and sue for 40 years of alleged wrongdoing by the FBI with respect to the use of informants.

Plaintiffs' claims regarding informants are barred, except as to matters occurring after October 28, 1974.

As to the claims of Sell, Jenness and Pulley, nothing needs to be added to what was stated in sections VI.B.5 and VI.B.6, ruling that these claims are barred by the two-year limitation.

## VI.D. *Waiting Period After Administrative Claims*

An action under the FTCA may not be instituted unless an administrative claim has been presented and the "claim shall have been finally denied by the agency in writing." The failure of an agency to make final disposition of a claim within six months of filing shall, at the option of the claimant, be deemed a final denial of the claim. 28 U.S.C. § 2675(a).

■ The administrative claim for the SWP Disruption Program was filed with the FBI on July 17, 1975. The period of six months from that date expired on January 17, 1976. By this time there had been no formal denial of the claim by the FBI. It was not until August 6, 1979 that the Government denied all of the administrative claims. Under the statute plaintiffs were free to sue on their claim regarding the Disruption Program any time after January 17, 1976. There is no contention that they were required to file a separate suit rather than amending the complaint in the existing action. Plaintiffs in fact pursued

the latter course and filed an amended complaint on May 12, 1976, alleging the Disruption Program. There was clear compliance with § 2675(a).

The timing was different with respect to plaintiffs' claims regarding surreptitious entries. The administrative claim was filed on July 22, 1976. The six-month period following this claim expired on January 22, 1977. However, the amended complaint filed May 12, 1976 and the second amended complaint filed October 8, 1976 both pleaded the claim about surreptitious entries. Obviously, neither the amended complaint nor the second amended complaint was filed more than six months after the filing of the July 1976 administrative claim.

However, certain factors weigh against finding a violation of the statutory requirement. We start with the time when the burglaries were disclosed by the FBI in March 1976. From that moment forward it was clear beyond any question, from the positions taken by the Government in this litigation, that the FBI denied any liability on this claim. Plaintiffs naturally included this claim in the amended complaint filed in May 1976, and again in the second amended complaint filed in October 1976. This was in no sense a situation where premature litigation deprived a Government agency of the opportunity to consider a claim.

It is apparently the Government's position that plaintiffs should have pleaded the burglaries in a third amended complaint filed after January 22, 1977. However, in practical fact this would have been an idle formality, which would have accomplished nothing of substance. The substantial equivalent of such a pleading was in fact provided by the numerous assertions and confirmations of plaintiffs' claim for the burglaries after January 22, 1976 until the time of the trial in 1981.

There is no valid defense that the claims regarding the SWP Disruption Program and the burglaries or surreptitious entries failed to comply with 28 U.S.C. § 2675(a). *See Kubrick v. United States*, 581 F.2d 1092 (3d Cir.1978), *rev'd on other grounds*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Clark v. United States*, 481 F.Supp. 1086 (S.D.N.Y.1979).

## VI.E. *Discretionary Function Defense*

28 U.S.C. § 2680(a) provides that the FTCA shall not apply to

Any claim based upon an act or omission of an employee of the Government, exercising due care ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

The Government contends that the SWP's claims as to disruption activities, surreptitious entries and the use of informants are barred by the discretionary function exception.

In *Birnbaum v. United States*, 588 F.2d 319, 329 (2d Cir.1978), the court held that a discretionary function can only be one within the scope of authority of an agency or official as delegated by statute, regulation or jurisdictional grant.

The Government contends that all three of the activities in question—disruption, surreptitious entries and the use of informants—were carried out by the FBI within the scope of its properly delegated authority.

There can be no doubt about the basic authority of the FBI to conduct appropriate investigations in the interest of the national security. Congress has given the Attorney General broad power to appoint officials to detect and prosecute violations of federal law and to conduct other investigations. 28 U.S.C. § 533. The basic powers of the FBI under the Attorney General are provided in 28 C.F.R. § 0.85. They include the investigation of violations of federal law and of subversive activities and related matters pursuant to the Presidential directives referred to in section V.A *supra*. The Supreme Court has recognized "the constitutional basis of the President's do-

mestic security role." *United States v. United States District Court,* 407 U.S. 297, 320, 92 S.Ct. 2125, 2138, 32 L.Ed.2d 752 (1972).

Former Attorney General Brownell and another witness from the Government testified that over many years Presidents and Attorneys General were aware of the technique of disrupting groups perceived to be a threat to the national security. Brownell testified about a 1958 briefing given by FBI Director Hoover to President Eisenhower and the Cabinet with respect to the COINTELPRO operation directed at the Communist Party. The fact of the investigation of the SWP was mentioned at that briefing, although there was no description of any disruptive activities against the SWP.

Brownell testified that by the time he came to office in 1953 the use of surreptitious entries for national security investigations was well established. He testified that this technique, among others, was described by Hoover at a National Security Council Meeting in March 1956, attended by President Eisenhower.

As to the use of informants, the Government contends that this is obviously a necessary and appropriate device in a national security investigation.

Although the Government's evidence shows that Presidents and cabinet officers had some knowledge of the more severe techniques used by the FBI in certain cases, and some information about the FBI's investigation of the SWP, there is no evidence that Presidents or cabinet officers sanctioned the full gamut of FBI operations against the SWP, or knew the facts about the kind of SWP political activities with which the FBI concerned itself.

The evidence in this case demonstrates that the three types of FBI operations here under discussion were directed against entirely lawful and peaceful political activities of the SWP.

This opinion will not attempt to deal with the question of whether, under certain extreme circumstances involving a group planning sabotage or violence, disruptive activities by the Government might be warranted. But no such thing was involved in the present case. By the time the FBI commenced its SWP Disruption Program in 1961, the FBI had been investigating the SWP for about 20 years. The FBI had accumulated evidence of a variety of lawful political pursuits by the SWP, but no evidence of sabotage or violence or anything else of that nature. During the time of the FBI's disruption operations, the picture changed not at all. These disruption operations were directed at the kind of political activities that the SWP had a constitutional right to carry out. Of course, the FBI had in mind the Marxist ideology of the SWP, and its teachings about ultimate revolution, but there is no evidence of any revolutionary *activities* towards which the disruption operations were directed.

There can be no doubt that these disruption operations were patently unconstitutional and violated the SWP's First Amendment rights of free speech and assembly. Moreover, there was no statutory or regulatory authority for the FBI to disrupt the SWP's lawful political activities.

As to the surreptitious entries, they were obvious violations of the Fourth Amendment. The FBI knew this full well. There was no statutory or regulatory authorization for such operations. Even if there was high official authority to engage in surreptitious entries in cases of genuine threat to the national security, there is no evidence of any such authority to burglarize for the purpose of obtaining information about peaceful political activities. By the time the FBI bag jobs against the SWP commenced in 1958, the FBI had no reason to believe that it would find material relating to anything other than lawful pursuits, and this is all that it did find.

The situation is somewhat more difficult in regard to the use of informants. Such a technique is well known in law enforcement. *Handschu v. Special Services Division,* 349 F.Supp. 766, 769 (S.D.N.Y.1972). If someone is willing to inform on private

discussions in a criminal conspiracy, this is no violation of the conspirators' rights.

However, there are limits on the ability of the Government to use informants. *Handschu,* 349 F.Supp. at 770. It must be concluded in the present case that, at least by October 1974 (the SWP's damage claim is restricted to the period beginning at this time), the FBI was using informants not to obtain any information necessary for the prosecution of crimes or for the protection of national security, but to obtain private information about political meetings, demonstrations and other lawful events and their participants. It is the court's conclusion that this was wholly incompatible with the SWP's First Amendment right to freely assemble and freely speak on political matters. Moreover, there was no statutory or regulatory authorization for the FBI's informant operations under the circumstances described.

The court concludes that, in respect to all three types of activities in question, the FBI exceeded any reasonable definition of its mandate and had no discretion to do so. *See Birnbaum,* 588 F.2d at 329.

It should be noted that the court in *Birnbaum* did not reach the question as to "whether a *properly* delegated but unconstitutional activity would come within the 'discretionary function' exception." *Id.* at 329 (emphasis in the original). The district court decision in *Birnbaum* by Judge Weinstein had held that a decision to conduct an intelligence operation by methods which violate the Constitution and probably several federal statutes is not discretionary. *Birnbaum v. United States,* 436 F.Supp. 967, 973 (E.D.N.Y.1977). Moreover, the Second Circuit has stated in *dictum* that "a federal official cannot have discretion to behave unconstitutionally." *Meyers & Meyers, Inc. v. United States Postal Service,* 527 F.2d 1252, 1261 (2d Cir.1975).

This court concludes that the violations of the Constitution in the present case rendered the acts in question non-discretionary. For this reason, and because the acts in question lacked statutory or regulatory authority, the discretionary function exception does not apply.

**VI.F.** *Sufficiency of Administrative Claims*

The Government contends that the administrative claims are insufficient in their description of the alleged torts and the sums of money claimed. There is no merit to these contentions. The issue does not require detailed discussion.

**VI.G.** *Tort Liability and Damages*

The FTCA allows actions against the United States on claims

> ... for money damages ... for injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). Thus the inquiry is whether the United States would be liable under "the law of the place where the act or omission occurred."

Three FTCA claims by the SWP remain to be considered on the merits—those relating to disruption, surreptitious entries and use of informants. The claim by the individual plaintiff Starsky also needs to be considered.

**VI.G.1.** *Disruption*

The formal SWP Disruption Program involved 46 operations approved and carried out. In addition, there were 8 such operations under COINTELPRO–New Left and 3 under COINTELPRO–CPUSA which affected the SWP in some degree. *See* section V.E.1 *supra.*

Section V.E.1 describes 20 of the operations under the SWP Disruption Program. In 17 of these, the evidence justifies a finding of harm resulting from the FBI's conduct. These are Items 1, 2, 4, 6, 7, 9–15, and 17–21. The remaining 3 did not

result in identifiable harm but are discussed because they elucidate the techniques of the FBI (Items 3, 5 and 8). One operation under COINTELPRO–New Left (Item 16) is described for this reason. The court has considered the evidence as to all other operations of the SWP Disruption Program and COINTELPRO–New Left, and all COINTELPRO–CPUSA operations, and has found that there is no evidence justifying a finding of resulting harm to the SWP. These other operations are not specifically discussed.

■ As to the 17 operations resulting in harm, the first issue is where is the "place where the act or omission occurred." The operations were initiated and carried out by the local field offices, although they were approved in Washington. Each operation was individual and distinct. The court holds that the operations are properly considered separately, and that the place of the act or omission was the location of the local field office.

Twelve of the 17 operations resulting in harm were performed by the New York City field office. These are Items 1, 2, 4, 6, 9–15 and 19. Four occurred in New Jersey (Items 7, 17, 20 and 21). Item 18 occurred in California.

Regarding the substantive law to be applied, it has been held that the FTCA does not comprehend federal constitutional torts—*i.e.*, violations of constitutional rights—in its reference to the "law of the place" in § 1346(b). *Birnbaum v. United States*, 588 F.2d 319, 327 (2d Cir.1978).

In connection with the FBI's disruption activities, the SWP relies on the theory of "prima facie tort." This doctrine was discussed to some extent in an earlier decision in the present case denying the Government's motion to dismiss certain claims. *Socialist Workers Party v. Attorney General*, 463 F.Supp. 515, 522–24 (S.D.N.Y. 1978).

New York applies prima facie tort. New Jersey and California have comparable rules, although not under that name.

■ The general principle is that harm intentionally inflicted is prima facie actionable unless justified. Prima facie tort is designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort rule offers a remedy. This rule is affirmed in the New York cases. *Curiano v. Suozzi*, 63 N.Y.2d 113, 117–18, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984). *See also Board of Education v. Farmingdale Classroom Teachers Association*, 38 N.Y.2d 397, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). As to New Jersey, the Superior Court has stated:

> We have no difficulty with the theoretical concept, expressed in various ways by modern jurisprudents, that intentional, willful or malicious harms of any kind are actionable unless justified.

*Trautwein v. Harbout*, 40 N.J.Super. 247, 123 A.2d 30, 40 (App.Div.1956). The court clearly had in mind prima facie tort, as evidenced by its citation to a law review article on that subject. The California Supreme Court has stated:

> There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification.

*Willis v. Santa Ana Community Hospital Association*, 58 Cal.2d 806, 26 Cal.Rptr. 640, 376 P.2d 568, 570 (1962). In commenting on the statement in *Willis*, a California Court of Appeals case stated that the doctrine is comparable to prima facie tort. *Diaz v. Kay-Dix Ranch*, 9 Cal.App.3d 588, 88 Cal.Rptr. 443, 445 n. 3 (1970).

■ The elements of prima facie tort in New York are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful. *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142–43, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985).

■ There can hardly be a more compelling case for applying the prima facie tort doctrine than the present one. The FBI embarked on a series of actions with the express purpose of harming the SWP by causing internal mistrust and strife, by weakening its alliances with other groups, by hampering its scheduled activities and by other means. There was no legal authority or justification for such operations.

■ This brings us to the requirement under New York law of proof of special damages. This refers to actual damages which are not merely presumed from the intention to harm or the overt acts effecting the intention. *Zausner v. Fotochrome, Inc.*, 18 A.D.2d 649, 235 N.Y.S.2d 698 (1st Dept.1962).

On the question of damages, the New York cases offer no precedent directly applicable to the present case. Most of the reported decisions involving prima facie tort deal with the pleading stage. No New York case on prima facie tort has been cited to the court where there was proof at trial of a clear and definite intent on the part of the defendant to inflict a precise kind of harm, and where there was evidence that the specific harm resulted. That, of course, occurred in the present case.

The court rules that, in respect to the 12 New York operations resulting in harm, there is a sufficient showing of special damages to satisfy the New York rule. As to New Jersey and California, there is no statement in the cases that special damages must be shown. However, the court concludes that there is the same basis for finding damages for the four New Jersey operations and the one California operation as for those in New York. It is safe to conclude that this satisfies New Jersey and California law.

To be sure, the SWP has not proven any definitely calculable pecuniary damages, such as loss of membership dues or reduction in contributions. But the Government has cited no case, and the court has found none, holding that special damages are limited to such pecuniary losses.

A principal purpose of requiring pleading and proof of special damages is obviously to avoid proliferation of actions based on novel and speculative theories of causation. *See* 16 A.L.R.3d 1191; *Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 458, 280 N.Y.S.2d 641, 643, 227 N.E.2d 572, 574 (1967). In the present case, the court is limiting damage awards to instances where there is not only evidence of intended harm by the FBI but also evidence that at least some measure of that intended harm resulted. In these instances causation cannot be said to be speculative.

The following is a summary of the harm resulting from the FBI acts described in the 17 items. Much of the evidence comes from the FBI's own records, as shown in section V.E.

Item (1)—loss of two members, a setback in recruiting blacks, hostility and a "definite demoralizing influence" within the organization.

Item (2)—hindering of SWP efforts to form an alliance with blacks in the civil rights movement.

Item (4)—heightening of racial tension within the SWP.

Item (6)—cessation of NAACP financial aid to an organization in which the SWP was heavily involved, thus harming the SWP's efforts to form alliances with other groups.

Item (7)—curtailment of a civic ceremony in which the SWP was to be prominent.

Item (9)—deterioration of relations between the SWP and a black group.

Items (10)–(15)—disruption of the efforts of the SWP and YSA in the anti-Vietnam War movement, and impairment of alliances with other groups.

Item (17)—disruption of a series of meetings at a camp.

Item (18)—intensifying a dispute within a branch—"fanned the flames of discord and discontent."

Item (19)—fund raising event prevented.

Item (20)—decision by a branch "organizer" to desist from this activity.

Item (21)—creation of internal dissension.

It must be recognized that many FBI disruption operations were ineffective and they were generally sophomoric. But the evidence compels the finding that some of the operations accomplished their malign purpose, at least in part. The harm was of a more subtle kind than can be calculated in terms of definite sums of money. But it was the type of harm intended by the FBI, and it *was harm.*

■ Under these circumstances there should be an award of damages, but it must necessarily be modest. The amount can only be arrived at by a rough estimation. The court awards the sum of $2,500 for each of the 17 occurrences, or a total of $42,500.

■ It is necessary to deal briefly with the Government's argument that the SWP's claim regarding disruption is really a cause of action for defamation. The FTCA does not allow recovery on such a claim. 28 U.S.C. § 2680(h). This argument has no merit. Certainly the bulk of the FBI's operations involved communications. But most of these were not defamatory in a legal sense. More important, the intention and purpose of the FBI was to accomplish something far different from injury to reputation. The FBI wished to incite persons and groups inside and outside the SWP to take action which would hinder that organization and its activities. Prima facie tort is the appropriate legal theory.

### VI.G.2. *Surreptitious Entries*

The SWP's claim is for the 193 surreptitious entries or burglaries committed by the FBI against the offices of the SWP and YSA in New York City between 1958 and 1966.

■ New York law applies. Under ancient common law concepts, these operations were at least trespasses. However, they were far more. They were invasions of privacy of the most aggravated form. The FBI's own nomenclature—"bag jobs" and "black bag jobs"—indicates something of the nature of these stealthy invasions of private premises for the purpose of obtaining private information.

The SWP's claim regarding the surreptitious entries falls within what is known as the "intrusion" branch of the tort of invasion of privacy. A cause of action is made out where one party intentionally intrudes into the private premises or private affairs of another and obtains private information. *See Nader v. General Motors Corp.,* 25 N.Y.2d 560, 567, 307 N.Y.S.2d 647, 653, 255 N.E.2d 765, 771 (1970) (applying District of Columbia law); Restatement (Second) of Torts § 652B.

In *Birnbaum v. United States,* 588 F.2d 319 (2d Cir.1978), the court held that New York law would recognize a cause of action under the intrusion branch of the tort of invasion of privacy. The Second Circuit recognized that the New York Court of Appeals had not yet expressly approved this rule, but took the view that the legal trend in this country so strongly favors the rule that New York would adopt it in an appropriate case.

In the few years since *Birnbaum* the New York Court of Appeals has not had occasion to rule on the question. *Arrington v. New York Times Co.,* 55 N.Y.2d 433, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982), was an action in which a plaintiff claimed that the New York Times violated his privacy by publishing his picture in connection with a news article. The plaintiff's claim did not fall within Sections 50 and 51 of the New York Civil Rights Law, relating to commercial exploitation. However, the plaintiff attempted to assert a common law cause of action under the branch of the right of privacy dealing with publicity placing a person in a false light. The court of appeals held that the claim should be dismissed. The court emphasized the limited nature of the rights conferred by Sections 50 and 51, and the fact that they were not intended to tread upon the publication of

news of public interest. In this connection, the court stated that a common law right of privacy does not exist in New York. *Arrington*, 55 N.Y.2d at 440, 449 N.Y.S.2d at 943, 434 N.E.2d at 1321.

This case in no way invalidates *Birnbaum*. The *Arrington* decision did not deal with a problem of intrusion or the related branch of the right of privacy. It cannot be said that there is some indivisible legal theory called "right of privacy" and that a holding by the New York Court of Appeals on one problem constitutes a ruling on a very different and distinct issue. *See* Note, *Privacy Tort Law in New York: Some Existing Routes To Recovery*, 31 Buff.L.Rev. 255 (1982).

To summarize, the law in the New York Court of Appeals is in basically the same state as it was at the time of *Birnbaum*. The court in the present case is bound to follow the authoritative ruling of the Second Circuit in that case, and to hold that the SWP has a valid cause of action for invasion of privacy based upon the surreptitious entries.

The question of whether an association, as distinct from an individual, can assert a right of privacy was dealt with in this court's earlier decision in *Socialist Workers Party v. Attorney General*, 463 F.Supp. 515 (S.D.N.Y.1978). The court held that an association may assert such a cause of action, relying upon *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), which held that an association had a constitutional right not to reveal the names of its members to state officials. Although that case was decided under the Constitution and not under tort law, it clearly announces the basic principle that an association has a right of privacy. Mr. Justice Harlan, writing for a unanimous Court, stated:

Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical.

*Id.* at 459, 78 S.Ct. at 1170. The Court emphasized the unique importance of privacy in the case of a political association.

This Court has recognized the vital relationship between freedom to associate and privacy in one's associations.... Inviolability of privacy in group associations may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.

*Id.* at 462, 78 S.Ct. at 1171. The Court further stated:

We hold that the immunity from state scrutiny of membership lists which the Association claims on behalf of its members is here so related to the right of the members to pursue their lawful private interests privately and to associate freely with others in so doing as to come within the protection of the Fourteenth Amendment.

*Id.* at 466, 78 S.Ct. at 1173. *See also Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 703 S.Ct. 416, 74 L.Ed.2d 250 (1982) (Marshall, J.).

The discussion of the court in *Block v. Meese*, 793 F.2d 1303 (D.C.Cir.1986), further refines the concept of an association's right of privacy. The case involved, among other things, the question of the constitutionality of a federal statute's requirement of disclosure of organizations destined to receive foreign films of a propaganda nature. The court sustained the requirement in view of a valid federal interest. However, the court recognized that there was a strong privacy interest of the organizations to be weighed in the balance, distinct from the privacy interest of the organizations' members. Judge Scalia, writing for Judges Bork and Wright, defined this interest as follows:

First, the right to receive ideas in privacy. *See Lamont v. Postmaster General*, 381 U.S. [301] at 307 [85 S.Ct. 1493 at 1496, 14 L.Ed.2d 398]; *cf. Procunier v. Martinez*, 416 U.S. 396, 422–24 [94 S.Ct. 1800, 1815–16, 40 L.Ed.2d 224] (1974) (Marshall, J., concurring). The reporting provision does not impair this right on the part of individuals, since it does not require identification of those who view the films, and the only 'users' who must

be disclosed are stations, organizations and theaters. Arguably, however, the Constitution recognizes an associational interest, as well as an individual interest, in the privacy of receipt of ideas—and that would unquestionably be affected. Consider, for example, a private association (fraternity, lodge, union or discussion group) that purchases a film directly from a foreign agent, or that uses a purchased film (*e.g.*, one of appellant Block's), in order to show it exclusively to its own members. What political information such a group chooses to consider and discuss is not public beyond its own membership, but in the case of foreign propaganda films that challenged reporting provision would require it to be disclosed.

In a right of privacy case the plaintiff can recover damages for "the harm to his interest in privacy resulting from the invasion." Restatement (Second) of Torts § 652H. He can also recover for mental distress and any special damage. *Id.* The difficulty of measuring damages for invasion of privacy is no reason for denying relief. W. Prosser, Law of Torts (4th ed. 1971).

 In the present case the SWP is entitled to recover for the harm to its interest in privacy resulting from the invasions. There were 193 burglaries. Thousands of private documents were removed and copied. The SWP was entitled to be private in its premises and that right was substantially diminished by the FBI's conduct. It appears reasonable to put a value of $500 on the harm to the SWP's privacy interest for each entry. Damages in the amount of $96,500 are awarded.

## VI.G.3. *Informants*

 On the question of what law to apply, the situation of the informants is different from the situation of the disruption operations and surreptitious entries. In those cases, the activities were so distinctly connected with the local FBI offices that the local tort law was held applicable. Also, the evidence showed exactly where

the activities took place. The same circumstances do not exist regarding the informants. The FBI informant program was basically uniform throughout the nation. Obviously, variations in activities occurred from informant to informant, but these variations are not germane to the SWP's claim based on informant activity. The claim here is to recover for the basic intrusion caused by infiltration into private gatherings and discussions by the member informants, and the further intrusion of having private information obtained by non-member informants such as janitors and hospital employees.

The program was initiated and directed at FBI headquarters in Washington, D.C. Headquarters decided upon the employment of the particular informants and monitored the program continually.

As to the specific locations of the informants, except in a few cases the evidence does not show where the individual informants functioned. This information was generally withheld to protect the identity of the informants.

For these reasons the court will apply the law of the District of Columbia on the informant claim. It should be said, however, that the tort of invasion of privacy by intrusion is recognized in almost every state. It is generally accepted common law.

*Pearson v. Dodd,* 410 F.2d 701, 703 (D.C. Cir.1969), affirmed that the intrusion branch of invasion of privacy is the law in the District of Columbia. The elements of this tort, as described in *Pearson,* are the same as stated in the previous section of the present opinion.

 The FBI's use of informants clearly constituted invasion of privacy. While the informants obtained some information of a public nature, the program was really designed to ferret out private matters. The work of the member informants had the effect of admitting the FBI covertly into the midst of the most private discussions. The member informants were instructed to gain the confidence of key per-

sons in the SWP organization so that the informants could be privy to plans and also to any problems that might be developing. The informants, both member and non-member, obtained information not only about organizational subjects but also about purely personal matters. The latter was sought by the FBI for its relevance to the organization and possible FBI operations to disrupt the organization through actions against the members. Thus the FBI's intrusions upon the privacy of the members was in reality an intrusion on the organization.

 The FBI contends that there can be no liability because the informants were not employees of the Government within the meaning of 28 U.S.C. § 1346(b). 28 U.S.C. § 2671 defines "employee of the Government" as including

... persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

The informants were employees within the statutory meaning. They were employed by the Government, paid by the Government, and directed, supervised and evaluated by the Government. *See Witt v. United States,* 462 F.2d 1261 (2d Cir.1972). However, the status of the informants is not crucial. The essential tortious activity for which the Government is being held liable was conducted by FBI officials at FBI headquarters in Washington, where the informant scheme was initiated, planned, and given overall direction.

The Government further argues that the FBI was merely a passive recipient of information acquired by outsiders (the informants) who were the real intruders. *See Pearson v. Dodd,* 410 F.2d at 704–705. For reasons already explained, the FBI was anything but a passive party.

As stated in section VI.B.3 and VI.C *supra,* the claim for use of informants is barred except for occurrences after October 28, 1974. Thus the claim embraces the period beginning with that date and running to the termination of the FBI investigation on September 9, 1976. Informants were in place until the latter date.

 The applicable rule of damages is set forth in the preceding section of this opinion. Thus the SWP can recover damages for harm to its interest in privacy resulting from the invasions.

A total of 99 member informants were in place in 1974, 85 in 1975 and 60 in 1976. A certain number of non-member informants were employed during this time, although the exact number is not shown by the evidence. The damages will be assessed on the basis of the member informants.

The intrusions of these member informants were serious, and of a substantial magnitude—an average of 75 functioning over a period of 23 months. Considering all the circumstances, the court awards damages in the amount of $125,000.

VI.G.4. *Starsky*

 On October 3, 1975 plaintiff Morris Starsky filed the following administrative claim:

On or about May 6, 1970, FBI agents drafted and mailed an anonymous letter concerning Morris Starsky to the Faculty Committee on Academic Freedom and Tenure, Arizona State University, where he was then a member of the faculty, with the purpose and effect of causing the termination of his employment.

The letter contained charges against Mr. Starsky which were false, and known by the said FBI agents to be false. The agents' actions were based solely upon his lawful political activity and associations, including his and his wife's association with the Socialist Workers Party.

Starsky seeks to recover damages for intentional infliction of emotional distress and for invasion of privacy.

In the late 1960's Starsky was active in the anti-war movement, the civil rights movement and the labor movement. Starsky was also very active in SWP/YSA affairs. As Starsky testified at trial, he was

"a very controversial figure" at Arizona State University ("ASU").

Starsky did not escape the attention of the FBI. A May 31, 1968 memorandum from the Phoenix FBI office to the Director of the FBI explained Starsky's involvement in various "New Left" organizations and concluded that the "most logical targets for potential counterintelligence action locally are therefore pretty obvious." An October 1, 1968 memorandum from the Phoenix FBI office to the Director stated that Starsky "has continued to spotlight himself as a target for counterintelligence action." The memorandum stated that a proposal for a specific counterintelligence action would be sent in a separate memorandum. No such memorandum was found during the discovery in this case.

On January 31, 1970 the Board of Regents of ASU directed the president to institute proceedings to determine whether Starsky should be terminated, or whether any other disciplinary action should be taken against him. This action by the Regents was prompted by Starsky's cancellation of one of his classes so that he could attend a rally on campus. Starsky had been involved in a number of other controversial incidents before this.

Pursuant to the direction of the Regents, the ASU president appointed an *ad hoc* faculty committee to consider whether formal charges should be filed against Starsky. The committee recommended that formal charges *not* be filed. The president accepted this recommendation and transmitted it to the Regents.

Nevertheless, the Regents insisted that formal charges be filed against Starsky and that a hearing be held. Starsky was generally charged with acting irresponsibly as a member of the teaching profession and violating various university regulations and policies. This general charge was premised on numerous specific allegations of wrongdoing. A hearing was commenced on March 29, 1970 before the Committee on Academic Freedom and Tenure. Over the course of 13 sessions the committee heard testimony from 21 witnesses and examined numerous documents. The hearing was concluded on April 29, 1970.

On April 7, 1970 the Phoenix FBI office proposed to the Director of the FBI that an anonymous letter be sent to the members of the committee referred to above accusing Starsky of "invading" the home of another campus activist at 2:00 a.m. and of threatening to beat the activist up if he didn't relinquish some socialist literature. The proposed letter commented that "this type of activity is something that Himmler or Beria could accept with pride." The incident described in this letter was loosely based on real-life events. Approval to send this letter was granted on April 24, 1970 and the letter was sent out on May 6, 1970. This activity was carried on as part of the COINTELPRO–New Left.

The university committee recommended that Starsky not be dismissed. The president of ASU accepted this decision and passed it on to the Regents. However, the Regents dismissed Starsky on June 10, 1970. It should be noted that Starsky's eventual termination as a result of these proceedings was later held to violate his first amendment and due process rights. *Starsky v. Williams*, 353 F.Supp. 900 (D.Ariz.1972), *aff'd in part, rev'd in part*, 512 F.2d 109 (9th Cir.1975). Starsky was afforded no relief, however, because the district court concluded on remand that Starsky's acceptance of a sabbatical for the 1970–1971 academic year operated as an accord and satisfaction.

The evidence at trial failed to establish Starsky's claim that he was terminated as a result of the anonymous FBI letter. Most pertinent is the fact that the committee members to whom the letter was addressed recommended *against* dismissal. No evidence was introduced to suggest that the letter was later seen by members of the Board of Regents.

Starsky seeks recovery on the basis of intentional infliction of emotional distress and invasion of privacy. However, according to Starsky's own testimony, all of his claimed damages resulted from his loss of employment. Starsky has failed to prove

that FBI activities caused this loss of employment. The claim is dismissed.

# VII

## Claims for Declaratory and Injunctive Relief

### VII.A. Basic Legal Rules

■■■■ An injunction can be issued only to prevent existing or presently threatened injuries. *Connecticut v. Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931). Past injury may have a bearing upon whether an injunction should be granted, but only as to the likelihood that the past misconduct will be repeated. To obtain injunctive relief based on past injury the plaintiff must show a real and immediate threat that the injury will be continued or repeated. *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 78 L.Ed.2d 674 (1974). Judicial intervention to prevent injury from misconduct is not justified when such misconduct is merely hypothetical. *Halkin v. Helms,* 690 F.2d 977, 1005 (D.C.Cir.1982).

■■■■ Declaratory relief has certain obvious differences from injunctive relief. However, there can be no declaratory relief against governmental policy or action unless the policy is fixed and definite or unless the action is taking place or is imminent. Where the policy or action rests on distant contingencies or upon an act of an official which may or may not occur, declaratory relief is inappropriate. *Halkin,* 690 F.2d at 1006.

### VII.B. Investigations

#### VII.B.1. FBI

■■■■ Plaintiffs seek a declaratory judgment to the effect that no investigation, disruption or surveillance of the SWP, the YSA, or their members or supporters, can be carried out "premised on the kind of advocacy or activities which the record of this case shows the plaintiffs to have engaged in for the last forty years." Plaintiffs ask the court to enjoin defendants from infiltrating the SWP or YSA with informants, or in any other manner investi-gating or monitoring the SWP, the YSA or their members or supporters based on the types of activities shown to have been engaged in by plaintiffs.

Plaintiffs seek these forms of relief against all the officials named as defendants. The issue as to the FBI will be discussed first.

As already described, the FBI investigation of the SWP and YSA was terminated in September 1976. The electronic surveillance ended in 1963, the surreptitious entries in 1966 and the Disruption/COINTELPRO operations no later than 1971.

There is no evidence that the FBI has resumed, or is about to resume, the electronic surveillance, the surreptitious entries, or the disruption tactics against the SWP or its members. There is no evidence that any investigation of plaintiffs is now taking place or is planned.

On March 12, 1984 plaintiffs' attorney sent a letter to the court contending that the March 1983 revised Attorney General's investigation guidelines portended a resumption of the FBI's misconduct. The court finds no merit to this contention. The guide-lines make it clear that an FBI investigation can occur only where there are "specific factors or circumstances indicating a current, or impending violation." *See* section V.J *supra.* It is true, as plaintiffs' attorney points out, that the guidelines provide (Part I) that statements advocating criminal activity or an apparent intent to engage in crime may be the basis of an investigation. However, it cannot be said that this provision, taken in the context of the guidelines as a whole, indicates any intention on the part of the Department of Justice or the FBI to engage in unconstitutional conduct. *See Alliance to End Repression v. City of Chicago,* 742 F.2d 1007 (7th Cir.1984).

#### VII.B.2. CIA

■■■■ At one time the CIA conducted what is known as Operation CHAOS, whose purpose was to determine whether aliens were involved in the anti-Vietnam

War movement. The SWP was one of the organizations the CIA spied upon. This operation commenced in 1967 and was terminated on March 5, 1974.

Another CIA operation was called Project 2. This involved training CIA agents for duty abroad by having them participate in an undercover manner in radical domestic groups. It was active between 1970 and 1974, although the evidence is not clear that it was ever terminated. However, certain executive orders have been promulgated since 1974 restricting the activities of the CIA within the United States. These orders place strict limitations on the type of operations involved in Project 2. E.O. 11905 (1976); E.O. 12036 (1978); E.O. 12333 (1981). In any event, there is no evidence that a CIA agent ever became involved in the SWP or the YSA in connection with Project 2 or any similar operation, except for a brief connection by one agent prior to 1975 that was not at the CIA's direction.

HTLINGUAL was carried out by the CIA from 1952 until February 1973, and involved opening of mail to and from the Soviet Union. *See Birnbaum v. United States,* 588 F.2d 319 (2d Cir.1978). Five intercepted letters and a postcard to or from SWP members (not plaintiffs here) were produced by the CIA in this action.

In addition to these three programs the CIA had nine informants who furnished some information about the SWP and YSA. Two were members of the YSA for brief periods in 1971 and 1972. The other seven attended meetings and collected handouts. There is no indication that the CIA is currently using any informants regarding the SWP or YSA.

Also, prior to the termination of Operation CHAOS on March 5, 1974, the CIA made certain surreptitious entries overseas and obtained some documents pertaining to plaintiffs.

Plaintiffs have no damage claims regarding any of these activities. However, they request declaratory and injunctive relief against investigation by the CIA. This request must be denied because the CIA ac-

tions affecting plaintiffs have been terminated, and there is no evidence that further actions are contemplated.

### VII.B.3. *Military Services*

The Army, Navy and Air Force conducted certain sporadic investigations of the SWP and YSA between the 1940's and 1971. The details need not be described. The events are entirely in the past and afford no basis for declaratory or injunctive relief. It should be noted that allegations of Army disruption activities were disproved by the defense evidence.

### VII.B.4. *Postal Service*

 From 1948 to 1957 the Post Office carried out a mail cover (a recording of information on envelopes) involving the SWP and its members.

From January 23, 1973 to May 18, 1973, the Postal Service placed a mail cover on the SWP headquarters in New York at the request of the FBI.

As a result of this mail cover the FBI briefly investigated a high-school girl who addressed a letter to the SWP inadvertently. She brought suit seeking various forms of relief. The case was eventually settled. However, prior to the settlement there were four opinions. *Paton v. La Prade,* 382 F.Supp. 1118 (D.N.J.1974); 524 F.2d 862 (3d Cir.1975); 469 F.Supp. 773 (D.N.J.1978); 471 F.Supp. 166 (D.N.J.1979). In the third of these the judge held that the postal regulation allowing mail covers to protect the national security was unconstitutionally vague and overbroad. The regulation was amended to provide that a mail cover for national security purposes is permitted only where there is an actual or potential threat to United States security from a foreign power or its agents, *e.g.,* sabotage or terrorism. The current citation is 39 C.F.R. § 233.3 (1985). In an unpublished ruling, the judge in the *Paton* case declined to enjoin the new regulation.

Plaintiffs in the present case are not entitled to declaratory or injunctive relief against the Postal Service. There has been

no mail cover against the SWP or its members since 1973. Since then the regulation has been amended in the course of the *Paton* litigation.

### VII.B.5. *Internal Revenue Service*

From 1969 to 1973 the IRS, working in cooperation with the FBI and the Department of Justice, had a program for performing special tax investigations of "dissidents." In 1972 one SWP leader was investigated and paid $3.11 in back taxes. The program is a thing of the past and does not justify prospective relief.

### VII.B.6. *Secret Service*

■ This agency collects information about public activities of various groups, including the SWP and YSA, for the purpose of determining if these activities pose a risk to persons the Secret Service protects. Such public activities include parades, demonstrations and picketing, which could require special precautions for the safety of the protected officials.

For its information the Secret Service relies mainly on other law enforcement agencies and public sources. The evidence shows only one exception to this. A secret service agent recorded speeches and photographed the speakers at the 1971 YSA National Convention in Houston. *See* section VI.B.6 *supra.*

This incident does not justify injunctive relief. The same must be said about the general program of the Secret Service regarding the gathering of information needed to perform its legal duties.

### VII.C. *Federal Employment*

Plaintiffs request a declaratory judgment to the effect that membership in or support for the SWP cannot be treated as relevant under the criteria of Executive Order 10450 in determining suitability for federal employment. This order applies to civilian employees of the Government. Although it is not perfectly clear, plaintiffs apparently also seek declaratory relief as to personnel matters in the military service and security clearances both for Government employees and for employees of Government contractors.

■ As to federal civilian employment and the application of E.O. 10450, the findings in section V.I *supra* show that there is no occasion for declaratory relief. Commencing with the decision in *Gordon v. Blount,* 336 F.Supp. 1271 (D.D.C.1971), certain events occurred which removed any arguably unconstitutional disabilities of SWP and YSA members with respect to federal civilian employment. The Attorney General's list was terminated in 1974. The FBI's investigation of the SWP ended in 1976. According to the evidence at trial, the Office of Personnel Management no longer regards SWP or YSA membership as raising a loyalty issue under E.O. 10450.

As far as federal civilian employment is concerned, the above circumstances leave no justiciable issue which could be the subject of declaratory relief.

With regard to the military services, plaintiffs presented evidence at the trial about the problem of an Army draftee, Steven Wattenmaker, a member of the YSA who announced prior to his induction into the service that he would not defend the capitalistic system and would urge his fellow soldiers to struggle against the Vietnam War. Not surprisingly, he was denied a security clearance and failed to receive certain promotions. However, despite these and other problems, he served on active duty from 1971 to 1973 and in the reserve until 1977.

At the trial plaintiffs also presented evidence of an isolated instance where the commanding officer of a Navy vessel objected to certain employees of a Government contractor who were members of the SWP. They were then transferred to another ship. Also, on March 12, 1984 plaintiffs' attorney sent the court a letter containing documents indicating that two SWP supporters were being questioned to determine if their security clearances would be revoked.

However, there is no occasion for the entry of declaratory relief with respect to

personnel actions in the military services or security clearances of Government employees or employees of Government contractors. On these matters, the record before the court indicates that each case turns on its own individual facts, involving the attitude and conduct of the person, the nature of the service to be performed for the Government, the sensitivity of the information which the person will handle, and other factors. Obviously, on the present record, the court can enter no declaratory judgment determining rights and responsibilities in such potential cases.

The March 1984 submission by plaintiffs' attorney, noted above, merits further comment. This came, of course, after the conclusion of the trial, and there was no reopening of the record to formally receive the submission or other relevant materials into evidence. Thus there can be no ruling, by way of declaratory judgment or otherwise, with respect to the security clearance issues referred to. In any event, no further complaint has been received in the succeeding two years.

However, the court is prompted to make certain affirmations of well-established legal principles which obviously must be applied in dealing with loyalty-security problems in the context of the issues in this case. *First*, any inquiry about SWP or YSA membership or connection must be germane to the security clearance or other issue being dealt with. It must be the least intrusive inquiry that can be made to accomplish its legitimate purpose, and cannot be designed to harass or intimidate the individual concerned. *See Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C.Cir.1984). *Second*, where information about the SWP or the YSA is considered relevant, there must be a rigorous regard for the facts about these organizations. Any indication that the SWP or YSA has a current program of carrying out violent revolution or acts of violence or terrorism would not reflect the presently known facts. This does not, of course, prevent legitimate inquiry about the actions and attitudes of an

individual to the extent that they bear on relevant questions of loyalty and security.

## VII.D. *Immigration Matters*

■ This discussion must begin with certain relevant statutes. 8 U.S.C. § 1251(a)(6)(D) mandates deportation, upon the order of the Attorney General, of aliens who "advocate ... world communism or the establishment ... of a totalitarian dictatorship," or who are members of "any organization that advocates" these ideas. Also to be deported are aliens who "advocate or teach or who are members of ... any organization that advocates or teaches ... the overthrow by force, violence, or other unconstitutional means of the Government of the United States." § 1251(a)(6)(F). Essentially the same provisions are contained in the statute defining those aliens who are to be denied naturalization, 8 U.S.C. § 1424(a)(3) and (4), and those who are to be denied visas for entry into the United States. 8 U.S.C. § 1182(a)(28)(D) and (F).

In order to be naturalized, a person must be found to be "attached to the principles of the Constitution ... and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a).

In 1956 the Immigration and Naturalization Service placed the SWP on a list of organizations deemed to be proscribed under the statutes. The INS found that the SWP advocated world communism and the overthrow of the Government by force or violence.

In 1961 the INS ordered the deportation of George Scythes. The INS found that Scythes was a member of an organization, the SWP, which advocated the violent overthrow of the Government. The Court of Appeals for the Seventh Circuit reversed the order. *Scythes v. Webb*, 307 F.2d 905 (7th Cir.1962). The court stated that the standard to be applied was that which the Supreme Court held applicable to Smith Act prosecutions in *Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), and *Noto v. United*

*States,* 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). Obviously both these decisions came long after the *Dunne* case involving the SWP. The Court in *Noto* stated that mere abstract teaching of communist theory, including the teaching of the moral necessity of violence, is not the same as preparing a group for violence. In order for membership in an organization to violate the Smith Act there must be evidence of an actual call to violence which could be imputed to the organization as a whole. *Noto,* 367 U.S. at 297, 81 S.Ct. at 1520.

In the *Scythes* case, the court held that there was no substantial evidence on the record that the SWP advocates or teaches the violent or forceful overthrow of the Government under the test of *Scales* and *Noto. Scythes,* 307 F.2d at 909.

In 1966 the INS removed the SWP from its list of proscribed organizations. The INS made a finding that evidence was not available to establish that the SWP advocates the overthrow of the Government by force or violence. Thereafter, the SWP was included in the so-called category III contained in the INS regulations, which means that it

> ... is an organization which has been held, or which appears, on the basis of all available information, NOT to be within the proscription of the Immigration and Nationality Act.

However, the INS regulations stated that SWP membership is relevant to naturalization decisions, specifically to the question of whether the applicant is attached to the principles of the Constitution and is well disposed to the good order and happiness of the United States. *See* 8 U.S.C. § 1427(a). The INS takes the position that, in connection with applications for naturalization, it has the right to know about membership in the SWP and to question any such member about whether he complies with § 1427(a).

The State Department, which has the primary responsibility for issuing visas permitting foreigners to enter the United States, has an unwritten policy, according to testimony at the trial, that SWP membership could be a basis for denial of a visa under 8 U.S.C. § 1182(a)(28)(D), because the SWP advocates world communism. However, visa decisions are made on a case by case basis, and the testimony is that SWP membership would not automatically preclude the granting of a visa.

During the trial of the present action the INS announced that it was considering whether to reinstate the SWP's proscribed status. The specific issue was whether the SWP advocates world communism. However, the court is advised that to the present date no change has been made in the SWP's non-proscribed status, and that the matter is no longer being considered.

The SWP seeks declaratory and injunctive relief against the INS and the State Department, as follows:

> 1) A declaration that it is unconstitutional and not in compliance with the relevant statutes for the INS to proscribe the SWP.
>
> 2) In the alternative, a declaration that the SWP is entitled to notice and a hearing before there can be any proscription.
>
> 3) A declaration that SWP membership cannot be considered as relevant in any way in applying the immigration laws.
>
> 4) An injunction against the INS and the State Department prohibiting any adverse action under the immigration and visa laws on the basis of SWP membership.

In connection with these requests certain salient facts should be noted. The record shows only one instance of an adverse action by the INS based on SWP membership, and that was the Scythes deportation order 25 years ago. The matter was resolved by the Seventh Circuit in Scythes' favor in 1962. There is no indication of any present or contemplated adverse action by the INS against any SWP member.

As to the SWP proscription, it was removed by the INS in 1966, seven years before the commencement of this lawsuit. For some reason, the INS decided during

**1430**

the time the trial was taking place to engage in a reconsideration of the matter. However, no action has been taken, and the SWP has not been restored to the list of proscribed organizations. The court has no reason to believe that the INS is furtively waiting for the decision in this case before announcing a restoration of the SWP's proscription.

Under these circumstances, there is no basis for granting declaratory relief against the INS with regard to the subject of proscription, and no basis for enjoining the INS from taking adverse action against SWP members under the immigration laws.

On the question of considering SWP membership relevant to immigration decisions, it would be inappropriate on the present record to make the declaration requested by the SWP—*i.e.*, that SWP membership can never be relevant. In the 20 years since the proscription has been removed, during which time SWP membership has been considered relevant for certain purposes, there has never been a case of adverse action by the INS on the basis of SWP membership. There is no case now pending. No justiciable issue on this point has been presented to the court.

As to the State Department's view that SWP membership could be the basis for denial of a visa to a foreigner, this must be viewed in the context that there is no evidence before the court of the issue *ever* coming up in an actual case. The SWP is mainly an organization for United States residents. The problem of foreign members of the SWP seeking visas to enter the United States would rarely, if ever, arise. There is no controversy of a concrete sort justifying declaratory or injunctive relief against the State Department.

There was reference in the evidence to something called a "lookout list." However, plaintiffs made no effort to develop any case for relief based on this list.

VII.E. *Statutes*

■ Plaintiffs seek a declaratory judgment that their political activities may not be held to violate certain federal criminal statutes. These statutes are primarily from a chapter of the United States Code entitled "Treason, Sedition, and Subversive Activities." 18 U.S.C. §§ 2381–2391. They include the Smith Act, 18 U.S.C. §§ 2385, 2387, which makes it a crime to advocate the violent overthrow of the Government or to urge insubordination in the military, and statutes prohibiting misprision of treason, 18 U.S.C. § 2382, rebellion or insurrection, 18 U.S.C. § 2383, and seditious conspiracy, 18 U.S.C. § 2384. Plaintiffs seek declarations that they may not be held in violation of the Foreign Agents Registration Act, 22 U.S.C. §§ 611 *et seq.*, or be held to be a subversive organization subject to the provisions of the Internal Security Act of 1950, 50 U.S.C. §§ 781 *et seq.* Plaintiffs also seek a declaration that the registration requirements of the Voorhis Act, 18 U.S.C. § 2386 (*see* section IV.B *supra*), are unconstitutional, and that in any event plaintiffs cannot be prosecuted under that statute.

Of these laws, only the Smith Act was ever the basis for prosecution of SWP members, and that occurred in the *Dunne* case in 1941. *See* section V.B *supra*. The Foreign Agents Registration Act was once relied on by the FBI as a basis for investigating the SWP, *see* section V.C *supra*, but no action was ever commenced under it. As to Title II of the Internal Security Act, the Emergency Detention Act, see section V.H. *supra*. Title II was repealed in 1971.

The present case presents no justiciable controversy under any of these statutes. None of the specific factual claims in the case presents any issue remotely indicating the need for a declaratory judgment as to any of these laws. Obviously neither this case nor any other can be the occasion for wholesale declarations about statutes which present some theoretical grievance to a plaintiff.

VII.F. *Files*

Plaintiffs seek a declaratory judgment that no political files may legally be maintained on the SWP or YSA based on the activities of these organizations described

in the record of this case. Plaintiffs also seek injunctive relief. With respect to the existing files on the SWP, YSA and their members in the possession of almost all defendants, plaintiffs seek an injunction requiring that these files be segregated from all others, and that their contents not be disseminated except in response to legal process or Freedom of Information Act requests. Plaintiffs also seek an injunction against the future accumulation or dissemination of information regarding their political activities.

 Plaintiffs argue that they are entitled to the declaratory and injunctive relief under the Privacy Act, 5 U.S.C. § 552a, and under the general equitable power of the court.

The Privacy Act became effective September 27, 1975. Basically it gives rights to "individuals" to obtain corrections of inaccurate Government records pertaining to them, and to obtain production of such records under certain circumstances. The Act also contains a provision that an agency shall

> Maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity....

5 U.S.C. § 552a(e)(7). The Act provides for a damage remedy for (e)(7) violations and certain other violations. § 552a(g)(4). It also provides for injunctive relief in certain circumstances, but an (e)(7) violation alone is not one of these. *Clarkson v. Internal Revenue Service,* 678 F.2d 1368, 1375 n. 11 (11th Cir.1982).

Only an individual, not an organization, has standing to obtain a remedy under the Act. 5 U.S.C. § 552a(g)(1). "Individual" is defined as a citizen of the United States or a permanent resident alien. § 552a(a)(2). *See Parks v. Internal Revenue Service,* 618 F.2d 677, 684 (10th Cir.1980).

The Act does not apply retrospectively. *Doe v. Civil Service Commission,* 483 F.Supp. 539, 564 (S.D.N.Y.1980).

In the present case the only arguable violation of the Act relates to subsection (e)(7). However, the SWP and YSA have no standing to sue under the Act. The individual plaintiffs have standing, but any claim by them runs into the problem of retrospective application. The vast bulk of the documents accumulated by the agencies in the present case were in the Government's hands before the effective date of the statute. The gathering of these pre-statute documents did not, of course, violate the Act. Moreover, it was clearly not a violation of the statute to retain the documents after the statute's 1975 effective date. There is no indication that the law was intended to compel the mass destruction of pre–1975 documents. In any event, destruction of the documents could not have been carried out in view of the pendency of the present lawsuit.

There is no provision in the Act for injunctive relief for an (e)(7) violation. While such a violation may be highly relevant to a suit for an injunction under other provisions of the Act, *see Clarkson,* 678 F.2d at 1375–77, these provisions require the exhaustion of administrative remedies, which plaintiffs have not done. *See* 5 U.S.C. § 522a(g)(1)(A).

For these various reasons, plaintiffs are entitled to no relief under the Privacy Act, and the claim under that Act must be dismissed.

It should be noted that plaintiffs have attempted to assert a damage claim under subsection (e)(7) of the Privacy Act in their post-trial briefs. However, no such claim had been pleaded. This belated claim should not be allowed. In any event it has no merit, for the reasons indicated above.

 Turning to the claim under the court's general equity power, certain injunctive relief is appropriate. The court has general power to grant an injunction with respect to documents that the Government obtained through clearly illegal activi-

ties, and the maintenance of which serves no legitimate purpose for the agency which possesses them. *Paton v. LaPrade,* 524 F.2d 862, 868–69 (3d Cir.1975); *Chastain v. Kelley,* 510 F.2d 1232, 1236 (D.C.Cir.1975). These cases hold that an aggrieved party may obtain expungement of Government documents illegally obtained or maintained. Plaintiffs in the present case seek a far less drastic remedy—the segregation of the documents and a provision that they cannot be disseminated except in response to legal process or Freedom of Information Act requests.

In the court's judgment plaintiffs are entitled to this relief. The exact scope of the relief must be determined. But in principle it should cover records obtained illegally or developed from illegally obtained information. A further proceeding will be necessary to identify precisely what documents and records fall into this category.

With respect to plaintiffs' request for an injunction against the future accumulation of records of the political activities of the SWP, the record shows no circumstances that would warrant such relief.

## VIII

### Conclusion

The SWP (including its youth arm the YSA) is entitled to judgment against the United States under the Federal Tort Claims Act in the amount of $42,500 for disruption activities by the FBI, $96,500 for surreptitious entries by the FBI, and $125,-000 for the FBI's use of informants, or a total of $264,000.

The SWP's claim for damages against the United States for electronic surveillance by the FBI is dismissed for failure to comply with the procedural requirements of the FTCA.

The claims of plaintiffs Sell, Jenness and Pulley for damages against the United States are dismissed for failure to comply with the procedural requirements of the FTCA.

The claims of plaintiffs Sell, Jenness and Pulley for damages against the United States are dismissed for failure to comply with the procedural requirements of the FTCA. The damage claim of plaintiff Starsky against the United States is dismissed on the merits.

All claims for declaratory and injunctive relief are dismissed, except that the court will enter an appropriate injunction directing the segregation of illegally obtained documents and documents developed from illegally obtained information, and also directing that the contents of such documents not be disseminated except in response to legal process or Freedom of Information Act requests. The exact scope of this injunction will be determined in a further proceeding.

The claims under the Privacy Act are dismissed.

The parties will settle an appropriate judgment after the further proceeding regarding the scope of the document injunction.

So ordered.